UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA (REDDING)

UNITED STATES OF AMERICA,    .  Case No. 3:24-po-00147-DMC
                      .
           Plaintiff,   .
                      .
    v.                .
                      .
MIA F. ROBICHAUD,      .  2989 Bechelli Lane
                      .  Redding, CA 96002
          Defendant.   .
                      .  Friday, August 8, 2025
. . . . . . . . . . . . . . . .  11:27 a.m.

TRANSCRIPT OF BENCH TRIAL RE CVB CITATION
BEFORE THE HONORABLE DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:      DOJ-USAO
                      By:  CHARLES CAMPBELL, ESQ.
                      510 I Street
                      Sacramento, CA 95814
                      (916) 554-2917

For the Defendant:      Federal Defender's Office
                      By:  MEGAN HOPKINS, ESQ.
                           AISLIN MURPHY
                           ELLIOT KEVANE
                      801 I Street
                      Third Floor
                      Sacramento, CA 95814
                      (916) 498-5700

APPEARANCES CONTINUED.

Audio Operator:         Courtroom ECRO Personnel

Transcription Company:  Access Transcripts, LLC
                      10110 Youngwood Lane
                      Fishers, IN 46048
                      (855) 873-2223
                      www.accesstranscripts.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

I N D E X
8/8/25

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE PLAINTIFF: | | | | |
| Ethan Caudle | 12 | 38 | 59 | -- |
| FOR THE DEFENDANT: | | | | |
| Val DeMars | 74 | 100 | -- | -- |
| Joe Egan | 105 | 124 | -- | -- |
| Juan Doig | 128 | 158 | 162 | -- |
| Christopher Carlton | 164 | 203 | 206 | -- |
| Paul Kingston | 209 | 216 | 218 | -- |
| Mia Robichaud | 220 | 234 | 239 | -- |

| EXHIBITS | ADMITTED |
|---|---|
| Plaintiff's Exhibit 3 | 22 |
| Plaintiff's Exhibit 1 | 25 |
| Plaintiff's Exhibit 2 | 36 |
| Defendant's Exhibit G-2 | 83 |
| Defendant's Exhibit J-Redacted | 111 |
| Defendant's Exhibits C and E | 143 |
| Defendant's Exhibit A | 173 |

(Proceedings commence at 11:27 a.m.)

THE CLERK:  All rise.  The United States District Court for the Eastern District of California is now in session. The Honorable Dennis M. Cota is presiding.

THE COURT:  Good morning.  You may be seated.

Madam Clerk.

THE CLERK:  Calling case number 3:24-po-00147-DMC USA v. Mia Robichaud.  This is on calendar for a bench trial, Your Honor.

THE COURT:  Very good.  If I could get appearances for the record, please, starting with the Government.

MR. CAMPBELL:  Good morning, Your Honor.  Charles Campbell on behalf of the United States.

THE COURT:  Mr. Campbell, welcome.  And who's with you?

MR. CAMPBELL:  I am accompanied by Officer Ethan Caudle, law enforcement officer with the U.S. Forest Service.

THE COURT:  All right.  Welcome. And for the defense.

MS. MURPHY:  Good morning, Your Honor.  Aislin Murphy for the Federal Defender's, along with Elliot Kevane.  And for the Federal Defender's, representing Mia Robichaud, who is here out of custody.

THE COURT:  Very good.  Welcome, Ms. Robichaud. Thank you for being here.

And, Counsel, thank you.

A few housekeeping matters before we begin our trial today. We are going to proceed today without a court reporter. This is being recorded electronically, so it is important that you use the microphones and not speak over each other, please. I'm going to ask you to stand when addressing the Court and to conduct your presentations from the podium. While we have several folks seated in the jury box, there is no jury today to wow with your various presentations. Everything can be directed here, so please speak into the microphone.

With regard to presentation of evidence, I expect you to share anything that you intend to present to a witness with your opposing party first. Then, if it is your own witness, you may approach and hand the proposed exhibit to the witness and conduct your inquiry thereafter. If there is an opposing witness on the stand that you wish to present with an exhibit, ask to approach, or this all may be moot by virtue of exhibit binders. Do we have exhibit binders at the witness stand?

MR. CAMPBELL: Yes, Your Honor.

THE COURT: All right, good. Then simply refer to the appropriate exhibit numbers. But if a need arises to approach, please follow those procedures.

All right. With regard to pretrial motions, I believe that all of that was covered at the pretrial conference. Is there anything else that needs to be addressed

before we begin with opening statements?

MR. CAMPBELL:  Your Honor, from the Government, I believe there was a pretrial motion filed by the defense to nominate party representatives and otherwise exclude witnesses. To that end, the Government would nominate Officer Caudle as its case agent and party representative for this case.  If defense --

THE COURT:  So noted.  Any objections, Counsel?

MR. KEVANE:  No objections.  No objections.

THE COURT:  All right.  Your appearance, Counsel. Welcome.

MR. KEVANE:  Thank you.  Elliot Kevane for the Federal Defender's Office on behalf of Mia Robichaud, who is present and out of custody.

THE COURT:  Mr. Kevane, welcome.  Good to have you here.  And in the absence of objections, the Government's designee will be so noted and remain in the courtroom.

MR. KEVANE:  May we designate our investigator, Juan Doig, to remain in the courtroom?

THE COURT:  And that's fine.

Any objections from the Government?

MR. CAMPBELL:  No objections, Your Honor.

THE COURT:  All right.  Leaving us with who by way of witnesses, and are they appropriately sequestered at this point?

Go ahead from the Government, Mr. Campbell.

MR. CAMPBELL:  Your Honor, the Government only intends to call one witness.  But my understanding is that the -- at least some of the individuals in the pews are witnesses who will need to be sequestered.

THE COURT:  All right.  I'll hear from defense on that.  Do we have witnesses in the courtroom?

MS. MURPHY:  Yes, Your Honor, we do.  And we would ask that they be excluded properly.

THE COURT:  All right.  We'll go ahead and invite them to follow the court security officer into our soundproof booth.  That would be our library today, where you can await comfortably until called.

All right.  Any other witnesses still in the courtroom?  Nope.

MR. KEVANE:  Your Honor, one brief housekeeping matter.

THE COURT:  Certainly.

MR. KEVANE:  Given that subpoenaed witness Jason Ingram is not present, the defense first requests an order to show cause as to why that witness is not present.  Second, we propose to have our investigator testify regarding the exhibits, or in the alternative, permit counsel to read them into the record.

THE COURT:  All right.  I need a proffer on this

witness.  What was his anticipated participation?

MR. KEVANE:  Yes, Your Honor.  His anticipated testimony will show that he made numerous Facebook posts specifically calling out Chris Carlton and U.S. Forest Service, sharing their number, and telling his constituents to pressure Chris Carlton into doing something about the Rainbow Gathering.

THE COURT:  And he was the subject of a subpoena for trial appearance?

MR. KEVANE:  Yes, Your Honor.

THE COURT:  All right.  Then an order to show cause will issue as to why sanctions should not be imposed for his failure to appear.  We'll address that separately, and Madam Clerk will set a hearing date for that issue.

But with regard to trial today, what is the defense proposed workaround?

MR. KEVANE:  Your Honor, we can have our investigator, who's the case agent here, testify as to his investigations into the Facebook posts.  Or we could, if you would permit counsel to read those posts into the record.

THE COURT:  Well, let's have some foundation for that.  So I'll let you take it up with your witness, recognizing again that this is a bench trial, and I am well able to sort through the relevant versus the irrelevant or admissible versus inadmissible.  Then I'll hear objections as appropriate, but let's start out with bringing that in through

your available witness.

And to the extent that during a break the parties wish to meet and confer and perhaps reach a stipulation on that, I'm fine with taking up a stipulation and reading them in if that's without objection to you, Mr. Campbell. But why don't we see where foundation takes us first?

MR. KEVANE: Thank you, Your Honor.

THE COURT: All right. Anything else?

MR. CAMPBELL: Yes, Your Honor. At this time, the Government would move for discovery under Rule 26.2, Jencks Act materials as to witnesses that the defense intends to call. I don't know if there are any Jencks Act materials that have not yet been turned over. But in order to avoid delays during trial, the Government would ask that such statements be turned over now.

THE COURT: All right.

MS. MURPHY: One moment, Your Honor.

THE COURT: Certainly.

(Counsel confer)

THE COURT: Thank you, Mr. Campbell. I trust that was a time-saving effort.

MR. CAMPBELL: I do believe so, Your Honor. Just for the record, defense counsel has turned over what I'm going to roughly estimate to be 15 to 20 pages of documents. It looks like they're mostly text documents. So for the sake of time,

I'd ask that we take a brief recess between the Government's case-in-chief and the defense's case so that I have time to review these.

THE COURT:  Certainly.  My understanding was that all of this was addressed at our pretrial conference.  The fact that there's documents surfacing now is a little bit of a concern.  Was there a reason that you're just now getting these?

MS. HOPKINS:  Your Honor, we believed we had produced these in the latest batch of discovery, but it's not clear that this was included.

THE COURT:  So this is the --

MS. HOPKINS:  This is just the investigator's reports of most recent interviews with each witness that will be testifying.

THE COURT:  All right.  So this is in the abundance of caution?

MS. HOPKINS:  Yes.  To ensure that all statements have been turned over.

THE COURT:  All right.  So noted.  And I will certainly give you time in between the Government resting and commencement of their witnesses for you to review those.

MR. CAMPBELL:  Thank you, Your Honor.

THE COURT:  All right.

MR. KEVANE:  Your Honor, we make the same motion as

to the Government's witness.

THE COURT:  All right.

MR. CAMPBELL:  The Government has already disclosed all testimony under the Jencks Act.

THE COURT:  As it should be.  All right.  Very good.  With that, any other housekeeping matters?

MR. CAMPBELL:  Not from the Government, Your Honor.  Thank you.

THE COURT:  All right.

MS. MURPHY:  None from the defense, Your Honor.

THE COURT:  All right.  With that then, let us proceed.  Defendant is here today on a charged violation of 36 Code of Federal Regulation 261.3, Subpart (a), interference with United States Forest Service Officer in performing their official duty.  The burden is on the Government.

And again, in the absence of a jury, I am not going to require, but merely invite, the parties to offer opening statements.  I am familiar with the issues of this case and have received the briefs from the parties.  But certainly, I will not turn you away if you wish to offer an opening statement at this time.

Thereafter, the Government will proceed with calling their first witness.

But, Mr. Campbell, opening statement today?

MR. CAMPBELL:  No opening statement from the

Government, Your Honor.  Thank you.

THE COURT:  All right.  And the defense has the option to offer an opening statement now or defer an opening statement until after the Government's case-in-chief, or to pass on an opening statement altogether.  What is your preference, Counsel?

MS. MURPHY:  Your Honor, we'll defer for after the Government's case-in-chief.

THE COURT:  All right.  That's fine.  And if after the Government's case-in-chief you decide that it's not necessary, advise the Court.  But we'll proceed then with the Government's first witness.

Mr. Campbell, call your witness.

MR. CAMPBELL:  Thank you, Your Honor.  The Government calls Officer Ethan Caudle to the stand.

THE COURT:  Officer, if you would come forward, and my courtroom deputy will swear you in.

ETHAN CAUDLE, PLAINTIFF'S WITNESS, SWORN

THE COURTROOM DEPUTY:  Please state your full name and spell your last name for the record.

THE WITNESS:  Ethan Thomas Caudle, C-A-U-D-L-E.

THE COURTROOM DEPUTY:  Have a seat.

THE COURT:  Officer Caudle, if you would have a seat, please.  Speak into the microphone.  Please try not to talk over Counsel.

Begin your direct exam at your leisure.

MR. CAMPBELL:  Thank you, Your Honor.  One thing I will note for the record is that the Government intends to introduce a video exhibit, Officer Caudle's body camera.  And just for the sake of the practicalities, I'm going to be using that HDMI cord.  And so given the space in the courtroom, I'd like to be able to place my computer on the bench and interact with it there, so that way it can display the video.

THE COURT:  That's fine.  I don't think my staff will be intimidated by you approaching, so we should be fine there.

Ms. Palmer, are we appropriately coordinated for that so that defense can see this video as it's playing, or do we need to get the big screen?

THE COURTROOM DEPUTY:  No, it will play on each of our desks.

THE COURT:  Excellent.  All right.

THE COURTROOM DEPUTY:  Yeah.  And they've tested it, so it'll be okay right here.

THE COURT:  All right.  If there's any issues with being able to see that, don't suffer in silence.  All right.

MR. CAMPBELL:  All right.  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. CAMPBELL:

Q    Good morning, Officer Caudle.

A    Good morning.

Q    What do you do for work?

A    I'm a law enforcement officer with the U.S. Forest Service.

Q    Did you -- how long have you had that position?

A    I've been commissioned about three and a half years.  I've been hired about four.

Q    How long have you -- apologies.  I asked that question. It's always a little bit of jitters at the beginning.

Where have you been stationed in your time with the Forest Service?

A    I'm in Central Oregon at the Bend-Fort Rock Ranger District.

Q    And in June and July of last year, did you respond to the Rainbow Gathering that was occurring in California?

A    Yes.

Q    Okay.  Let's talk about the training you received to become a forest officer.  What training did you receive?

A    Before I even joined or was hired by the Forest Service, I received a bachelor's degree of science from Oregon State University.  After that, I went to the Federal Academy in Georgia for the Land Management Police Academy.  And then after the Land -- that academy, I did three months of field training.

Q    Okay.  And is that the standard training that law enforcement officers with the Forest Service receive?

A    Yes.

Q    As part of that training, did you receive specific training on the issuance of citations to individuals?

A    Yes.

Q    Did you receive training on orders that manage use of the forest, including forest closure orders?

A    Yes.

Q    All right.  You talked about -- I asked earlier about you attending the -- or being part of the law enforcement response to the Rainbow Gathering.  Have you ever been a part of coordinated Forest Service law enforcement actions like that before?

A    I've never been to Rainbows, but I have done many fire closures before, yes.

Q    Okay.  So you're familiar with the -- how the Forest Service law enforcement organizes and responds to --

A    Yes.

Q    Thank you.  When you are at an operation like that, what sort of briefing will you as a law enforcement officer receive before you go out into the field?

A    Normally, you'll receive a briefing prior to your shift start.

Q    Would it be fair to say that normally that's in the morning?

A    It depends on when your shift starts.

Q    Okay.  Who usually issues the briefing?

A    It would be our command, so either captain, sergeant, or above.

Q    And what sort of information would normally be contained in one of these pre-shift briefings?

A    Safety and then what our day's mission is going to be.

Q    And so for example, in the case of a fire closure operation, what would the mission be?

A    First mission would be always safety, evac-ing people out. And then after that, it'd be keeping people that aren't helping with the fire safe and out of the closure.

Q    And when you receive these instructions, is it your understanding that your duty that day is to carry out those instructions?

A    Yes.

Q    In the Forest Service, do you know who usually issues forest closure orders?

A    It's usually the forest superintendent.

Q    And is the forest superintendent, is that a national position, or is there one for each state?  How does that work?

A    There's one for each national forest.

Q    Okay.  Do you, as a law enforcement officer, normally take part in the decision-making process as to when a forest closure order should be issued?

A    No.

Q    At briefings, the pre-shift briefings, would you normally

receive information as to why the forest superintendent had decided to issue a particular closure order at a particular time?

A    If they'd like to share that information.  But normally, no.

Q    And when you are enforcing a closure order, what information or documents are you usually given regarding the closure order itself?

A    I'm given the forest closure order.

Q    Okay.  So you've seen those closure orders before?

A    Yes.

Q    Okay.  And you're familiar with what the -- information they normally contain?

A    Yes.

Q    Okay. All right.  Let's talk now about issuing citations. Generally speaking, when do you, as a law enforcement officer, issue citations?

A    When I observe a crime being committed.

Q    Once you've determined that you are going to issue someone a citation, what's the procedure that you're trained to follow?

A    It's identify the person, what crime they violated, and then fill out the rest of the information on the citation, then they get a copy of that citation.

Q    Is there a standard citation form that you use?

A    Yes.

Q    Does that contain the -- does that form require you to fill out the name of the person you are issuing the citation to?

A    Yes.

Q    You also mentioned that identification is part of the process.  Can you issue someone a citation if you do not know their identity?

A    No.

Q    Why not?

A    I -- we have no way identifying or sending that citation to.  They wouldn't be able to show up to court.  The Court wouldn't know who to send that summons to.

Q    So in your training, if you have determined to issue a citation to someone and that person refuses to identify themselves, what's the procedure you're trained to follow in that circumstance?

A    We're trained to ask them for their identification.  If they don't give it, we'll explain ramifications, if time permits, of not identifying.  If the person proceeds not -- or continues not to identify, they will be detained, given a -- we'll ask them -- or tell them again the ramifications, give them another opportunity to identify themselves.  If they do not, then they will be taken to the nearest department that has Live Scan, and we'll be able to scan in their fingerprints and then find their identification.  Then from then, a summon -- or

a citation will be written.

Q    Have you followed -- have you issued citations before in your work as a law enforcement officer?

A    Yes.

Q    Have you encountered individuals who refused to identify themselves before?

A    They have at first, yes.

Q    When you've been in those scenarios, have you followed this procedure that you were trained on?

A    Yes.

Q    And in your experience, have the individuals you've encountered eventually identified themselves willingly?

A    Yes, until this case.

MR. KEVANE:  Objection.  Relevance.

THE COURT:  Counsel?

MR. CAMPBELL:  Your Honor, there is a standing question in this case about the presumption -- about the regularity of the procedure that was followed.  I'd like to establish that in this officer's experience, he has training to follow a certain procedure that he -- and that lays the foundation for showing that he followed it in this case, and that his actions were in accordance with Forest Service guidelines.

THE COURT:  Counsel?

MR. KEVANE:  Compliance here goes beyond what is

being proffered for evidence, which makes it irrelevant.

THE COURT:  Well, I'm going to receive it as foundational.  You can certainly follow up with it on cross-examination.  All right.

BY MR. CAMPBELL:

Q    Officer Caudle, on July 5th, 2024, were you working in the Plumas National Forest?

A    Yes.

Q    Is that in the state and Eastern District of California?

A    Yes.

Q    On that morning, was there a pre-shift meeting to discuss your operation that day?

A    Yes.

Q    Did you attend?

A    Yes.

Q    All right.  Do you know a U.S. -- or a United States Forest Service employee named Chris Carlton?

A    Yes.

Q    Do you know what his job is with the Forest Service?

A    I believe he is a forest sup or district sup.  I can't remember exactly.  He's a -- he's, you know, higher up in the Forest Service.  Yeah.

Q    It sounds like you're not terribly familiar with him.

A    I've only met him a handful of times, and it was when I came down here for Rainbows.

Q    Okay.  When did you come down here for the Rainbow Gathering?

A    I -- I came down late.  I didn't -- can't recall the exact date I came down.  I believe it was around the 25th or 26th.

Q    Okay.  And that would be of June, to be clear?

A    Yes.

Q    Okay.  At the July 5th pre-shift briefing, do you remember whether Mr. Carlton was present?

A    I can't remember off the top of my head, no.

Q    You mentioned that normally those briefings are given by some higher up officer.  Is that correct?

A    That is correct.

Q    Do you remember who gave the briefing that day?

A    I do not recall.

Q    Okay.  Do you know whether -- do you know who you -- your commanding officer was on the 5th?

A    Yes, it was -- let's see.  It would be Officer Smathers (phonetic).

Q    Officer Smathers.  Was -- to the best of your recollection, was Chris Carlton your commanding officer?

A    No.

Q    Do you recall receiving instructions from Mr. Carlton that day about what to do, where to do it, how to do it?

A    No.

Q    Do you recall any interactions with Mr. Carlton that day?

A    I don't believe I had any.  I can't recall that I did.

Q    Do you recall receiving instructions from Mr. Carlton in -- the day prior, the 4th?

A    No.

Q    Do you recall receiving instructions from Mr. Carlton the day before that?

A    No.

Q    Do you recall ever receiving direct instructions on how to perform your duties from Mr. Carlton?

A    No.

Q    Did you receive direct instructions from Mr. Smathers?

A    Yes.

Q    Okay.  All right.  At the briefing on the 5th of July, do you remember hearing that you would be enforcing a specific forest closure order?

A    Yes.

Q    Are you already familiar with that closure order?

A    Yes.

Q    Would you recognize a copy of it?

A    Yes.

Q    I will direct you to Exhibit 2 in the Government's exhibit binder.  It should be the white one.  And you'll see a document there that's in a sleeve.  You'll pull it out.  It has three pages.

A    Exhibit 2 is the citation.  Exhibit 3?

Q    Exhibit 3.  Apologies, Exhibit 3.  Thank you.

A    Yes.

Q    All right.  Exhibit 3, can you tell us what that is?

A    That is the closure order for the Indian Creek headwaters.

Q    Do you remember seeing that document in July when you were at the Rainbow Gathering?

A    Yes.

Q    Does the document that you have in front of you appear to be a fair and accurate copy of what the document looked like back in July, as you remember?

A    As I remember, yes.

         MR. CAMPBELL:  Then, Your Honor, at this time, the Government would move Exhibit 3 into evidence.

         THE COURT:  Any objections?

         MR. KEVANE:  No, Your Honor.

         THE COURT:  Thank you.  Exhibit 3 will be admitted and can be used for all purposes.

    (Plaintiff's Exhibit 3 admitted into evidence)

         MR. CAMPBELL:  Thank you, Your Honor.

BY MR. CAMPBELL:

Q    Officer Caudle, you testified earlier that you were familiar with closure orders.  Does this closure order that you have right now look similar to ones you'd seen in the past?

A    Yes.

Q    When you look at it, is there anything to you that stands

out as unusual or inappropriate about the order?

A    No.

Q    Do you remember seeing anything about or thinking anything about that order back in July that made you think that there was something wrong with it?

A    No.

Q    During the pre-shift briefing on July 5th, do you remember hearing anyone say anything about the order being invalid or unenforceable?

A    No.

Q    So when you went out into the field on July 5th, did you believe that this closure order was a normal and valid --

            THE COURT:  All right.  I'm going to stop you there, Counsel.  On -- I appreciate that many of these questions are foundational in getting us to the central topic.  But -- and I also appreciate, again, that we don't have a jury here.  But I'm going to ask you not to lead the witness.  Give him open-ended questions.  I'm much more interested in what he knows as opposed to answers built into the question.  So try to restructure these into more typical direct exam questions that address your topic areas.

            MR. CAMPBELL:  Yes, Your Honor.

            THE COURT:  All right.  Rephrase and try again.

BY MR. CAMPBELL:

Q    What instructions did you receive regarding this closure

order --

THE COURT:  If any.

BY MR. CAMPBELL:

Q    -- if any, on the date of the 5th?

A    That if people were in the closure, they would be receiving citations.

Q    Had you received an instruction like that before regarding closure orders?

A    Yes.

Q    All right.  Let's talk about your actions out in the field that day.  When you went out on July 5th, did you have a body camera on?

A    Yes.

Q    Is that standard for you?

A    Yes.

Q    Have you received training in how to operate body cameras?

A    Yes.

Q    Was your camera on for most of that day?

A    Yes.

Q    And do you know whether your camera was on when you had your interaction with the defendant, Ms. Robichaud?

A    It was.

Q    Have you reviewed your camera footage from July 5th?

A    Yes.

Q    Would you recognize it if you saw it?

A    Yes.

Q    I'll direct your attention to Exhibit 1 in the binder.

A    Yes.

Q    Mr. Caudle, can you tell us what Exhibit 1 is?

A    It is a CD, and then on the CD is a copy of my body cam footage.

Q    How do you know that?

A    After reviewing what was on the CD, I signed the outside of the CD with my signature.

MR. CAMPBELL:  Okay.  All right.  Then, Your Honor, at this time, the Government would move to admit Exhibit 1 and the footage contained therein.  In consulting with defense counsel, I believe this is a joint exhibit at this point.

THE COURT:  Is that correct, Counsel?

MR. KEVANE:  That is correct, Your Honor.

THE COURT:  Any objections to this being admitted for use by both sides?

MR. KEVANE:  No, Your Honor.

THE COURT:  All right.  Then Exhibit 1 will be admitted, and you may publish at your discretion.

(Plaintiff's Exhibit 1 admitted into evidence)

MR. CAMPBELL:  Thank you, Your Honor.  A few more questions, and then we'll get to the footage.

BY MR. CAMPBELL:

Q    All right.  On July 5th, what -- were you working with any

other officers that day?

A    Yes.

Q    Were you assigned a particular group of officers to work with?

A    We -- I went out with my team, then I was also assigned with a partner that day.

Q    What was your team?

A    It was mid-shift team.

Q    Mid-shift, what does that mean?

A    We were running three different shifts, and that was just the shift I was put on.

Q    Okay.  What hours was mid-shift that day?

A    That's a good question.  I do not recall the exact hours that day.

Q    If you -- give me an estimate.

A    The shifts at that point had changed, so we weren't on a regular shift anymore.  So it was just the team.  I believe we started earlier that morning.  It would have been between 7 to 8, I believe, is when we would have started that day.

Q    Okay.  Thank you.  You mentioned that you had a partner.  Is that right?

A    Yes.

Q    Who was your partner?

A    Officer Daniel.  I don't know his -- I have a very hard time pronouncing his last name.

Q    We can call him Officer Daniel.

A    Okay.

Q    Did you and Officer Daniel go into the area that was covered by the forest closure order?

A    Yes.

Q    And what did you understand your duty to be when you went in?

A    Our duty was to, if people were still in the -- the closure order -- or in the closure site, that they would be receiving citations.

Q    When you went into the closure area with Officer Daniel, did you encounter any individuals there?

A    Yes.

Q    Did you encounter any -- did you encounter the defendant there?

A    Yes.

Q    Okay.  Did you encounter anyone -- did you encounter the other individuals before encountering the defendant?

A    Yes.

Q    Did you and Officer Daniel issue those other individual citations for being in the closure area?

A    I did not receive -- or I did not cite anybody.  I was the cover officer.  I believe Officer Daniel did, but I'd have to review body cam to be 100 percent.

Q    And in issuing those citations, did you observe Officer

Daniel following the procedure that you laid out earlier?

A    Yes.

MR. KEVANE:  Objection, Your Honor.  The witness has already testified he does not recall this information about the enforcement.

MR. CAMPBELL:  Your Honor, I don't believe that's -- the witness has testified to that.

THE COURT:  I've heard the witness's testimony, and we'll proceed.  Again, Counsel, you can take that up on cross-examination.

BY MR. CAMPBELL:

Q    On July 5th, did you encounter the defendant in this case, Mia Robichaud?

A    Yes.

Q    Do you recognize -- do you remember what Ms. Robichaud looked like?

A    Yes.

Q    Do you know whether Ms. Robichaud is in the courtroom today?

A    She is.

Q    Can you identify her by a piece of clothing?

A    She was wearing a red dress.

Q    I apologize.  Can you identify Ms. Robichaud in the courtroom today with something she's wearing today?

A    I only can see her from the -- the head down from this

position.

THE COURT:  Go ahead and stand up, Counsel, and see if you can make an identification.

THE WITNESS:  She is wearing the black -- I guess it's a dress, I believe.  But she's the -- the second one from the right from my perspective.

MR. CAMPBELL:  Your Honor, let the record reflect that the witness has identified the defendant.

THE COURT:  The record will so reflect.

MR. CAMPBELL:  All right.  All right.  Then I'm going to take a moment to set up the body camera footage and get that on the screen.

On the screens?

THE COURT:  Yes.

BY MR. CAMPBELL:

Q    Okay.  Officer Caudle, on the screen in front of you, can you see a paused video?

A    Yes, I can.

MR. CAMPBELL:  All right.  And I will note for the record that the video is currently paused at the timestamp 27 minutes and 40 seconds.

BY MR. CAMPBELL:

Q    All right.  Officer Caudle, I'm going to play 10 seconds of video footage going to 27 minutes and 50 seconds, then pause it.

A    Okay.

(Video played at 12:05 p.m.)

BY MR. CAMPBELL:

Q    All right.  Officer Caudle, was -- does this footage show another law enforcement officer?

A    Yes.

Q    Who is that?

A    That's Officer Daniel.

Q    And does this video show currently the defendant?

A    Yes.

Q    In the video -- can you identify her on the video screen?

A    I can.

Q    What is she -- where is she on the screen right now?

A    She is almost in the middle of the screen.  She's wearing the red dress.

Q    Okay.  When you and Officer Daniel encountered the defendant -- well, I should ask, is the defendant with anyone else?

A    Yes.

Q    When you and Officer Daniel encountered these people, was it your intention to issue them citations?

A    I believe that was his intention, yes.

MR. CAMPBELL:  All right.  Then, Your Honor, I'm going to play approximately a minute and a half clip from 27:50 to 29 minutes and 17 seconds.

THE COURT:  You may proceed.

(Video played from 12:06 p.m. to 12:08 p.m.)

MR. CAMPBELL:  All right.  For the record, that is paused at 29 minutes and 17 seconds.

BY MR. CAMPBELL:

Q    Officer Caudle, you previously identified Officer Daniel. Is there another forest service officer there now?

A    That's Officer Sinjin (phonetic).

Q    Officer Sinjin.  And how do you spell that?

A    Your guess is as good as mine.

Q    All right.  Based on what you heard in the video and based on your recollection of this day, did Officer Daniel ask the defendant to identify herself?

A    Yes.

Q    Did the defendant identify herself?

A    No.

Q    What did Officer Daniel do next?

A    He explained what would happen if she did not identify herself.

Q    And so far, this process, is that in accordance with the instructions you've -- or with the training you've received on issuing citations?

A    Yes.

Q    And is it in accordance with the training you've received on what to do if someone does not identify themselves?

A    Yes.

Q    All right.  Did Officer Sinjin -- what did you hear him tell the defendant about what would happen?  Or what did you hear him say?

A    He also explained what would happen.

MR. KEVANE:  Objection.  Leading.

THE COURT:  Overruled on that ground.

BY MR. CAMPBELL:

Q    What did you hear Officer Sinjin say?

A    He explained what would happen if the defendant did not identify herself.

Q    What procedure did you hear him explain?

A    That if she did not identify herself, she would be taken -- she would be detained and taken down to be identified.

Q    Is that in accordance with the training you've received on the procedure for individuals who don't identify themselves?

A    Yes.

Q    And did you -- the -- at the briefing, the pre-shift briefing that morning, did you receive any instruction on where -- on what to do with individuals who didn't identify themselves?

A    Yes.

Q    Do you remember what you were told?

A    Yes.  I was told that we were going to ask them for identification.  If they did not identify, we'd explain exactly

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

what would -- or explain the ramifications of that.  If they still did not identify, they would be detained in handcuffs. They'd be given another chance and explained to what would happen if they did not identify.  If they did not identify at that point, they would be taken down to the local sheriff's department and be Live Scanned.

Q    Do you know what sheriff's department you were told they'd be taken to?

A    I can't remember off the top of my head.  I believe it was in Susanville.

MR. CAMPBELL:  All right.  Then, Your Honor, I'm going to play another clip.  This time from 29 minutes and 17 seconds to 30 minutes and 33 seconds.

THE COURT:  Very good.

(Video played from 12:11 p.m. to 12:12 p.m.)

MR. CAMPBELL:  All right.  So the video was paused at 30 minutes and 33 seconds.

BY MR. CAMPBELL:

Q    Did a new officer show up?

A    Yes.

Q    Who was that?

A    I don't recall his name.

Q    Based on what you saw and your memory, what did you hear that new officer saying?

A    He was explaining the ramifications of not IDing --

identifying.

Q    And was the procedure he explained consistent with your training and the information you'd received that day?

A    Yes.

Q    Did you eventually detain the defendant?

A    Yes.

Q    Why?

A    She was trying to walk away from the contact.

Q    Why did that result in you detaining her?

A    Because she was refusing to identify.  So she was given the ramifications of what would happen.  So we're moving to the next step of what would happen, is she's going to be detained and then asked again for her identification.

MR. CAMPBELL:  Your Honor, I'm going to skip forward a bit and then play a clip from 31 minutes and 20 seconds to 32 minutes and 8 seconds.

THE COURT:  You may proceed.

MR. CAMPBELL:  Starting at 31 minutes, 19.

(Video played from 12:13 p.m. to 12:14 p.m.)

MR. CAMPBELL:  All right.  I stopped at 32 minutes and 11 seconds.

BY MR. CAMPBELL:

Q    Did you talk to the defendant in that clip?

A    I did.

Q    What did you ask?  What did you say?

A    When she was walking away, I told her she couldn't.  Then after she was handcuffed, I tried to explain again or ask her for her identification.

Q    Did the defendant respond to your request for identification?

A    Not with her name.

Q    All right.  At -- what happened after this?

A    After this, we tried to proceed back up to the vehicles. The defendant refused to walk by digging her heels into the ground, going limp, and making it very hard to get up the hill.

Q    Did you bring the defendant back to the vehicles regardless?

A    We did.

Q    What did you do with the defendant when you got to the vehicles?

A    She was searched by a female officer, then placed in back of a truck that had the AC on, and I went and got a bottle of water for the defendant.

Q    Did you have any contact with her after that?

A    No.

Q    During your time with the defendant, did you ever hear her provide her name or identification?

A    No.

Q    Did the defendant eventually get issued a citation for remaining in the closure area?

A    Yes.

Q    Have you reviewed that citation?

A    Yes.

Q    I'll direct you to Exhibit 2 in the binder.  Do you recognize that document?

A    Yes.

Q    How do you recognize it?

A    It is a citation that was issued to the defendant.

Q    Were you the one who issued this citation?

A    No.

Q    Do you know who did issue it?

A    I believe it was Officer Tyler Harris.  I believe.

Q    All right.  Does it nonetheless appear to be a fair and accurate copy of the citation as you have seen it?

A    Yes.

        MR. CAMPBELL:  Then, Your Honor, the Government moves to admit Exhibit 2.

        THE COURT:  Objections?

        MR. KEVANE:  No, Your Honor.

        THE COURT:  All right.  Exhibit 2 will be admitted and can be used for all purposes.

    (Plaintiff's Exhibit 2 admitted into evidence)

BY MR. CAMPBELL:

Q    What citation -- what offense is the defendant cited with in this document?

A    This citation's for interfering with a -- a forest officer.

Q    In the footage, you mentioned earlier -- well, in the footage, were there any other people with the defendant?

A    Yes.

Q    Do you remember whether those individuals were asked to identify themselves?

A    They were.

Q    Did they?

A    Yes.

Q    Did they do so immediately?

A    I believe so.

Q    Do you know whether those two men were ever taken into custody?

A    They were not.

Q    Do you know whether those two men were issued citations for interfering with a forest officer?

A    They were not.

        MR. CAMPBELL:  Your Honor, no further questions at this time.

        THE COURT:  All right.  Very good.

        MR. CAMPBELL:  I'd like to retrieve my computer.  I understand that the defense may want to play the video, but I'd ask that you do so with your own computer.  Thank you.

        THE COURT:  All right.

All right.  When you're ready, Counsel.  Go ahead.

MR. KEVANE:  Your Honor --

THE COURT:  Cross-examination.

MR. KEVANE:  -- I would like to first move under Henthorn.  I'd like to request, pursuant to U.S. v. Henthorn, any impeachment statements or material made by the officer.

MR. CAMPBELL:  Your Honor, the Government has submitted a Henthorn request and has no impeachment statements to turn over pursuant to that ruling.

THE COURT:  All right.

MR. KEVANE:  All right.

THE COURT:  So noted.

CROSS-EXAMINATION

BY MR. KEVANE:

Q    Good afternoon, Officer Caudle.

A    Good afternoon.

Q    Thank you for being here.  Did you talk to anyone about your testimony today?

A    I -- I don't believe.  I've talked to AUSA and -- yes.

Q    Did they give you any advice as to what to say today?

A    No.

Q    Okay.  You heard about the Rainbow Gathering coming to Plumas National Forest well before the closure order was implemented?

A    Yes.

Q    Okay.  And the Forest Service worked with a national task force that monitors these gatherings and tries to stop them from taking place.

A    I don't get what your question is, sir.

THE COURT:  And break that down into --

MR. KEVANE:  Sure.

THE COURT:  -- two questions.  We've got multiple things --

MR. KEVANE:  Yeah.

THE COURT:  -- going on there.

BY MR. KEVANE:

Q    The Forest Service worked with a national task force during the 2024 Rainbow Gathering, investigating it.

A    I believe the Forest Service puts a task force together for the Rainbows, yes.

Q    And that task force tries to stop the gatherings from taking place?

A    Not in -- I don't believe so.

Q    There was an incident management team responding to this gathering?

A    There was a Rainbow Task Force, yes.

Q    And that team, that task force, was a law enforcement incident management team?

A    Yes.

Q    It was not a fire safety incident management team.

A    I don't know if there was a fire safety task force.

Q    Forest Service was understandably concerned about the types of people that this gathering would attract?

MR. CAMPBELL:  Objection, Your Honor.  Calls for speculation.  This defendant can't speak for the Forest Service as a whole -- or this witness.

THE COURT:  Sustained.

And, Counsel, where are we going with this?

MR. KEVANE:  Yes, Your Honor.  We're going to the fact that Forest Service was very concerned about the actions taken -- about the people who were attending the Rainbow Gathering and actions that they might have taken, and that they coordinated with local leaders about responding to this gathering.

THE COURT:  All right.  I made clear in my orders relating to the pretrial motions that the focus today is going to be on the good faith enforcement of the closure orders, specifically the arrest at issue with the pending citation for resisting.  I'm struggling, Counsel, to see where this issue goes to good faith enforcement as opposed to issues of the good faith of the closure order itself, which is not before the Court today.

MR. KEVANE:  Yes, Your Honor.  The beliefs that Forest Service had about the Rainbow Gathering is inextricably tied to the enforcement of the order and those beliefs that

people working for Forest Service may have had or misplaced.

THE COURT:  I -- I'll let you ask about this officer's enforcement of the closure order.  But the beliefs of the Forest Service, generally, a massive nationwide organization, and what this agency may or may not have felt about the Rainbow Gathering is not going to come in today.

MR. KEVANE:  Okay.  Yes, Your Honor.  I can move on.

BY MR. KEVANE:

Q    You were aware that locals in Plumas, in the Plumas community, were concerned about the gathering?

A    I came in late.  I didn't know.  I -- I can't answer that.

Q    Okay.  You're aware of any pressure on U.S. -- on you to enforce this closure order?

A    No.

Q    Okay.  You were aware of a confrontation between locals and people camping with the Rainbow Gathering on June 20th, 2024?

A    I believe that was before I arrived.

Q    Okay.

THE COURT:  So that would be a no, you were not aware?

THE WITNESS:  That's correct.

THE COURT:  All right.  Move on, Counsel.

BY MR. KEVANE:

Q    You were informed of this incident, when you arrived?

A    What incident was that, sir?

Q    The incident --

MR. CAMPBELL:  Objection, Your Honor.  Relevance.

THE COURT:  Let's hear his answer first, and then we'll address.  The question pending is, were you informed of this incident that predated your arrival?

THE WITNESS:  I don't know what incident you're talking about, sir.

BY MR. KEVANE:

Q    You were informed of an incident where people destroyed the Rainbow Gathering's water access lines?

A    I did not know that, no.

Q    You were responsible with your fellow officers with the enforcement of the order?

A    I did enforce the order, yes.

Q    And enforcement of the order began on June 26th, 2024?

A    Yes.

Q    Okay.  Yet Ms. Robichaud was not cited until July 5th, 2024?

A    Yes.

Q    She was not cited prior to that date because she was given permission to remain in the forest and clean up?

A    I did not give her permission.

Q    Okay.  Your first interaction with her was when you went to cite her for violating the order?

A    From my -- what I recall, yes, that's my first interaction with her.

Q    You were aware of a barricade set up at the entrance of the forest when the closure order was issued?

A    Yes.

Q    And you were aware that people were being let in after the closure order to continue cleaning up?

A    With a permit, yes.

Q    Were you in -- you knew the officers who were at that barricade?

A    Yes.

Q    You were in communication with those officers?

A    Sometimes, yes.

Q    Okay.  On direct, you said, I've never done a Rainbows when in enforce -- in enforcing a closure order?

A    That's correct.

Q    So you would agree that the 2024 closure order of the Rainbow Gathering was in a slightly different category than other closure orders you've worked on?

A    I believe the reason I said that was on how the AUSA phrased the question.

Q    You said you came here for the Rainbows.

A    Yes, I came for the Rainbow closure, yes -- or for the Rainbow Gathering, yes.

Q    The closure order was targeting the Rainbow Gathering

specifically?

MR. CAMPBELL:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Sustained.  Rephrase, Counsel.

MR. KEVANE:  Okay.

BY MR. KEVANE:

Q    You were aware that this order was targeting the Rainbow Gathering?

MR. CAMPBELL:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Same question, Counsel.  Where are you going with this?

MR. KEVANE:  Where I'm going with this is going to the content-based nature of the closure order, that it was targeting the Rainbow Gathering specifically.  As the witness said, he came here for the Rainbows.

THE COURT:  Well, he has testified that he came here --

MR. KEVANE:  Okay.

THE COURT:  -- pursuant to the direction --

BY MR. KEVANE:

Q    You came here for --

THE COURT:  -- of the Forest Service.

BY MR. KEVANE:

Q    -- the Rainbow closure?

THE COURT:  Counsel, we're still working on this.

MR. KEVANE:  My apologies.

THE COURT:  His testimony did not indicate a knowledge of anything other than the direction he received to perform his duty.  To the extent that your questioning is attempting to interpose some knowledge of why the closure order was issued or the scope of that closure order, again, we're getting outside the focus of today's proceedings, which is the citation issued here and the good faith efforts, or lack thereof, with regard to this citing officer.  So if we could narrow the scope of the questions, please --

MR. KEVANE:  Yes.

THE COURT:  -- and move on.

BY MR. KEVANE:

Q    You were there to enforce the Rainbow closure?

A    I was there to enforce the closure order.

Q    Okay.  You did not -- when you came up to Ms. Robichaud to cite her, you did not confirm with her that she had permission from another officer to remain in the forest to clean up?

A    I was the cover officer.  I did not make initial contact.

Q    Okay.  You did not hear another officer confirm with Ms. Robichaud that she had permission to remain in the forest to clean up?

A    I don't believe I heard that, no.

Q    You were not aware that a forest officer had given her

permission to remain in the forest?

A    Best of my knowledge, no.

Q    Okay.  Because officers were not in communication regarding this closure order?

MR. CAMPBELL:  Objection, Your Honor.  Calls for speculation.

THE COURT:  Overruled.  I'll hear the witness's answer.  He's asking for this witness's knowledge.

Re-ask your question, please, Counsel.

MR. KEVANE:  Sure.

BY MR. KEVANE:

Q    You were not aware that Ms. Robichaud had permission to remain in the forest because you were not in communication with those officers who gave her permission?

A    The officers that gave permission, I believe, were there, and it was by permit, which they had paper copies of who should and who shouldn't have been in the closure.

Q    Okay.

A    I mean, who should have been in the closure from the permit.

Q    The closure order encompassed a fairly large area.  You would have had difficulty providing uniform instructions to the attendees?

THE COURT:  All right.  And again, Counsel, we're building facts in that are not in evidence.  If you wanted to

ask him first about what he knows about the geographic size of the closure order, then we can go on to ask about the relative significance of that.

MR. KEVANE:  Yes, Your Honor.

THE COURT:  But please don't build in facts and then add a question.  Try again.

MR. KEVANE:  Yes, Your Honor.

BY MR. KEVANE:

Q    The closure order encompassed a fairly large area of the forest?

A    I -- I can't recall the exact size of it.  There is a map of the closure, yes.

Q    Okay.  You would have had difficulty providing uniform instructions on when to vacate the attendees?

THE COURT:  All right.  I'm going to object as to vague.

MR. KEVANE:  Okay.

THE COURT:  Try that one again, please.

MR. KEVANE:  Sure.

BY MR. KEVANE:

Q    You would have had difficulty providing instructions to the attendees on how to follow the closure order.

A    What is the question?

Q    Sure.

THE COURT:  Yeah, I'm not sure I know either.

MR. KEVANE:  Okay.

THE COURT:  Counsel, where are we headed with this?

MR. KEVANE:  Yes, the closure order encompassed a fairly large area.  Officers were not able to communicate the facts of the closure order to the attendees and that they relied on it spreading word of mouth from the attendees.

THE COURT:  All right.  Why don't you ask him --

MR. KEVANE:  Yeah.

THE COURT:  -- that in three parts.  You've covered the initial part of the geographic size.  Now ask if this witness had any difficulty conveying whatever it is you're contending.

MR. KEVANE:  Okay.

BY MR. KEVANE:

Q    You would have had difficulty conveying information about the closure order to the attendees?

A    If I was by myself, yes.

Q    Okay.  You relied on news of the enforcement being spread word of mouth by the attendees?

MR. CAMPBELL:  Objection, Your Honor.  Calls for speculation.

THE COURT:  I'm going to overrule.  He's asking what, if anything, this officer did by way of reliance.

And again, I'm hearing that question to be asking what this officer did.  If it is your intent to superimpose

reliance on anyone else, then you need to rephrase the question.  But go ahead.  Ask your question again.

And I'm overruling your objection.

BY MR. KEVANE:

Q    You were aware of the process in which officers communicated the closure order to the attendees?

A    I was a small part of it.  There were multiple things going on that I was not aware of.

Q    Okay.  You were aware that other officers relied on news of the closure order to spread word of mouth between the attendees of the Rainbow Gathering?

A    I don't know what the other officers thought or speculated on.

Q    You were not in communication with those officers?

A    I was not in communication with every officer.  That was command's position in this.

Q    On July 4th, you were aware that Forest Service officers visited campsites where Rainbow -- where the Rainbow family was camping?

A    On July 5th?

Q    On July 4th?

A    Yes.

Q    Okay.  You were aware that some officers gave gatherers a 24-hour extension to continue cleaning up?

A    Yes.

Q    Okay.  You were aware that that extension was given in the morning of July 4th?

A    I don't recall what time it was given, but yes.

Q    You were aware that the extension was given in the afternoon of July 4th?

A    I -- I believe it was afternoon.

Q    Yes.  And you came back the morning of the 5th to cite Rainbow family?

A    Yes.

Q    Okay.  The Forest Service officer's response on July 5th did not honor the 24-hour extension that was given to the campers?

        MR. CAMPBELL:  Objection, Your Honor.  Calls for a legal conclusion.

        THE COURT:  Well, it also calls for speculation. Once again, we're outside the bounds of what this officer did, Counsel.  And to the extent that you want to ask him if he knows another example, I'll allow you to do that.  But if you're attempting to superimpose knowledge of this on this witness, then your question is improper and does indeed call for speculation.

        All of which, again, drifts away from the central focus of the good faith enforcement of the closure order by this witness.  And I'll ask you to get back to that objective so that we might proceed.

MR. KEVANE:  Okay.

BY MR. KEVANE:

Q    You did not honor the extension given to campers to continue cleaning up on July 4th?

A    I did not issue any citations.

Q    Okay.  Officers -- you saw that officers you were with did not honor the extension given on July 4th?

THE COURT:  Well, again, Counsel, this assumes facts not in evidence, because we don't have anything before the Court that any of the officers that he was with issued an extension to anybody, particularly to the defendant here.  So now we're dealing with the what-if world that isn't before the Court today.

So if you want to ask if this officer issued an extension to this defendant and then failed to honor that extension, that might be relevant to good faith enforcement of this citation.  But asking generally about who somewhere might have had an extension and might have honored it is really just burning up court time.

MR. KEVANE:  Okay.

THE COURT:  So let us focus again, please.

BY MR. KEVANE:

Q    You didn't ask if Ms. Robichaud had an extension?

A    No.

Q    Okay.  You were the officer who handcuffed Ms. Robichaud?

A    Yes.

MR. KEVANE:  Okay.  I would like to play a portion of Joint Exhibit 1 marked F-1.

THE COURT:  You may.

(Video played at 12:37 p.m.)

BY MR. KEVANE:

Q    Okay.  You heard Ms. Robichaud say -- you heard Ms. Robichaud exercise her right -- say that she was exercising her right to peaceably assemble?

A    She did say that.

Q    You heard her say this before you placed her in handcuffs?

A    Yes.

MR. KEVANE:  Okay.  I would like to play a portion of Joint Exhibit 1, marked F-2.

(Video played at 12:37 p.m.)

BY MR. KEVANE:

Q    You heard Ms. Robichaud assert her right to peacefully assemble a second time?

A    Yes.

Q    Okay.  You didn't listen to her when she said -- you didn't change your behavior when she said that her First Amendment rights were being violated?

A    She's in the forest closure violating law.

Q    Okay.  Ms. Robichaud was talking to another officer during -- while you were watching?

A     In that interaction?

Q     Yes.

A     Yes.

Q     Okay.  And you handcuffed her before she was finished talking to that officer?

A     Can -- what was the question?

Q     Was the officer finished talking to her when you began handcuffing her?

A     In that clip?  I believe -- it was a very short clip.  I can't remember exactly what timeline that is.  I believe that she was already handcuffed at that point.  I think I was double locking the handcuffs so that they wouldn't tighten if she moved.  But I couldn't be 100 percent because it's such a small clip.

Q     You always use handcuffs to detain people when they don't give their identification?

A     It's a escalation of ask for information.  If they don't give it -- ramifications if they don't give their identification.  In this case, the defendant decided to walk or try to walk away.

Q     So that's a no?

A     Do I always use -- it depends on where I am on that spectrum of getting identification.

Q     Before you handcuffed Ms. Robichaud, you told her to stop?

A     Yes.

Q    Stop walking away?

A    Mm-hmm.  Yes.

Q    And she stopped?

A    She did.

Q    She followed your instructions to remain there?

A    Yes.

Q    And you proceeded to handcuff her?

A    Yes.

Q    Okay.  You restrained her in handcuffs even though she didn't present a physical threat?

A    She was detained in handcuffs, yes.

Q    She didn't raise her voice at officers?

A    No.

Q    She never made any threats to officers?

MR. CAMPBELL:  Objection, Your Honor.  I'm not sure what the line -- what the relevance of this line of questioning is.

THE COURT:  Well, it's going to the extent of resistance, Counsel, and it is appropriate cross-examination at this point, given the issues that were opened in the direct exam.  So I'm going to allow it and overrule your objection.

Ask your question again, please, Counsel.

BY MR. KEVANE:

Q    You restrained her -- she was not acting violently towards officers?

A    No.

Q    Okay.  You had the discretion not to bind her wrists behind her back?

A    Yes.

Q    Okay.  You heard Ms. Robichaud cry out in pain when you handcuffed her?

A    I don't believe I heard her cry out in pain.  She was actively trying to twist away from us as we tried to place her in handcuffs.

Q    Is that a yes?

A    I -- she said, "Ow," I believe.  Yes.

Q    You could have let her walk to the vehicle with her hands at her side?

A    I -- yes.

Q    You handcuffed her to show her and the others around her who was in control of the situation?

A    No.

Q    Ms. Robichaud walked with you while you took her to the vehicle?

A    No.

Q    Would a video help refresh your recollection?  Never mind.
     Three officers were involved in bringing Ms. Robichaud to the vehicle?

A    Yes.

Q    She was being taken up a steep incline as you were taking

her to the vehicle?

A    Parts of it were steep, yes.

Q    She was wearing sandals during this walk?

A    I don't remember what was on her feet.

THE COURT:  I believe the testimony on direct exam was that she dug in her heels and was not actively cooperating. If you want to --

MR. KEVANE:  Oh, sure.

THE COURT:  -- ask him more specific questions about that process, it may be more productive than showing pieces of video that may or may not actually cover what he testified about.

MR. KEVANE:  May I have a moment to confer with my co-counsel?

THE COURT:  You certainly may.

MR. KEVANE:  Thank you, Your Honor.

(Counsel confer)

BY MR. KEVANE:

Q    Did you have to physically pick her up to have her -- to take her to the vehicle?

A    At some points, yes.

Q    It took you about 20 minutes to get back to the vehicle?

A    I don't recall exactly how long it took.

Q    That was about the same amount of time it took you to get from the vehicle to the campsite?

A    There were stops in between, so.

Q    You said that Ms. Robichaud -- you testified that Ms. Robichaud was not walking with you.

A    For the most part, she was not.

MR. KEVANE:  I'm going to go ahead and play --

THE COURT:  Are we still talking about after being cuffed?

MR. KEVANE:  Yes.

THE COURT:  On the way to the vehicle?

MR. KEVANE:  Yes, your Honor.

THE COURT:  Okay.  Go ahead.

MR. KEVANE:  I'm going to go ahead and play a portion of Joint Exhibit 1.

(Video played at 12:44 p.m.)

BY MR. KEVANE:

Q    She was walking with you in that video?

A    From what it appears like she was at some points, yes.

Q    Okay.  You kept her in handcuffs the entire walk to the vehicle?

A    Yes.

Q    Okay.  You kept her in handcuffs when she was placed in the vehicle?

A    Yes.

Q    You left her in handcuffs for about 20 minutes before she was driven to the sheriff's station?

A    As soon as she was placed in the -- the police vehicle, I was no longer part of the contact.

Q    Okay.  You heard her ask for water when she was placed in the vehicle?

A    Yes.

Q    Okay.

A    I believe I did.

Q    Okay.  How did you expect her to drink water with her hands handcuffed behind her back?

A    She was assisted by another female officer.

Q    You didn't think this was a good time to uncuff her?

A    That's -- that's not in our training.

Q    Okay.

          MR. KEVANE:  Okay.  May I have a brief moment again to confer?

          THE COURT:  You may.

     (Counsel confer)

BY MR. KEVANE:

Q    You had the discretion to uncuff her at that point?

A    We always have the discretion.

Q    She was handcuffed for the 45-minute drive to the sheriff's station?

A    I believe the ramifications were described to her on what would happen if she did not identify.

Q    She was in an uncomfortable position, bending forward with

her hands behind her back for over an hour?

A    I don't know what position she was in the back of the vehicle.

        MR. KEVANE:  Nothing further, Your Honor.

        THE COURT:  Very good.

        MR. KEVANE:  Thank you, Your Honor.

        THE COURT:  Redirect for this witness?

        MR. CAMPBELL:  Yes, Your Honor.  Thank you.

        THE COURT:  You may proceed.

                    REDIRECT EXAMINATION

BY MR. CAMPBELL:

Q    Officer Caudle, I want to talk about some of the information you received or didn't receive for July 5th. Before July -- on or before July 5th, did you view any Instagram posts about the Rainbow Gathering posted by an individual named Jason Ingram?

A    No.

Q    Were you at or did you have any knowledge of a meeting of the Plumas County Board of Supervisors on June 25th?

A    No.

        MR. KEVANE:  Your Honor, this is beyond the scope of cross.

        THE COURT:  Well, Counsel, I think you opened the door to this in your cross.

        It is, however, Mr. Campbell, again, treading back

into the area that I admonished counsel is not before the Court today, to the extent that you're wishing through your questions to confirm that this officer had no knowledge of the events preceding, I think the questions you've asked thus far have affirmed that.  But be careful in that you are again going into the very same prohibited inquiries that I limited the defense on.  We are not going to go into issues of the why as to the closure order.  We are dealing today with the good faith enforcement of the closure order.  So proceed accordingly.

MR. CAMPBELL:  Understood, Your Honor.

THE COURT:  And I am going to sustain the objection, Counsel.

BY MR. CAMPBELL:

Q    When you were in -- in detaining and citing Ms. Robichaud, did anything you do, to your knowledge, deviate from the instructions you'd been given by your superior that morning?

A    No.

Q    Did you have any reason to believe that what you were doing was not in compliance with your training or Forest Service procedure?

A    No.

MR. CAMPBELL:  No further questions, Your Honor.

THE COURT:  All right.

Any re-cross on that limited scope of inquiry?

MR. KEVANE:  No, Your Honor.

THE COURT:  All right.

MR. CAMPBELL:  Your Honor, the Government would ask that this witness be excused.

THE COURT:  All right.  With the Court's thanks.

THE WITNESS:  Thank you, sir.

(Witness excused)

MR. CAMPBELL:  And with that, Your Honor, the Government rests.

THE COURT:  All right.  At this point, we're going to take a brief recess.  How long do you think it will take you, Mr. Campbell, to review the documents that you had asked for an opportunity to examine?

MR. CAMPBELL:  Ten minutes should be sufficient, Your Honor.

THE COURT:  How long would the defense like for a break before beginning your case?

MR. KEVANE:  Ten minutes is plenty, Your Honor.

THE COURT:  All right.  We will reconvene at 1 p.m.

MR. CAMPBELL:  Thank you, Your Honor.

MR. KEVANE:  Thank you, Your Honor.

THE COURT:  Madam Clerk.

THE CLERK:  The Court is in recess.

(Recess taken at 12:50 p.m.)

(Proceedings commence at 1:00 p.m.)

THE CLERK:  Court is back in session.

THE COURT:  You may be seated.

All right.  Is the defense prepared to proceed?

MS. MURPHY:  Yes, Your Honor.

MR. CAMPBELL:  Your Honor, one matter before.  In some of the discovery material that defense turned over and then in reviewing these statements, it appears there was a -- I do not have independent knowledge of this just going off of what defense counsel turned over in these statements, there was an encounter in late June involving irrigation pipes that -- it appears there was a dispute about whether they were on land legally and then whether those pipes were destroyed, all of which is to say I would request that the witnesses be given a Fifth Amendment instruction because it appears there is a possibility of some criminal conduct occurring here. And if there's going to be questions directed towards this interaction, then I believe it's appropriate the witness be informed that they might be incriminating themselves.

THE COURT:  All right.  I'll hear from defense in this regard.

MS. MURPHY:  One moment to confer, please, Your Honor?

THE COURT:  Certainly.

(Counsel confer)

MR. KEVANE:  Your Honor, we don't know the statute of limitations on these potential misconducts, and we don't think

anything would result in opening an investigation.  No objection.

THE COURT:  All right.  I would ask for a proffer. I'm not familiar with what counsel is referring to.  But before we go down that road and potentially issue Fifth Amendment admonitions, I'd ask for a proffer as to what relevance, if any, irrigation lines and events that, based on the facts currently before the Court, seem to have no immediate involvement with this defendant's arrest or resistance at issue.

Is there some connective tissue that is going to come out through your witnesses?  And if so, please give the Court a proffer in that regard.

MR. KEVANE:  Your Honor, testimony regarding this incident will show that Forest Service was in place in letting this incident happen.  A person in this video says that Chris Carlton gave him permission to destroy water lines belonging to the Rainbow family.

THE COURT:  Was Ms. Robichaud involved in that destruction?

MR. KEVANE:  No, Your Honor.  But this speaks to the content-facing nature of the order, and its foundational to the question presented to the Supreme Court in Little that there was -- this was a content-based order and remonstrances where a constitutional violation was taking place.  And that coupled

with Ms. Robichaud's polite conduct, does not rise to interference.

And so we're arguing that the closure order is content based and inextricably tied to the enforceable order.  As Your Honor said in our motions, the dance cannot be separated from the dancer.

THE COURT:  So noted, Counsel, but again, the determination of the content of the order -- I'm struggling with here when what we're dealing with is the enforcement relative to this defendant and whether or not the order was valid.  The question before the Court is whether the officers who were enforcing it were enforcing it in good faith.

And while the reference is made to a previous determination that the order was not valid, I would clarify that this Court's determination in granting that motion was merely that the Government had failed to offer sufficient evidence that it was a valid order.

As distinct from it being an invalid order, this was a matter of the Government having failed to meet their burden of proof and as a result, various of the charges for violation had been dismissed.

But today, we're not dealing with the validity of the order.  We're dealing with the validity of the enforcement, if you will.  And so to the extent that Ms. Robichaud was not laying irrigation pipes or destroying irrigation pipes or

whatever this issue is that is now being brought forward, I'm concerned that we're oozing outside the issues before the Court.

MS. HOPKINS:  Your Honor, I'll just address that. Megan Hopkins, for the record -- Mr. (indiscernible) supervisor --  since I appeared and argued the original motion to dismiss.

THE COURT:  I remember well.  Welcome back, Ms. Hopkins.

MS. HOPKINS:  Thank you, Your Honor.  So I think what we have here is a bit of a step ladder.  For one, when the Court issued its ruling on the motion to dismiss Ms. Robichaud's second citation, the Court inquired -- or presented the question of whether or not it's necessary that Ms. Robichaud had preserved her First Amendment objections at the time of the incident when she was cited.

That led us to look at Little, which is a Supreme Court case, and Little presents the question of whether or not there's a Constitutional violation, remonstrances are appropriately made, and then through that lens, looking at the conduct of the defendant and whether that rises to the level of interferences.

In light of those remonstrances and the Constitutional violation, I think it's very important to lay the foundation that here, we do have a content-based

restriction so that we have the appropriate lens under Little to look at Ms. Robichaud's other behavior.

The fact that the Forest Service may, and we believe that, you know -- as an offer of proof, we believe that the evidence we're going to present through the testimony of Val DeMars, Chris Carlton, and Joe Egan relating, in part, to this water line incident, demonstrates that the Forest Service was taking other actions in the attempt to drive out the Rainbow Gatherers, and when those failed, turned to a closure order.

There's already been testimony from Officer Caudle, who referred to it as the Rainbow closure, specifically when asked to differentiate it from other closure orders.  This was specifically targeted.  That's our position, and I think that it's necessary to gather that evidence.

I think that the questioning you're going to see with regard to Mr. DeMars and Egan and the water line issue is going to be very brief and pointed, and the evidence -- that's specifically the exhibit that we present -- is short, but makes very clear that officers were present and aware of the incident and made the decision for one, not to interfere and perhaps even gave the direction for some of these generously deemed protestors to participate in what I think is accurate, criminal activity at the time.

I also think that the Court, you know, would benefit from better understanding the culture surrounding enforcement

of this order.  I think the attitudes of the officers, not simply Officer Caudle, who has admitted he was not the officer who cited her.  He simply assisted with the arrest and was the person who recorded the Government's primary exhibit.  These other officers were also steeped in that culture.

Chris Carlton, who's present and going to be a defense witness, will be able to testify as to the information he provided in these briefings, whether or not these other officers had been present prior to this time and were present at the time of the -- what we'll call the water line incident.  And I do think, ultimately, the Court will determine it's relevant.  What I would encourage the Court to do is allow his testimony to be taken, and as the Court correctly pointed out, we don't have a jury.  Your Honor's certainly in a position to determine at the close of evidence what is and what is not relevant and disregard that evidence you don't feel is appropriate.

We'll keep it brief, but I do think, ultimately, it does go to the heart of our argument under Little, and I just think that it's important for us to make the record should this proceed to an appeal because it does present Constitutional issues.

THE COURT:  And your thought, Counsel, on a Fifth Amendment admonition?

MS. HOPKINS: I don't think it's necessary, Your

Honor.  We don't intend -- well, that would really depend on the Forest Service, who has the authority to investigate and prosecute, in conjunction with the United States Attorney's Office, the conduct that took place on National Forest Service land.

I guess in an abundance of caution, if the United States Attorney's Office feels an admonition is appropriate, an admonition can be given, and we can tailor our questions to address the -- what was occurring at the event rather than the specific actions taken by the witnesses and focus primarily on -- you know, I think the video that we intend to present speaks for itself on what was happening there.

We may not need the witnesses to individually admit the conduct they took.  One of the witnesses is present and is the subject of the order to show cause that the Court issued earlier, and the other witness we can limit to be very careful as to the questions we ask.

THE COURT:  All right.  I think that would be appropriate, Counsel.  I appreciate you raising this.  I will give each of the witnesses -- since the Court is not aware of the anticipated or intended questioning, as we go through the defense witnesses, at the outset immediately following the oath, I will remind each of the witnesses in the abundance of caution that they have a Fifth Amendment right to remain silent and not incriminate themselves.  I'm not going to give any

further indication as where, if at all, that may apply.

MS. HOPKINS:  And, Your Honor, the only witness I think a Fifth Amendment admonition would apply to would be Joe Egan.  He's the only witness that we would ask any questions about activity that may rise to the level of criminal liability.

THE COURT:  Any concerns, Mr. Campbell?

MR. CAMPBELL:  Your Honor, I would ask that it be given to everyone involved in this incident.  I don't have enough information to know what criminal liability may attach. I also don't know whether the land this took place on was federal land or state land or whether sworn testimony here might bring liability from the county.

So -- and given the limited information I have from this and from reviewing the video, there is disputes about who's on whose land, whether water pipes are correctly used, machetes being swung.  I think it's appropriate to give a Fifth Amendment admonition to everyone.

THE COURT:  And I think if it's done pro forma immediately following the oath, it doesn't create any issues.

MS. HOPKINS:  In that case, Your Honor, it would be Val DeMars and Joe Egan.

THE COURT:  All right.  We'll proceed accordingly. Any other housekeeping matters having now reviewed these documents?

MR. CAMPBELL:  Yes, Your Honor.  I understand that Your Honor's made a ruling on this, but for the sake of the record, the Government would renew its objection to relevance as to the entirety of this interaction, specifically, at this point, given that the Government's witness has testified that he did not receive -- does not remember receiving instruction from Mr. Carlton, or there's not testimony that he received instruction from any other source that influenced his enforcement of the order.

And the notion that the Forest Service was steeped in a culture I think is insufficient to show a meaningful connection between Officer Caudle's actions and actions taking place weeks prior at a third location -- or at a second location with unknown individuals involved.

THE COURT:  Well, that will be your task on cross-examination and in closing, Counsel, based on the proffer.

I am going to overrule that objection without prejudice to you renewing it as specific testimony arises and will address the scope of relevance and appropriate testimony as we go on.

As I've indicated multiple times already, we don't have a jury. I'll sort out what is appropriately considered inadmissible, and let's go ahead and hear the evidence.

MR. CAMPBELL:  Yes, Your Honor.  Nothing further from the Government.

THE COURT: All right. With that, defense, call your next witness -- first witness.

MS. MURPHY: Your Honor, we'd like to get our opening statement.

THE COURT: Oh, all right. Very good.

MS. MURPHY: Yeah.

THE COURT: Please proceed.

MS. MURPHY: Your Honor, this case is really very simple. Ms. Robichaud's actions on July 5th, 2024, simply did not constitute interference. Today, the defense will show that under applicable case law, Ms. Robichaud's peaceful and polite conduct, in combination with her Constitutional remonstrances, do not amount to interference.

Your Honor will hear from Ms. Robichaud herself, who will also -- who will testify specifically to that. U.S. Forest Service Officer Ethan Caudle's testimony will also affirm that Ms. Robichaud, in fact, was polite with law enforcement and did not prove herself to be violent or threatening at any point in her interactions with him.

The Government will not be able to meet its burden to prove that beyond a reasonable doubt Ms. Robichaud threatened, resisted, intimidated, or interfered with any forest officer. Additionally, the Government will not be able to prove that Forest Officer Caudle was engaged in the performance of his official duties.

The defense will show today that the closure order that Ms. Robichaud's interference charge arose from was not facially neutral.  And further, that forest officers were so privy to the fact that the off -- the order was content based that enforcement of the order was necessarily bad faith.

To do so, Your Honor will hear from several witnesses, including Forest Supervisor Chris Carlton, who issued the closure order in question.

His testimony will show that he was continually pressured by Plumas County community members who made their distaste for the kinds of people camping with Ms. Robichaud at the 2024 Rainbow Gathering abundantly clear, and that he issued a targeted closure order in an attempt to push peaceful dispersed campers out of Plumas National Forest.

You'll hear from Mr. Joe Egan and Jason Ingram or our designated investigator, Juan Doig, who both not only made several public untrue disparaging remarks about the campers at the Rainbow Gathering, but also sought out Mr. Carlton in order to pressure him to close the area.  Evidence will prove that both men participated in the destruction of a Rainbow camper's personal property while in the national forest.

You'll then get to hear from that camper himself, Mr. Val DeMars and his experience with the forest service when trying to get justice for the destruction of his property. Mr. Paul Kingston, another camper at the Rainbow Gathering,

will testify that expectations for how to lawfully comply with the closure order were unclear because officers did not provide uniform directions to campers.  This will further contextualize how disorganized and targeted the enforcement of the unconstitutional order really was.

In summation, Your Honor, the Government will not meet its burden to prove beyond a reasonable doubt that Ms. Robichaud's actions amounted to interference, nor will it meet its burden to prove beyond a reasonable doubt that Ms. Robichaud's arresting officers were acting in accordance with their official duties.

Ms. Robichaud must be found not guilty.  Thank you.

THE COURT:  Thank you.

MR. KEVANE:  Defense would call their first witness, Val DeMars.

THE COURT:  Mr. DeMars will be brought forward.

VAL DEMARS, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Will you state your name and spell your last name for the record?

THE WITNESS:  Val DeMars.  It's D-E capital M-A-R-S.

THE COURT:  Mr. DeMars, in advance of you providing any testimony, I'm going to advise you of your Fifth Amendment right to not incriminate yourself in responding to any of the questions.  Today, you have a Fifth Amendment right to remain silent.  And should you waive that right and provide testimony

as to any criminal activity, that evidence can be used against you at a subsequent proceeding.

THE WITNESS:  Okay.

THE COURT:  I'm just making you aware of your Fifth Amendment rights.

THE WITNESS:  All right.

THE COURT:  You may proceed now to the witness stand, and counsel for the defense has some questions for you.

THE WITNESS:  Okay.

THE COURT:  Go ahead and have a seat, and when he starts his questioning, if you would speak into the microphone. Today's proceedings are being recorded rather than --

THE WITNESS:  Yeah.

THE COURT:  -- having a court reporter take them down.

THE WITNESS:  Okay.  All right.

DIRECT EXAMINATION

BY MR. KEVANE:

Q    Good afternoon, Mr. DeMars.

A    Hello.

Q    Would you please spell and state your name for the record.

A    V-A-L D-E-M-A-R-S, Val DeMars.

Q    Did you talk to anyone about your testimony today?

A    No.

Q    Did you talk to the defense about the testimony today?

A    I haven't talked to --

Q    Did the -- sorry.  Did the defense interview you?

A    No.

Q    Okay.  All right.  Were you present at the Rainbow Gathering in 2024?

A    Yes, sir.

Q    When did you arrive to the gathering?

A    It was June 17th when we went up to Indian Creek area.

Q    Did you set up your camp then?

A    Yeah.

Q    Okay.  Did you have -- when you set up your camp, did you have any contact with Forest Service?

A    Yeah.  Yeah.

Q    What was the reason for that contact?

A    Within that day --

Q    Okay.

A    -- I'm sure.

Q    What was the reason?

A    Just kind of say hi, I think.  I mean, just normal --

Q    Did they come to check on anything?

MR. CAMPBELL:  Objection, Your Honor.  Calls for speculation as to law enforcement's intent.

THE COURT:  Well, I think it's a foundational question trying to determine what, if anything, happened in that context, so I'm going to overrule.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

Rephrase your question though, Counsel, and maybe it'll help this witness with where it is you are going.

MR. KEVANE:  Okay.

BY MR. KEVANE:

Q    Did those first Forest Service officers talk to you about fire safety?

A    You know, I don't recall on that day that -- any discussion of fire safety.

Q    Okay.  How does the Rainbow Gathering secure water for the event?

A    It -- it's all -- depends on each gathering being different.  How -- how do we do it for this year -- or that year?

Q    Yeah.  How did you secure water access for the Rainbow Gathering in 2024?

A    We studied the creek and used it appropriate to our needs and -- and the conditions and the -- our rights to -- to have water.

Q    Okay.  Did you volunteer to lay water lines --

A    Yes.

Q    -- for the Rainbow Gathering?

A    Yeah.

Q    Okay.  What material did you use to lay those water lines?

A    It's a three-quarter inch black poly pipe is the general thing of most everything.

Q     Did those materials belong to you?

A     Yeah.

Q     Okay.  Did you learn that people were upset about the Rainbow Gathering happening in Plumas?

A     We started learning about that particular condition as the days progressed, yeah.

Q     How'd you learn about those concerns?

A     Well, a man came up and stated, what are you doing with my water, on the 18th, and that kind of gave a red flag of something going on.

Q     Did you know who that man was?

A     I learned subsequently what his name was.

Q     What was his name?

A     Joe Egan.

Q     Okay.  Did he identify himself to you?

A     No.

Q     Okay.  What did he say to you in that interaction on the 18th?

A     Besides what are you doing with my water?  He didn't say anything.  He just took some pictures.

Q     Okay.  Do you recognize the name Jason Ingram?

A     I do.

Q     How is he known to you?

A     Subsequently, on the 20th, I met him and Joe Egan and a group of other men.

Q    Let's talk about what happened on the 20th.  Where were you on June 20th?

A    In the little camp that -- we called it Water Camp because the people there are interested in the water -- or doing things with water, the hook ups.  But I was there.  A few other people were there.

Q    Did people who were not camping with the gathering come to this Water Camp?

A    Yeah.

Q    What did they go when they came to the Water Camp?

A    Well, in the morning, a small group came and -- and went right to the creek and cut up some of the water pipe.  Later in the day, they came back with a larger group to do more of that.

Q    Were these water lines in National Forest?

A    Yes, sir.

Q    Okay.  Who were these people who cut up the water lines?

A    Well, like I said, subsequently, we learned it was Joe Egan, Jason Ingram, and six or seven helpers.  I didn't get an exact number, but six or seven younger men.  And Sam -- I want to say Williams -- Sam is the newspaper man out of there.  He was with them, but he didn't -- he -- just observing.

Q    Okay.  Did you take a video of this incident?

A    I did.

Q    Would you recognize this video if we played it for you?

A    Yeah.

Q    Okay.  I'm going to go ahead and play what is pre-marked Defense Exhibit G.

MR. CAMPBELL:  Your Honor, I would object to this being played before it's admitted into evidence.

THE COURT:  Yes, Counsel.  While we've got some minimal foundation here, this is not admitted into evidence at this time.  Do you wish to --

MR. KEVANE:  Yeah.  I wish to --

THE COURT:  -- proffer it?

MR. KEVANE:  Yes.  I wish to proffer it.  I wish to just play about 20, 30 seconds of video and then ask Mr. DeMars if he recognizes it, and admit it into evidence.

THE COURT:  All right.  I think he's already acknowledged that he is aware of it and recognizes it.

Do you have any objection, Counsel, to the admission of this?

MR. CAMPBELL:  Yes, Your Honor.  This video contains -- I believe this is approximately a 20-minute video.  I may be slightly off, but substantial video, which contains statements from many individuals, all of which are hearsay.

So on that basis, I would admit [sic] to the statements in the video.

THE COURT:  All right.  How do we overcome out of court statements apparently being offered for the truth?

MR. KEVANE:  May I have a moment to confer?

THE COURT:  You may.

(Counsel confer)

MR. KEVANE:  Your Honor, we only plan to play three portions of the video no longer than 30 seconds each, and all of the statements made in that video were made by people who will be able to testify today.  There was no declarant who was out of court making statements.

THE COURT:  But these statements were made out of court.

MR. KEVANE:  They were made out of court.

THE COURT:  And if you wish to have the declarant come into court and make those statements, we'll certainly hear from those declarants at such time as you bringing them forward as witnesses, but we haven't solved the hearsay problem.

MR. KEVANE:  They're not being offered for the truth of the matter.  They're being offered for the effect on Mr. DeMars and for potential conflicting testimony.

THE COURT:  All right.  What is the relevance of the effect on Mr. DeMars?

MR. KEVANE:  Yes, Your Honor.  This just goes to lay foundation for a line of questioning that will show that Forest Service was complacent in this incident taking place.  They were aware of that incident taking place and statements made in that video will indicate that people said to Mr. DeMars that

Chris Carlton gave them permission.

THE COURT:  Well, I appreciate that proffer, but it would seem then that the relevant effect is on the what you argue is the complacent Forest Service as opposed to Mr. DeMars.  And to the extent that you have witnesses that are going to come into court to -- you may proceed.

To the extent that you have the witnesses in the form of the individuals that are on these videos, I'll -- I'm going to grant the objection, and we'll wait to hear from the live witnesses themselves.

(Counsel confer)

THE COURT:  Standby Mr. DeMars.  It'll be just a minute.  No worries.

THE WITNESS:  Sure.

(Counsel confer)

MR. KEVANE:  Your Honor, this is important to lay foundation.  Mr. DeMars took this video.  There were officials there, and we're not going to ask -- we're not going to show any statements by declarants who are not on the stand.

MS. HOPKINS:  Your Honor, just to answer that -- Megan Hopkins, for the record.  Mr. DeMars will be laying the authentication for this video as the person who recorded it and provided it.  We will be only showing portions of the video during this testimony that do not include statements from out of court declarants.  They're being offered for the truth of

the matter asserted.

For example, the only statements we'll be offering with regard to this testimony are derogatory statements made that were directed to the defendant, which we certain -- I apologize, directed at Mr. DeMars, which we certainly aren't proffering are true as asserted.

And we will be offering sections of the video that show physical activity taking place that we do believe this -- the United States Forest Service is complicit in.  It demonstrates that officers were present and taking no action. When there are later witnesses on the stand who make statements on the video, then we will play those portions and provide testimony regarding those statement.

THE COURT:  All right.

MS. HOPKINS:  None of the statements would be offered for the truth of the matter asserted.

THE COURT:  Within that limited parameter, it would seem then that it goes to the effect on this witness, and I am going to permit -- again, Counsel, very limited --

MR. KEVANE:  Yes, Your Honor.

THE COURT:  I am going to allow you to show only that portion that reflects what Counsel has just described sufficient to lay the foundation here and authenticate and dealing with statements directed at this witness.  Proceed carefully.

MR. KEVANE:  Yes, Your Honor.

Okay.  So at this time, I'd move to admit Defense Exhibit G.

THE COURT:  I'm going to permit only what I have described.  That limited portion, you may now show.

(Defendant's Exhibit G-2 admitted into evidence)

MR. KEVANE:  Okay.  Okay.  I'm going to play a portion of that exhibit.  Okay.

THE COURT:  For the record, do you wish to identify what it is you're playing so that --

MR. KEVANE:  Yes.  I'm going to play a portion of the video -- of Exhibit G, we'll call G-2.

THE CLERK:  Time stamp?

MR. KEVANE:  8:10 to 8:30.

THE COURT:  All right.  Defense Exhibit G-2 time stamped -- I'm sorry?  Time stamped?

MR. KEVANE:  8:10 to 8:30.

(Video played at 1:35 p.m.)

BY MR. KEVANE:

Q    Do you recognize that man in the video with the --

MR. CAMPBELL:  Your Honor, just to interject, I would note that the video stopped at 8 minutes and 36 seconds, just for the sake of clear record.

THE COURT:  Thank you, Counsel.  So noted.  That will be included in what has been admitted as Defense Exhibit G-2.

And to the extent that you're going to ask this witness about individuals, since we saw three individuals, you might back it up and have them on the screen so that we have clear identification.

MR. KEVANE:  Absolutely.

THE COURT:  There we go.

MR. KEVANE:  Could you go to -- yeah.  I can't see it from up here.

BY MR. KEVANE:

Q    Do you recognize that man wearing the sunglasses in the video?

A    Yeah.  With the blue dotted shirt is Joe Egan.

Q    Okay.  Were you trying to have a conversation with him?

A    Yeah.

Q    About what?

A    I was asking him to stop his guys from cutting up the water line.

Q    Did it --

A    And trying to have dialogue about maybe him understanding what we were doing there rather than what he thought we might be doing with --

Q    Did you feel like Mr. Egan was interested in talking to you?

A    No.

Q    What gave you that impression?

A    His responses.

Q    Okay.  He called you names?

A    Yeah.  And he -- yeah.

Q    And he called you those names repeatedly?

A    Yeah.

Q    All right.

THE COURT:  The Court saw the video.  We can keep going.

THE WITNESS:  Yeah.

BY MR. KEVANE:

Q    Were you present in Plumas when the closure order was implemented?

THE COURT:  Why don't you clarify with this witness the closure order that you're referencing?

MR. KEVANE:  Sure.

BY MR. KEVANE:

Q    You were aware that there was a closure order issued on June 26th in Plumas National Forest?

A    I'd heard.  I'd heard.  I'd been -- talked to an officer, yeah.

Q    Okay.  How did news of the closure order spread amongst the gatherers?

THE COURT:  If you know.

BY MR. KEVANE:

Q    If you know.

A    I don't think it happened very efficiently because many, many people had no idea nor were they available to talk with.

MR. CAMPBELL: Objection, Your Honor. Speculation.

THE COURT: Sustained.

THE WITNESS: By me.

MR. CAMPBELL: Move to strike the answer.

THE COURT: Stricken. Go ahead.

BY MR. KEVANE:

Q    Were you given directions from Forest Service regarding the closure order?

A    I was told what was going to happen.

Q    Do you know how Forest Service communicated these instructions to other attendees?

A    From what I saw, they only told a few people expecting that that was the way that it was going to spread through the whole camp.

Q    How do you think this -- how do you think they expected this information to spread?

MR. CAMPBELL: Objection.

THE COURT: All right. That is speculative.

MR. KEVANE: Yes.

THE COURT: You can stay seated, Counsel.

When were you told?

THE WITNESS: I believe -- so the date --- they said within 48 hours. So if the closure happened, say, on the 26th,

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

then it must have been on the 24th, and that's just -- that's my thinking. They said within 24 hours, and hopefully, you could maybe understand that when you're up in the woods, you're not sure 23rd, 24th. I -- there's no talking about time of day and -- I mean, the date of the week, so --

THE COURT: Sure. All right.

You may proceed, Counsel.

MR. KEVANE: Yeah.

BY MR. KEVANE:

Q    On July 4th, did you speak to Forest Service?

A    I -- yes. Commander Canuto Molina came to our camp and spoke with us.

Q    Did he tell you anything regarding the closure order?

A    He said -- and a lot of times, I wish there were body cams that were present at all these conversations. He said, what do you expect to be able to do? And I answered him.

Q    Did he issue you an extension for the closure order to continue cleaning up?

A    There was a verbal understanding that I was going to take a few days to do what was in front of me.

Q    Okay.

MR. CAMPBELL: Objection, Your Honor. Speculation just as to an understanding between the two parties.

THE WITNESS: Right.

THE COURT: Well, it was this witness's impression

that there was a verbal understanding.  Perhaps counsel's going to follow up on what was said and what was understood, but if not, I'll let you take that up on cross.

But I took that question to be asking specifically what impression this witness had and his impression was that there was a verbal understanding.

MR. KEVANE:  Yes, Your Honor.

THE COURT:  We may yet hear what the terms of that were.  But if not, you've got it on cross.

MR. KEVANE:  Yeah.

BY MR. KEVANE:

Q    What were the terms of that verbal communication with Officer Molina?

A    The part that has been -- I've had -- I've had phone calls with him prior to my trial, and we talked about that.  And he said, yes, I understood that you would have to have the next few days to do what you were going to do.  That was -- we've talked about it several times.

Q    Okay.

A    And he's affirmed it with -- through the Court on other trials.

MR. CAMPBELL:  Objection, Your Honor, as to hearsay for the officer's statements as to what the officer understood.

THE WITNESS:  It was -- I think it's been recorded in court on other cases.

THE COURT: All right. I'm going to sustain that objection and let you rephrase the question.

MR. KEVANE: Sure.

BY MR. KEVANE:

Q    What did Officer Molina tell you then?

A    What did he tell me?

Q    Yeah.

A    After he asked me what I had planned to be able to do in the next few days?

Q    Yeah. What were his instructions to you?

A    It wasn't really instructions. It's -- there was just, like, he -- we had that understanding.

Q    Okay.

A    I've talked to him many times, and we -- he said, what do you plan to do? And I said, well, that's what I plan to do, and he said okay.

Q    Okay.

A    That was that.

Q    What did you tell him you planned to do?

A    I told him specifically, on the 5th, I was going to load up the garbage because I had a trailer, take it to the dump because it was Friday, and I wasn't sure about the dump on Saturday. Communications out of site was hard. And then on the -- I said on the 6th and the 7th, I would do such and such, and he said he understood.

Q   On the 4th when you talked to him, did he give you a time that you could remain in the forest to clean up?

A   No.  But he definitely understood, and I thought, because I talked to the commander, that that was understood with the whole team.

Q   Okay.  Did you hear from other attendees that officers gave a 24-hour extension on the 4th?

A   Yes.

MR. CAMPBELL:  Objection, Your Honor.  Calls for hearsay.

THE COURT:  Sustained.

MR. KEVANE:  Your Honor, this is the effect on Mr. DeMars's thinking that he could continue to remain in the forest to clean up.

THE COURT:  Then ask him that question.

MR. KEVANE:  Yeah.  Okay.

BY MR. KEVANE:

Q   Were you under the impression that you could remain in the forest to continue cleaning up in the forest?

A   I was.

Q   Okay.  Did they come back on -- did officers come back to your campground on July 5th?

A   I was on my way out with the garbage on the morning of July 5th at 9:00 when they were arriving and -- to -- pursing tickets and all the misunderstandings began.

Q    Yeah.  But did you speak to any officers on July 5th?

A    I did.  I said, where's Canuto Molina?  We would like to have him here.

Q    Yeah.

A    And they said, he's at the other site.

Q    Did they cite you on the 5th?

A    Yes.

Q    And when they cited you, were you under the impression that you could remain --

THE COURT:  Don't lead, Counsel.

MR. KEVANE:  You're right.

THE COURT:  This is direct exam.

MR. KEVANE:  Yes.

BY MR. KEVANE:

Q    When they cited you --

THE COURT:  What if anything --

BY MR. KEVANE:

Q    -- what, if anything, did you believe --

THE COURT:  Did you understand --

BY MR. KEVANE:

Q    -- did you understand that you could remain in the forest to continue cleaning up?

A    At that point, I felt like my discussion with Canuto Molina meant what -- and I'd -- I'd spoken with him on the phone several times.  He's a commander in New Mexico --

Q    Okay.

A    -- available.

Q    Did you have any conversations with Ms. Robichaud about the extensions to clean up?

A    I'm sorry, say that again?

Q    Yeah.  Did you have any conversation --

THE COURT:  What, if any, conversations did you have --

BY MR. KEVANE:

Q    What, if any, conversations did you have with Ms. Robichaud about the extensions to clean up?

A    During the gathering?

Q    Yes.

A    Okay.  If there's 40 people there, they're all in an area that's a square mile.  They -- you just don't go around talking to everybody.  It's -- you're in your own little camp, and you talk to a few people if they -- it's -- it's very hard to have communications in that level.  No.  I didn't say anything with her.  I -- I saw her on the 5th get arrested is what -- if that's meaningful.

Q    Mr. DeMars, I just want to circle back to my first line of questioning.  Did you review your testimony with the defense?

A    Did I review?  I -- I think I did.  Yeah.

Q    Did you practice questions we would ask?

A    I got asked --

MR. CAMPBELL:  Objection, Your Honor.  Leading.

THE COURT:  Where is this going, Counsel?

MR. KEVANE:  Your Honor, I just want to circle back and clarify that Mr. DeMars --

THE COURT:  Are you attempting to refresh here?

MR. KEVANE:  I just want to -- I'm just trying to circle back and clarify that Mr. DeMars talked with the defense about his testimony and that he was not instructed to give answers.

THE COURT:  All right.  Ask him that.

BY MR. KEVANE:

Q    Were you instructed to give any answers by the defense?

A    No.

Q    Okay.

MR. KEVANE:  May I have a moment to confer?

THE COURT:  You may.

(Counsel confer)

BY MR. KEVANE:

Q    I'm going to circle back to the incident on June 20th. I'm going to go ahead and play a portion of that Defense Exhibit G, which I'm going to refer to as G-1, time stamped 3:25 through 3:50.

THE COURT:  All right.  Wait, wait, wait.  Before you do this, we don't, again, have any foundation.  I'll hear a proffer as to what this involves and why it's relevant, but

we're not just going to play it and start questioning.  All that's admitted right now is G-2, timestamped 8:10 to 8:36.

MR. KEVANE:  I see.  Okay.  Video G-1 is relevant to lay foundation of the cutting of the water lines, which will show the severity of the behavior that was present, which will reflect Forest Service's lack of complacency -- Forest Service's complacency in this incident.  And it will show that Mr. DeMars was interacting with people who had severe negative impressions about the gathering, and it will lay foundation for future testimony that people told Forest Service about those concerns and that Forest Service may have listened to those concerns when implementing the closure order.

THE COURT:  This seems significantly far afield, Counsel.  And is Mr. DeMars part of this video?

MS. HOPKINS:  Yes, Your Honor.  This portion of the video addresses Mr. DeMars interacting with Jason Ingram during conduct which any Forest Service officer would ordinarily be compelled to intervene.  And in this video, there is no intervention, and testimony later will show that there was no future intervention or investigation.

THE COURT:  And I'll hear from Mr. Campbell.

MR. CAMPBELL:  Your Honor, as to relevance, I don't believe there's been any proffer that Forest Service agents were present or that Mr. Caudle was present or that Mr. Carlton was present.  So insofar as some -- I would review my objection

to relevance.  I don't think there's a connection.

THE COURT:  All right.  What, if anything, does this show with regard to a Forest Service officer?

MS. HOPKINS:  Your Honor, well, this specific video -- we will be showing a portion of the video following this that shows that CAL FIRE was present.  We were reserving the portions --

THE COURT:  As distinct from U.S. Forest Service?

MS. HOPKINS: Yes.  We will -- yes.  But they were working in collaboration with U.S. Forest Service.

THE COURT:  But I don't have that before me either.

MS. HOPKINS:  Well, we -- which we'll get into later. We are also reserving showing those portions of the video that contain potential hearsay statements until we have later witnesses.

This portion of the video we're about to play involves an interaction between Mr. DeMars and Jason Ingram, who's a local official who worked closely with Chris Carlton and attended, as an offer of proof, a number of board meetings and town hall meetings with Chris Carlson related to the Rainbow Gathering.

THE COURT:  All right.  I'm going to sustain the objection.  We're not ready for this yet.  If there's evidence from others, including Forest Service officers or those who were, apparently, failing to take up a duty to protect, that

makes this relevant.

But right now, it just seems that what's being offered, A, doesn't have foundation, and B, is, in the abstract, just a prejudicial display of hostile activity.  I don't feel like there's enough before the Court yet to put this into any sort of context.

(Counsel confer)

BY MR. KEVANE:

Q    Were any law enforcement officers present at this incident?

THE COURT:  What incident are we talking about, Counsel?

BY MR. KEVANE:

Q    The incident on June 20th.

A    (No audible response)

Q    Were any CAL FIRE officers present at this incident on June 20th?

A    Yes.

Q    Did they do anything to intervene when people cut up the water lines?

A    No.  And they -- they voiced an opinion that was very disturbing to me.

Q    What was that opinion?

A    They --

THE COURT:  And again, Counsel -- I'm sorry,

Mr. DeMars.

THE WITNESS:  That's fine.

THE COURT:  Hold for just a moment.

How does this overcome hearsay?  You're asking this witness to repeat, allegedly, a CAL FIRE representative's statements that are out of court presumably for the truth of whatever this CAL FIRE person is saying.

They're not a defendant.  They're not a party to this, and all of this is somehow stretching to a constitutional issue involving the closure order that this Court is struggling to make the connection to.

So please, Counsel, explain why this is not inappropriate hearsay that should be excluded.

MR. KEVANE:  We can move on.  We'll move on, Your Honor.

(Counsel confer)

BY MR. KEVANE:

Q    What were people doing at this incident on June 20th?

A    Well, there were two observers from CAL FIRE, and I spoke with them for a minute.  And during that -- that very little clip of this video that I took, Joe Egan said that Chris Carlton told him to come do this and that --

THE COURT:  And he can't --

MR. KEVANE:  Yeah.

THE COURT:  Okay.  Stop.

THE WITNESS:  It's on the video.

THE COURT:  Mr. DeMars --

THE WITNESS:  Yeah.  I  -- I'm a little clueless on what he means what they were doing if I can answer.

BY MR. KEVANE:

Q    What were these -- okay.  Jason -- was Jason Ingram at this incident?

A    Yeah.

Q    Okay.  What was he doing at this incident?

A    He was flamboyant.  He was -- he was using the machete to chop of lots of pipe with the other people.

Q    After this incident, did you speak to any -- did you report this incident to anybody in Forest Service?

A    Oh, yes.

Q    Okay.  Who did you speak to?

A    Most -- well, Canuto Molina, the commander who --- I told -- talked to him several times.  Mostly, it was -- and there's videos of it.

I don't know why they're not -- RJ and Steve Buckman were two of the main officers that did dialogue with me almost every day talking about situations.

Q    Did you speak to Chris Carlton about the incident?

A    Yes.  He showed up the next day, and I asked him if it was true that he told them to come do that.

Q    Okay.  Did he --

THE COURT:  And, Counsel, if you would clarify for the record, who is Chris Carlton and what his role is in these events.

MR. KEVANE:  Yeah.

BY MR. KEVANE:

Q    Do you know who Chris Carlton is, Mr. DeMars?

A    Yes.  He is -- or was the forest supervisor of that part of the Plumas.

Q    Okay.  Did he open an investigation about the incident?

A    No.

Q    Okay.

MR. CAMPBELL:  Objection, Your Honor.  Calls for speculation.

BY MR. KEVANE:

Q    Were you --

THE COURT:  No.  It just calls for this witness's understanding, and he's saying that he does not believe that one was opened.  It doesn't mean it wasn't opened.  It simply means that Mr. DeMars is not aware of it.

You may proceed.

MR. KEVANE:  Okay.

BY MR. KEVANE:

Q    Were you aware of any action he took regarding this incident?

A    Regarding the destruction of the pipe?

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

Q    Yes, sir.

A    No.  No actions were known to me to ever come out of there.

Q    Okay.

MR. KEVANE:  Can I have a brief moment to confer?

THE COURT:  You may.

(Counsel confer)

BY MR. KEVANE:

Q    You were never interviewed after -- were you ever interviewed after this incident on June 20th?

A    Officially?  No.  I just spoke with officers as -- as the --

Q    Okay.

A    -- conditions came up.

Q    And were you aware of any investigations opened about this incident?

A    I was not aware of anything investigated into the incident, no.

MR. KEVANE:  No further questions, Your Honor.

THE COURT:  All right.  Standby, Mr. DeMars.  I believe the Government has questions for you.

MR. CAMPBELL:  Yes, Your Honor.  Thank you.

THE COURT:  Cross-examination.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q    Good afternoon, Mr. DeMars.

A    Hello.

Q    Do you know Ethan Caudle?

A    (No audible response)

Q    Do you know an individual named Ethan Caudle?

A    I don't believe so, and I'm not sure how you're saying the last name.

Q    C-A-U-D-L-E, Caudle.

A    No.  Ethan?

Q    Do you know if you've ever had an interaction or a conversation with an individual named Ethan Caudle.

A    I don't recollect any.

Q    I'd like to ask another question.  How old are you, Mr. DeMars?

A    I'm 69.

Q    69?  Do you ever have issues with your memory, sir?

A    Not in any respect that's meaningful.

Q    You were testifying on direct about conversations that you had in July and June of 2024.  Is that correct?

A    Oh, yeah.

Q    And you -- your memory of that is accurate?

A    Yeah.

Q    So your memory from a year ago is pretty accurate.  That's fair to say?

A    At that -- at that place, yes, very accurate.

Q    And your memory probably gets better for more recent events.  Is that correct?

A    That's -- I'm not sure how that --

Q    I'll be more specific.

THE COURT:  Please.

BY MR. KEVANE:

Q    At the beginning of your direct examination, the attorney for the defense asked you whether you'd spoken with the defense in anticipation of this case, and you said no.  Is that correct?

A    Spoken with or in a particular way?  I haven't been spoken with.  I've -- I've talked to them.  Is that what you mean?

Q    But when you were first asked on direct examination, you said that you had not discussed your testimony with the defense.  Is that correct?

A    Yeah.  I don't quite understand what you're saying.  I'm going to try to answer anyway.  I think what you're saying is -- if you're asking me right now if I talked to the defense, I have.

If I've been in any way talked to how I was going to say anything or even really asked beyond what's pertinent evidence, I haven't been asked anything or told anything other than -- I feel like you're leading toward I -- have I been coached to do anything and -- and that's what I -- no.

THE COURT:  Ask him that question, Counsel.

BY MR. CAMPBELL:

Q    Have you been coached to say anything?

A    No.

THE COURT:  There we go.  Next question.

MR. CAMPBELL:  No further questions, Your Honor.

MR. KEVANE:  Nothing on redirect, Your Honor.

THE COURT:  Mr. DeMars, at this time, you are excused.  Thank you for being here today.

THE WITNESS:  Thank you.

THE COURT:  And if this witness is not subject to recall, then, Mr. DeMars, you're welcome to stay in the courtroom and observe the rest of the trial, or you're free to go at your leisure.

(Witness excused)

MR. DEMARS:  May I speak with you?

THE COURT:  No, unfortunately.

MR. DEMARS:  Okay.  I was just thinking if only my --

MS. HOPKINS:  Mr. DeMars?  Mr. DeMars, please take a seat if you want to remain in this courtroom.

MR. DEMARS:  So I'm not going to be recalled?

MS. HOPKINS:  No.  It's just policy.

MR. DEMARS:  Well, I'd like to --

THE COURT:  All right.  Call your next witness.

MR. KEVANE:  Your Honor, defense calls Joe Egan to the stand.

THE COURT:  All right.  If we could have Mr. Egan brought forth, please.

THE CLERK:  Raise your right hand.

JOE EGAN, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Can you say your name and spell your last name for the record?

THE WITNESS:  Joe Egan, E-G-A-N.

THE COURT:  Mr. Egan, welcome.  As a witness here today, I'm advising you that you have a Fifth Amendment right to not incriminate yourself, and you may remain silent with regard to any questions that you believe are asking for evidence that might incriminate you.  If you elect to respond and offer testimony that could incriminate you, that testimony may be used at future proceedings in the event that it was relevant to any criminal activity or incriminating issue.  So you have Fifth Amendment rights applicable.  I'm just advising you as all the witnesses are being advised.

THE WITNESS:  Okay.

THE COURT:  All right.  With that, welcome.  Please speak into the microphone so that we can get a clear record of today's proceedings, and defense counsel will be asking you a few questions shortly.  Thereafter, counsel for the Government will have cross-examination, and we'll work our way through this.

THE WITNESS:  Okay.

THE COURT:  Thank you.

DIRECT EXAMINATION

BY MR. KEVANE:

Q    Good afternoon, Mr. Egan.  Mr. Egan, what is your occupation?

A    I own a cattle ranch in -- in Lassen County.

Q    Is that ranch near Plumas National Forest?

A    Yes, it is.

Q    Is -- do you have grazing rights in Plumas National Forest?

A    Yes, I do.

Q    Okay.  Is that leased from Forest Service?

A    Yeah.  It's from the Forest Service.  I don't know technically if it's lease or a grazing permit, but yeah.

Q    All right.  Do you pay Forest Service for this payment -- for this permit?

A    Yes, I do.

Q    How much do you pay?

MR. CAMPBELL:  Objection, Your Honor, as to relevance.

MR. KEVANE:  This goes to show the long -- a longstanding relationship between Mr. Egan and Forest Service.

THE COURT:  Why don't you ask him how long he's had a relationship, then?

MR. KEVANE:  Sure.  Yeah.

BY MR. KEVANE:

Q    How long have you had this permit from Forest Service to graze?

A    Which permit?

Q    For the grazing rights.

A    Which one are you referring to?

Q    How long have you been interacting with Forest Service about these grazing permits?

A    Approximately 15 years.

Q    Okay.  Do you have a longstanding relationship with Forest Service?

A    I just said it was 15 years.  I don't know if you'd classify that as longstanding or not.

Q    Okay.  Well.  Did you become aware that the 2024 Rainbow Gathering was taking place in Plumas National Forest?

A    Didn't I come -- yes.  I was aware of it.

Q    How -- when were you made aware of that?

A    I don't recall exactly.

Q    Do you remember how you were made aware?

A    Yeah.  I really don't, no.

Q    That's all right.  Were you concerned about the Rainbow Gathering coming to your community?

A    Yes.

Q    Okay.  What were those concerns?

A    Well, primarily it was the fire danger they were causing

on the allotments that we utilize in addition to the ranch that I own.

Q    Did you have concerns about the type of people expected to attend the Rainbow Gathering?

MR. CAMPBELL:  Objection, Your Honor, relevance. This man is not a member of Forest Service.  There's no information he's communicated with Forest Service officers, much less Officer Caudle.

THE COURT:  Well, I don't think it went to issues of Forest Service, but I am struggling with the relevance, Counsel, of what Mr. Egan's feelings about people are.  I'm going to sustain the objection.  Rephrase or move on.

MR. KEVANE:  Okay.  I can move on.

BY MR. KEVANE:

Q    Did you post about the Rainbow Gathering online?

A    I believe so, yes.

Q    Would you recognize these posts if they were shown to you?

A    I guess I'd have to see them to know that.

Q    You can -- I'm going to ask -- show you what is pre-marked Defense Exhibit J.  If you want to open your binder to Exhibit J.

THE COURT:  That would be the black binder before you, Mr. Egan.

THE WITNESS:  Okay.

BY MR. KEVANE:

Q    Do you recognize that post in front of you?

A    Yes, I do.

Q    What is this post?

A    Excuse me?

Q    What is the post?

A    It's a Facebook post.

Q    And how do you recognize that post?

A    I'm not sure I understand the question.

Q    This is just laying foundation for authentication.  How do you recognize the post?

THE COURT:  Is this something you posted, sir?

MR. KEVANE:  Yeah.

THE WITNESS:  You -- you know, I believe that it is, but I will caveat it by saying that there's AI, and then what's the term for when your -- your account gets hacked?  That's happened a number of times.

BY MR. KEVANE:

Q    Okay.

A    So I can't say with 100 percent certainty it is.

Q    Okay.  To the best of your knowledge, is that a true and correct copy of the post you posted?

THE COURT:  Go ahead and take a minute to review it.

THE WITNESS:  I don't know for certain.  It's -- it's in a different format, obviously.

MR. KEVANE:  Okay.  At this time, I would move to

admit Defense Exhibit J.

MR. CAMPBELL: Your Honor, this document has not been authenticated.

THE COURT: All right, Counsel.

MR. KEVANE: I can go further to authenticate the document.

BY MR. KEVANE:

Q    Did you post --

(Counsel confer)

BY MR. KEVANE:

Q    Did you post that you ran across about 100 of the filthiest people you can imagine on -- on June 18th?

MR. CAMPBELL: Objection, Your Honor. I would -- this document should be admitted before portions of it are read into the record.

THE COURT: Well, I'm going to allow some additional authentication consistent with your prior objection, Counsel.

So it's not being admitted yet, and I'm going to limit your questions to foundation and authentication. You might ask him to focus just on the text --

MR. KEVANE: Sure.

THE COURT: -- and we might take up redactions. Your approach, Counsel, but right now, it is not in evidence. And see if you can help the witness through some foundation.'

MR. KEVANE: Okay.

BY MR. KEVANE:

Q    Do you recognize the pictures you took at the bottom of this post?

A    The -- the large one is blurred out.  I -- I don't have any idea what that is.  And I --

Q    How about the other three pictures?

A    You know, it was over a year ago.  I don't specifically recall.

Q    Okay.  This is posted on your Facebook page?

        THE COURT:  You're asking him?

        MR. KEVANE:  Yes.

BY MR. KEVANE:

Q    Was this posted on your Facebook page?

A    I -- I believe so.

Q    Okay.  Does this look like a true and correct copy of that post you posted?

        THE COURT:  And we're focusing just on the text?

        MR. KEVANE:  Just on the text, yeah.

        THE COURT:  All right.  Ignoring for a moment the photographs, he's asking did you author the text -- the one, two, three, four, five, six, seven lines of text to the best of your recollection?

        THE WITNESS:  To the best of my recollection, yes.

        MR. KEVANE:  Okay.

        THE COURT:  All right.  Then I'm going to admit this

in redacted form.  We're not going to address the photographs because he doesn't recall them.  I'm going to let you ask questions about the text.

MR. KEVANE:  Okay.

THE COURT:  This will be admitted as Defense Exhibit J, redacted.

(Defendant's Exhibit J - Redacted admitted into evidence)

MR. KEVANE:  Okay.

MR. CAMPBELL:  Your Honor, I would also raise an additional objection.  The text of this says that -- contains statements about what law enforcement thinks about the Rainbow Gathering.  That's either hearsay, speculation, or both.  It should not be admitted.

THE COURT:  All right.  Right now, it's being admitted just for purposes of his recollection of the posting, not for the truth of anything that is in there.  And I'll overrule that without prejudice to you reraising it if any of these particular lines are being offered for the truth of what's asserted there.

MR. KEVANE:  Okay.

BY MR. KEVANE:

Q    In one such post -- in this post, did you refer to the Rainbow Gathering as 100 of the filthiest people you can imagine?

A    Yes.

Q    Okay.  Did you -- in this post, did you refer to them as hallucinating, drugged out freaks?

A    I don't remember -- recall that specific language.

Q    Do you see that in the document in front of you?

A    Yes, I do.

Q    What was your goal when making these social media posts?

A    I guess I was trying to make the -- the public officials aware of -- of the situation that was going on.

Q    Were you trying to make -- did these public officials you were trying to make aware include members of Forest Service?

A    Not particularly.

Q    Was Forest Service part of your intended audience when making these posts?

A    I don't think they're my Facebook friends, if that's what you're asking.

Q    Did you directly link the Forest Service Plumas National page in this post?

A    I don't believe so.

Q    So was Forest Service part of your intended audience when you made these posts?

A    I guess I don't really -- didn't really consider who the -- the whole audience was.  I -- I don't know the answer to that question.

Q    Did you visit any of the campgrounds the gathering was held at?

A    I -- I am not aware of it being in a campground, per se.

Q    Did you visit the area that the Rainbow Gathering was being held?

A    I did, yes.

Q    Did you speak to any of the Rainbow Gathering attendees?

A    Not that I specifically recall, no.

Q    Do you know Jason Ingram?

A    I do.

Q    What is your relationship?

A    There is no relationship.  He's an acquaintance.

Q    Okay.  Would you consider him a friend?

A    I mean, I guess that's not a term I would use.  But he's an acquaintance.  I wouldn't object to it.

Q    Did you discuss your concerns about the Rainbow Gathering with him?

THE COURT:  Before you go on, Counsel, there's no evidence before the Court as to who Jason Ingram is.

MR. KEVANE:  Yeah.

THE COURT:  If --

MR. KEVANE:  Sure.

THE COURT:  -- since the witness has indicated that he is aware of this individual, the Court would ask that you develop some foundation as to who this individual is and/or his significance in this set of facts?

MR. KEVANE:  Yes, Your Honor.

BY MR. KEVANE:

Q    Who is Jason Ingram?

A    That's a question for me?

Q    Yes.

A    He -- he's a resident of Lassen County.  I don't know what you're looking for, but --

Q    What is his occupation?

A    You know, I don't know what his actual occupation is.  I know he's on the board of supervisors for Lassen County.

Q    Okay.  And did you discuss your concerns about the Rainbow Gathering with Mr. Ingram?

A    I -- I'm assuming I did, but I don't specifically recall it.

Q    Did you attend any town -- were you aware of any town halls being held regarding the Rainbow Gathering?

A    No.  I don't believe so.

Q    Okay.  Did you attend any of those town halls?

A    No.  I wasn't aware of them, so I -- no.  I did not attend any.

Q    Were you aware of an incident that occurred on June 20th, 2024, where people destroyed the Rainbow Gathering's water lines?

A    You know, I -- since I'm not represented, I'm going to go ahead and -- and ask for my Fifth Amendment privileges on that.

Q    Mr. Egan, this is not an incriminating question.

MR. CAMPBELL:  Your Honor --

THE COURT:  He's asserted his Fifth Amendment rights.

MR. KEVANE:  Sure.

THE COURT:  Move on, Counsel.

MR. KEVANE:  Okay.  May I have a moment to confer?

THE COURT:  You may.

(Counsel confer)

BY MR. KEVANE:

Q    Mr. Egan, I'm going to show you a video, Defense Exhibit G-2.

THE CLERK:  Time stamp?

MR. KEVANE:  8:10 to 8:30.

MR. CAMPBELL:  Your Honor, I would object insofar as this video depicts portions of the incident that Mr. -- that the witness just invoked his Fifth Amendment right not to discuss.  I'm not sure how this video can be played and questions can be asked in a way that does not infringe of the witness's Fifth Amendment rights.

THE COURT:  The witness certainly has the right and opportunity to further assert Fifth Amendment rights in response to any questions.  Right now, we have no questions pending, merely an announcement that an exhibit, which is already in evidence, is going to be played.

Hold your objection until there is a question pending.  Because the exhibit is in evidence, I'll allow you to

go ahead and play it again for this witness.  But again, Counsel, foundation --

MR. KEVANE:  Yes.

THE COURT:  -- is going to be appropriate and Mr. Egan can raise Fifth Amendment rights.

MR. KEVANE:  Understood, Your Honor.  I'll be careful.

BY MR. KEVANE:

Q    Do you see an image on your screen right now?

A    I do.

Q    Okay.  Who's that person in that image?

A    I'm going to assert my Fifth Amendment rights with regard to that.

Q    Okay.  Okay.  I'm going to go ahead and play Defense Exhibit G-2.

(Video played at 2:19 p.m. to 2:20 p.m.)

BY MR. KEVANE:

Q    Is that you speaking in the video to Mr. DeMars?

A    I'm going to assert my Fifth Amendment rights with regard to that.

Q    Okay.  Do you recognize the voice of the other individuals speaking in that video?

A    I'm going to assert my Fifth Amendment rights with regard to that incident.

Q    Okay.

MR. KEVANE:  Your Honor, I'm going to object to Mr. Egan asserting his Fifth Amendment rights to that question. We're just asking him if he recognizes a voice in the video.

THE COURT:  Counsel?

MR. CAMPBELL:  Your Honor, whether an individual recognizes a voice indicates whether an individual knows someone and remembers the incident, all of which it could be used at a later trial to establish criminal liability.  I believe the witness is well within his rights to refuse to answer that question.

MR. KEVANE:  Okay.

THE COURT:  Objection overruled.

BY MR. KEVANE:

Q    Do you recognize the man -- do you recognize the man sitting right there?

A    No.  I do not.

Q    Okay.

THE COURT:  You can go ahead and take down G-2, please.

MR. KEVANE:  Sure.

BY MR. KEVANE:

Q    Would you consider yourself an honest person, Mr. Egan?

A    Yes, I would.

Q    Okay.  Did you speak to Forest Service Chris Carlton about water lines that the Rainbow family had placed in the forest?

A    Yes, I did.

Q    Okay.

THE COURT:  Can you clarify as to when?

BY MR. KEVANE:

Q    When did you speak to Mr. Carlton about that?

A    I don't recall the specific date.

Q    Did Chris Carlton tell you that you could remove the water lines yourself?

MR. CAMPBELL:  Objection, Your Honor, hearsay.

THE COURT:  Sustained.

MR. CAMPBELL:  Also leading.

THE COURT:  Sustained.

MR. KEVANE:  Okay.

THE COURT:  And, again, we still don't have --

MR. KEVANE:  Yeah.

THE COURT:  -- a timeframe, whether that was yesterday or in 2024.

BY MR. KEVANE:

Q    You spoke to Mr. Carlton before he issued -- did you speak to Mr. Carlton before he issued the closure order?

A    I -- I believe that's correct.  Yes.

MR. KEVANE:  Okay.  At this time, I would like to introduce pre-marked Defense Exhibit G, specifically, G-2 into evidence.  I could play portion of it, see if Mr. Egan recognizes it.

THE COURT:  Wait, I thought we just did that.

MR. KEVANE:  Sorry, I mean G-3.  My apologies.

THE COURT:  All right.  Do we have any foundation for that, Counsel?  I'm not going to have you play it, and then ask him if he recognizes it.  Why don't you walk him through what you believe is represented there, and if he has any knowledge of those issues, then perhaps we'll address G-3?

MR. KEVANE:  Okay.

BY MR. KEVANE:

Q    Did you say to people at this incident on June 20th that Mr. Carlton gave you permission to cut up the water lines?

A    I think I already asserted my Fifth Amendment rights concerning the incident that day.

MR. KEVANE:  Okay.  May I have a moment to confer?

THE COURT:  You may.

(Counsel confer)

BY MR. KEVANE:

Q    Were you concerned about your water lines -- or were you concerned about the water lines that were placed by the Rainbow Gathering?

A    Yes, I was.  That's why I mentioned it to Chris.

Q    Did Chris Carlton give you permission to take care of the water lines yourself?

A    Once again, I'm going to assert my Fifth Amendment rights.

MR. KEVANE:  Objection, Your Honor.  He doesn't have

a right to assert his Fifth Amendment as to what Chris Carlton told him.

MR. CAMPBELL:  Your Honor, I'm going to object to hearsay for the question before we get to the --

MR. KEVANE:  I'm not -- yeah.  I'm not offering for the truth.  I'm offering it --

THE COURT:  However --

MR. KEVANE:  -- to show the effect on the listener, of Mr. Egan.

THE COURT:  However, before we ever get to the hearsay issue, to the extent that this witness believes it has some connection with any issue that might incriminate him, he's asserting a Fifth Amendment right, and the Court's going to respect that.

MR. KEVANE:  Okay.

THE COURT:  So your objection is overruled.

(Counsel confer)

BY MR. KEVANE:

Q   Reflecting back, Mr. Egan, do you have any reason to believe that Chris Carlton may have supported removing the water lines?

A   Once again, I'm going to assert my Fifth amendment rights.

(Counsel confer)

BY MR. KEVANE:

Q   Okay.  Were you ever investigated regarding this incident?

THE COURT:  Which incident are we talking about?

MR. KEVANE:  The incident on June 20th.

THE WITNESS:  Not that I know of.

BY MR. KEVANE:

Q    Were you ever cited for disorderly conduct about this incident on June 20th?

A    No.

Q    Were you ever cited for vandalism about this incident on June 20th?

A    No.

Q    Were you ever cited for assault about this incident on June 20th?

A    No.

MR. KEVANE:  Brief moment to confer?

THE COURT:  You may.

(Counsel confer)

BY MR. KEVANE:

Q    Did you receive any communications from U.S. Forest Service regarding the Rainbow Gathering?

THE COURT:  Ever.

MR. KEVANE:  I'm sorry?

THE COURT:  Ever?

BY MR. KEVANE:

Q    Ever -- regarding this -- regarding the Rainbow Gathering in 2024?

MR. CAMPBELL: Objection, Your Honor, vague and relevance.

THE COURT: Yeah. Please rephrase, Counsel. What I'm looking for is a clarification of when you're asking him he received them, not when Rainbow Gathering occurred.

BY MR. KEVANE:

Q    Did you ever receive an email from Forest Service informing you that the Rainbow Gathering was happening in 2024?

A    I -- I don't specifically recall. There was communications from a range person with regard to it during that time. I don't recall whether it was email or text or phone call.

Q    Okay. Were you the only -- if it was a -- were you the only recipient of that communication?

A    I doubt it, but I don't specifically recall.

Q    Do you believe that your Facebook posts, the actions taken on June 20th contributed to the implementation of a closure order?

MR. CAMPBELL: Objection, Your Honor. Relevance as to the witnesses specific belief.

THE COURT: Well, ambiguity.

MR. CAMPBELL: Yeah.

THE COURT: I don't even know what you're asking, Counsel. Please rephrase and focus the question. Your objection is overruled.

MR. KEVANE:  Okay.

MR. CAMPBELL:  Your Honor, for the record, two individuals have entered the courtroom.  I would just ask we verify that neither of them are witnesses pursuant to the exclusion order.

THE COURT:  I'm fairly certain they are not.  Officer Boland, who's with you today?

MR. BOLAND:  Officer Harris, Your Honor.

THE COURT:  All right.  That's regarding another matter, not witnesses.  Please go ahead and have a seat gentlemen.  Thank you.

All right.

MR. KEVANE:  Yeah.

THE COURT:  Your question again, please.

BY MR. KEVANE:

Q    Do you believe that your Facebook posts had an impact on Chris Carlton regarding the enforcement of a -- regarding the implementation of a closure order?

A    I -- I can't answer that.  I --  you know, I don't know what's in Chris Carlton's head.

Q    Do you believe the actions you took on June 20th at this incident at the water lines contributed to Chris Carlton's decision to implement a closure order.

A    You know, I already asserted my Fifth Amendment rights with regard to that.

Q    Based on the communications you had with Chris Carlton, did it seem to you like he took those concerns that you shared with him into consideration?

THE COURT:  Mr. Egan, this question goes just to your impressions.  He's not asking you what was going on in Mr. Carlton's head.  He's just asking what was your impression of a reaction, if any.

Correct?

MR. KEVANE:  Yes, Your Honor.

THE COURT:  All right.  So try the question again --

MR. KEVANE:  Sure.

THE COURT:  -- but that's where this question's going.  It's just your impressions that he's looking for.

BY MR. KEVANE:

Q    Did you believe that your communications about your concerns to Chris Carlton contributed to his implementation of the closure order?

A    I guess I don't know conclusively one way or the other.

Q    Okay.

MR. KEVANE:  No further questions, Your Honor.

THE COURT:  All right.  Thank you, Mr. Egan.  The Government may have some questions for you now, and there may be some redirect following that, so standby.  We'll get through this.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q    Good afternoon, Mr. Egan.  Thank you for being here.  I know you traveled a long way for this.  Are you a member of the Forest Service, sir?

A    No, sir.

Q    Do you have the authority to direct members of the Forest Service to issue forest closure orders?

A    No, sir.

Q    In your 15 years working with the Forest Service, do they generally do what they -- what you tell them to do?

A    I wish.  No, they do not.

Q    Do you know an individual named Mia Robichaud?

A    No, I do not.

Q    Do you know and individual named Ethan Caudle?

A    No, I do not.

        MR. CAMPBELL:  Your Honor, I have no further questions.

        THE COURT:  All right.  Any redirect on that limited line of cross?

        MR. KEVANE:  No redirect, Your Honor.

        THE COURT:  All right.  And thank you, Mr. Egan.  Is this witness excused?

        MR. CAMPBELL:  From the Government, yes, Your Honor.

        THE COURT:  All right.  Does the defense intend --

        MR. KEVANE:  I would ask -- yeah.  I would ask

Mr. Egan be subject to recall for impeachment purposes.

THE COURT:  All right.  Mr. Egan, I'm going to ask you to remain seated in the library for a few more --

MR. EGAN:  Can I ask -- can I ask --

THE COURT:  We'll see where this goes.  Thank you for making the journey.  But at this time, the defense is not releasing you, so I have to ask you to stay.

MR. EGAN:  Okay.  Can I just ask a question?  I do have a commitment in Susanville at 5:00.  Do we have an idea of how long?

THE COURT:  Counsel, this witness has a commitment in Susanville, which is a 2 hour and 30-minute drive from here.  Do we have any anticipation of when, if at all, you will need him back?

MR. KEVANE:  I would say we have two witnesses to call, and we would call him back after Mr. Carlton's testimony.  So maybe another hour?

THE COURT:  All right.  I'm going to take a brief recess.  I'm going to ask that defense caucus and see if it's really necessary to keep Mr. Egan at this time.

Unfortunately, Mr. Egan, it is within their rights to keep you, but I'm -- I'll ask them to confirm that and be able to give a, hopefully, more precise estimate, if he is still going to be needed.  We will reconvene at quarter till the hour.

And Mr. Stewart, if you could escort Agent Boland back to my chambers, please?  He'll come around and get you.

THE CLERK:  Court is in recess.

(Recess taken at 2:35 p.m.)

(Proceedings resumed at 2:43 p.m.)

THE CLERK:  Court is back in session.

THE COURT:  All right.  You may be seated.

All right.  Before we begin, does the defense have an updated estimate to provide to this witness?

MR. KEVANE:  Your Honor, we -- we'll -- we can release Mr. Egan.

THE COURT:  All right.  Very good.

Rick, if you would notify Mr. Egan that he is released.

(Witness excused)

THE COURT:  All right.  Defense, call your next witness.

THE BAILIFF:  He's been notified, Your Honor.

THE COURT:  Thank you.

MS. MURPHY:  Your Honor, at this time, the defense would call Investigator Juan Doig.

THE COURT:  Very good.  Investigator, if you could come forward.

JUAN DOIG, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Will you say your name and spell your

last name for the record?

THE WITNESS:  Juan Doig, D-O-I-G.

THE COURT:  Mr. Doig, I don't know the scope of your anticipated testimony.

Is there any need to provide a Fifth Amendment admonition to Mr. Doig?

THE WITNESS:  I could --

MS. MURPHY:  I'll waive, Your Honor.  No.  No, I don't believe so, Your Honor.  This is our case agent, and --

THE WITNESS:  Nope.

THE COURT:  All right.  That was my understanding, but I didn't want to overlook it in the event that there was something I wasn't aware of.  So very good.

                    DIRECT EXAMINATION

BY MS. MURPHY:

Q    Mr. Doig, can you please explain your role in the case of United States v. Mia Robichaud?

A    So I'm a investigator with the Federal Defender's Office. One second.  Is that better?  I was tasked to look up information, open-source information about and interview some people about the Mia Robichaud case.

Q    Who did you interview specifically?

A    I interviewed Joseph Egan, Paul Kingston, Val DeMars.  I attempted to interview Jason Ingram, and Chris Carlton was also interviewed.

Q    Do you recall your interview with Joseph Egan and the substance of that interview?

A    Somewhat, yes.

Q    Okay.  If at any time I ask you a question you cannot recall, let me know and we can attempt to refresh your recollection.  Did you provide a written summary of the interview with Joseph Egan?

A    I did.

Q    Yeah.  Thank you.  When did you interview Joseph Egan?

A    I don't remember the specific date, but I would say maybe a couple months ago.

Q    Okay.  Would reviewing your report help refresh your recollection?

A    Yes.

        MS. MURPHY:  Permission to approach the witness?

        THE COURT:  You may.

BY MS. MURPHY:

Q    Just let me know if your recollection has been refreshed.

A    Yes.

Q    When did you interview Joseph Egan?

A    So the official interview was conducted on July 2nd.

Q    When you interviewed -- and did you conduct a follow-up interview with Joseph Egan?

A    Yes, I did.

        THE COURT:  July 2nd, 2025 or 2024?

THE WITNESS:  July 2nd, 2025, Your Honor.

THE COURT:  Very good.  Thanks.

BY MS. MURPHY:

Q    In speaking with Mr. Egan, did you discuss his communications with Chris Carlton?

A    Somewhat, yes.

Q    Okay.  Did Mr. Egan discuss with you his attendance at a protest at the water lines on June 20th of 2024?

A    Briefly, yes.

Q    Based on what Mr. Egan relayed to you, is it your impression that he was present --

A    Yes.

Q    -- at that incident?

A    Yes.

Q    Based on what Mr. Egan relayed to you, was it your impression that he'd had communications with Chris Carlton surrounding that incident?

A    Yes.

Q    Based on what Mr. Egan relayed to you --

THE COURT:  What, if any, impression did you have?  Just to keep us in bounds, Counsel.

MS. MURPHY:  Certainly.

BY MS. MURPHY:

Q    What impression did you have about Chris Carlton's role in that incident?

A    I don't understand the question.  Sorry.

Q    Based on what Mr. Egan relayed to you, what was your impression of whether or not Mr. Carlton supported that protest?

MR. CAMPBELL:  Objection, Your Honor.  It calls for speculation and/or relates hearsay.

THE COURT:  Well, I think Counsel has navigated around hearsay, but I -- why is this not speculative?

MS. MURPHY:  I can tighten it up --

THE COURT:  Please.

MS. MURPHY:  -- if there's a concern --

THE COURT:  Sustained.

MS. MURPHY:  -- this is speculation.

BY MS. MURPHY:

Q    Did Mr. Egan relate to you that he had permission from Mr. Carlton to rip up water lines on June 20th?

MR. CAMPBELL:  Objection, Your Honor.  Hearsay.

MS. MURPHY:  Your Honor, this is for the purposes of impeachment.  We had a witness on the stand who repeatedly took his Fifth Amendment privilege with regard to this line of questioning.  This investigator interviewed him.  He did not assert his Fifth Amendment privilege at that time and provided details that I think are relevant.

THE COURT:  I'm not sure that it's possible to impeach against a Fifth Amendment assertion.  However, I will

allow some latitude with regard to this witness's recollections, but I am not going to allow him to attribute quotes because, again, then we're into hearsay.  And --

MS. MURPHY:  I will absolutely not be asking for any quotes, Your Honor.

THE COURT:  I -- well, with that clarification and with a diligent effort at not leading the witness, I'll allow you to rephrase.  I'm going to sustain the objection and allow you to rephrase.

BY MS. MURPHY:

Q    Based on your interview of Joseph Egan, did you come away with a conclusion --

MR. CAMPBELL:  Objection, Your Honor.  Leading.

THE COURT:  Based --

BY MS. MURPHY:

Q    Did you come away with any conclusions regarding Chris Carlton's complicity in the June 20th, 2024 ripping up of the water lines?

MR. CAMPBELL:  Your Honor, at this point, I would object to relevance.  I don't know why this witness's opinion of what Carlton said based on an interview with another person is relevant, especially when that other -- Joe Egan and Mr. Carlton will testify as witnesses or have already.

THE COURT:  Well, Mr. Egan didn't offer any substantive testimony as to June 20th.  Is Mr. Carlton here?

MS. MURPHY:  He is.

THE COURT:  All right.  Then that may be a better source than having the investigator state his recollections. However, Counsel, I am prepared to hear this witness's recollections in terms of impressions in the context of the defense that has been raised.  It is still the subject of evaluation by this Court as to whether that defense is a -- is appropriately applied here, but it is this Court's understanding that the direction ultimately goes to the content-neutral status of the closure order and that they are building through a series of connections.  I'm not sure that this witness is going to be able to respond to that, but we'll see from the questions.  So, in short, I'm overruling your objection and admonishing Counsel, again, to be careful here not to lead this witness or invite hearsay.

BY MS. MURPHY:

Q    Did you -- were you able, after your conversation with Mr. Joseph Egan on July 2nd, 2025, to form an impression as to whether or not Chris Carlton approved of the destruction of the water lines?

A    So --

Q    Were you able to form an impression from that conversation?

A    Mr. --

THE COURT:  Just a yes or no on that one.

THE WITNESS:  Yes.

BY MS. MURPHY:

Q    What was your impression?

A    That he was given permission.

Q    In the course of your investigation in this case, did you review a video provided and with -- that was recorded by Val DeMars on June 20th, 2024?

A    Yes.

Q    In that video, did you have an opportunity to observe Joe Egan making a statement about --

MR. CAMPBELL:  Objection, Your Honor.  Leading.

BY MS. MURPHY:

Q    In that video, did you observe --

THE COURT:  What, if anything, did you observe?

BY MS. MURPHY:

Q    What, if anything, did you observe relating to Joe Egan representing permission to rip up water lines?

A    That Chris Carlton gave him permission.

Q    Is that consistent with what Joe Egan related to you --

MR. CAMPBELL:  Objection, Your Honor.  Hearsay as to Mr. Egan's statements about what Mr. Carlton allowed him to do.

THE COURT:  The question as phrased, again, was only asking for this witness's impressions having viewed this.  The Court is making the distinction between whether or not Mr. Carlton, Mr. Egan, or anybody else made any statements and

merely this witness's impression a -- at least two steps away from the actual events, and again, it's a bench trial, Counsel. I am sifting through the relative weight of all of this evidence and recognize the tenuous nature of the impressions of an investigator of a video of other individuals.  At this point, I am absolutely prepared to weigh the weight of that evidence, but I'm going to allow it to be presented and then evaluated in the context of all of the evidence that is presented, including presumably some testimony from Mr. Carlton upcoming.

MR. CAMPBELL:  Yes, Your Honor.

THE COURT:  But again --

MS. MURPHY:  One more question, Your Honor, and --

THE COURT:  I think it is very narrow band.

MS. MURPHY:  -- I won't elicit --

THE COURT:  All right.

MS. MURPHY:  -- any hearsay.

BY MS. MURPHY:

Q    After reviewing the video provided by Val DeMars, was the impression that you just testified to after speaking with Joseph Egan regarding Chris Carlton's approval of the tearing up of the water lines confirmed?

A    So yes and no.  So the permission that was told to me was that he was given permission.  He never went into if he was allowed to tear up the water line.  He wouldn't answer those

questions.

Q   Okay.  Did you feel -- were you confident after reviewing the video that the information -- the impressions you had drawn from your conversations with Joseph Egan were correct?

A   Yes.

Q   I am now going to move on to what might be a slightly more complicated line of questioning, given that we're dealing with an unavailable witness.  I'm going to ask you if in the course of your investigation you did any investigation regarding Jason Ingram.

A   I did.

Q   What did that investigation entail?

A   So I was tasked to do some open-source information, just basically what was out on the internet.  So I started by basically just Google searching his name and his -- his title as Lassen County district supervisor.  I was able to find Facebook posts, and I kind of narrowed it down more through the Rainbow Gathering.  And I found four or five posts about the Rainbow Gathering.

Q   Would you -- did you -- what did you do when you found those posts?

A   I advised defense counsel this material was available on the internet, and I forwarded it to them.

Q   Would you recognize the post that you forwarded to defense counsel if you were shown them?

A     Probably, yes.

Q     Okay.  I would ask you to look at the witness binder in front of you and open it to what has been pre-marked as Defense Exhibit C.

A     Okay.

Q     Do you recognize Defense Exhibit -- what has been pre-marked as Defense Exhibit C?

A     Barely.  I mean, I do and I don't.  I do recognize that it's Lassen County's Jason Ingram's post because of the -- the little photographs in the corner.  I don't know what that's called.  His avatar, maybe.  And that kind of relates back to his overall Facebook page, the name.  That's how I recognize that.

Q     Okay.  Just to clarify, do you recognize what that is --

A     Yes.

Q     -- that's in front of you?

A     Yes.  It's --

Q     Okay.

A     -- it seems to be a representation of a post that Mr. Ingram might have made on his Facebook for the Lassen County.

Q     Is that the post that you provided to the defense?

A     It's one of the posts, yes.

Q     Okay.  And how can -- how are you recognizing that?

A     His name is on there and then as I mentioned earlier, his

photograph -- very small, but I can recognize that it's Mr. Ingram from a larger photograph of Facebook.

Q    Okay.  Setting aside the Bates numbering on that document and any titling on that document regarding the exhibit number, is that a true and correct copy of the post you provided to defense counsel?

A    Yes.

MS. MURPHY:  Okay.  At this time, I would move to admit Defense Exhibit C.

MR. CAMPBELL:  Objection as to hearsay, Your Honor.

MS. MURPHY:  So this is where -- this is a declarant who is unavailable.  They've chosen not to appear in court pursuant to a subpoena that was issued.  So this was one of the two alternative proposals that defense counsel represented at the outset of this trial.  I would ask the Court to give us leeway with regard to hearsay given that the declarant is unavailable and has made themselves unavailable for trial and that we have statements made by them that are indeed out of court but are not being offered for the truth of the matter asserted but are being offered to demonstrate the effect on Mr. Carlton specifically and other members of the Lassen County and Plumas County areas.

THE COURT:  Then what I'm going to do, Counsel, if it is still your intent to put Mr. Carlton on the stand --

MS. MURPHY:  It is, Your Honor, but he is not able to

authenticate the post.

THE COURT:  Well, I'm going to accept the authentication from this witness that this is a true and correct copy of what this witness found on the internet.  I believe that testimony is before the Court.  However, just because something was found floating on the internet doesn't then satisfy any of a host of other evidentiary issues that follow.  What I will allow you to do is then admit this on that very limited scope that is what your investigator found and then allow you to question Mr. Carlton --

MS. MURPHY:  That is my intention, Your Honor.

THE COURT:  -- about it.  But as far as walking this witness through the substance of this document, no.  I'm going to sustain the objection in that regard.  You can take it up with Mr. Carlton, but --

MS. MURPHY:  Certainly.

THE COURT:  -- I don't see how this witness has any more knowledge of this than if he was going to offer testimony about anything else that he found on the internet, which may be fascinating but isn't necessarily then responsive to --

MS. MURPHY:  I understand.

THE COURT:  -- the evidentiary issues that exist.

MS. MURPHY:  But that is why we subpoenaed the author --

THE COURT:  Well, and that's --

MS. MURPHY:  -- of the post, and we're in a bit of a pickle.  So I'm doing my best.

THE COURT:  I appreciate that.  I don't think we can get there with the investigator.  You might be able to get there with Mr. Carlton, and believe me, that's why we have an OSC with regard to --

MS. MURPHY:  Yes.

THE COURT:  -- the failure to appear on the subpoena.  I recognize that you attempted to get him here.

MS. MURPHY:  I will ask that we admit on the limited basis that Mr. Doig here has authenticated the document, and I will reserve the majority of my questioning for Mr. Carlton with regard to whether or not he had an opportunity to --

THE COURT:  I'm going to sustain your hearsay objection.  I'm going to admit on that limited basis and as I said, allow you then to cross-exam -- or question Mr. Carlton.

MS. MURPHY:  All right.

MR. CAMPBELL:  Your Honor --

MS. MURPHY:  I have a --

MR. CAMPBELL:  -- if I may, on the topic of hearsay, I believe if -- this is an out-of-court statement that is not admissible to prove the truth of the matter asserted regardless of which witness is on the stand.  If all of the text in this is excluded as hearsay, I don't believe there's any basis to admit the document at all.

MS. MURPHY:  Well, Your Honor, this is not hearsay. It's not being offered for the truth of the matter asserted.

THE COURT:  Right now, it's just being offered as to completeness of Mr. Doig's investigation.  And I'm willing to admit it on that limited purpose in the absence of Mr. Ingram's appearance.  I think that some latitude is appropriate here. The extent to which the substance of this becomes evidence remains to be seen, but right now -- and again, I would remind you, Mr. Campbell, there's no worry about a jury seeing this and forming impressions that would be inappropriate.  It's coming in to evidence without weight on any substantive issue within the document.  It's just coming in to show that it was retrieved as part of this investigation and thereby providing some latitude for further questioning if a witness is here that can address the substantive specifics, but we're not going there yet.  Right now, it has no substantive weight before the Court.

MS. MURPHY:  And Your Honor, just to clarify, when we do seek to introduce any of the contents of this post with a later witness, we won't be seeking to introduce it for the truth of the matter asserted but rather the effect on that witness.

THE COURT:  On Mr. Carlton.

MS. MURPHY:  Yes.

THE COURT:  And we'll address those -- and again,

Mr. Campbell, that's without your further objection -- or without prejudice to your further objections at that time.  Do not view this as barring any further objections.  It's coming in in the absence of Mr. Ingram only for this very limited purpose.

With that, Counsel, further questions for your investigator?

MS. MURPHY:  Yes, Your Honor.

BY MS. MURPHY:

Q    Mr. Doig, was the post -- was this the only post that you've provided to defense counsel?

A    No.

Q    No.  Would you recognize another post if I provided it -- the other post that you've provided to defense counsel --

A    Yes.

Q    -- if I provided it to you?  I would ask that you, in that exhibit binder in front of you, turn to what has been pre-marked as Defense Exhibit E.

A    Okay.

Q    Do you recognize what has been pre-marked as Defense Exhibit E?

A    I do.

Q    What is it?

A    It's a post on Mr. Ingram's Facebook page.

Q    And how do you come -- how do you recognize that?

A    Again, I remember reading it.  I remember there's mention about Mr. Carlton, phone numbers, about what's going on at the Rainbow Gathering, and also the image displayed that seems to be of Mr. Ingram.

Q    Okay.  Does that appear to be a true and correct copy of the post that you provided to the defense in the course of your investigation?

A    Yes.

        MS. MURPHY:  At this time, for the same reason that the Court ruled previously to admit Defense Exhibit C on very limited grounds, I would ask to admit Defense Exhibit E on those same very limited grounds.

        MR. CAMPBELL:  No objection on those limited grounds, Your Honor.

        THE COURT:  It will come in only for that limited purpose.  I'm not going to permit this witness to provide substantive testimony out of what's here.  If he has that knowledge from some other source, you can go into it with your investigator.

        MS. MURPHY:  Certainly.

        THE COURT:  But Exhibit C and E are in evidence with that caveat.

        (Defendant's Exhibits C and E admitted into evidence)

BY MS. MURPHY:

Q    In the course of your investigation, Mr. Doig, did you

come to learn whether or not Mr. Ingram, Jason Ingram -- did you come to learn what his occupation is?

A    Yes.

Q    What is his occupation?

A    He's a district supervisor.

Q    Okay.  Do you recall what county he is the district supervisor for?

A    Lassen County.

Q    Thank you.  In the course of your investigation, did you have an opportunity to speak with Chris Carlton?

A    Yes.

Q    In your conversation with Mr. Carlton, did he indicate whether or not he was familiar with Jason Ingram?

A    I believe he said he was.

Q    In the course of your investigation, did you have an opportunity to inquire of Mr. Carlton whether or not he had communicated with Mr. Egan around the 2024 Rainbow Gathering?

        THE COURT:  And Mr. Doig, I'm going ask you to listen very carefully to Counsel's question.  And properly, her question is asking yes or no, did you take these actions?  And properly, you can respond and to the extent that there's follow up, provide your understanding, your impressions, if they are relevant, but properly, under the Rules of Evidence, you cannot repeat what, in this case, Carlton or Ingram said outside of court.

MS. MURPHY:  Mm-hmm.

THE COURT:  That's where we venture into multiple hearsay objections that Mr. Campbell has properly asserted.  So keeping everything within bounds --

MS. MURPHY:  Yes.

THE COURT:  -- Counsel is only asking you, did this happen at this point?  And she may ask you about your impressions, but please resist the urge to say Carlton said, Ingram said.  It's merely, it was my impression or I formed the understanding that --

THE WITNESS:  Yes, sir.

THE COURT:  -- from there.

BY MS. MURPHY:

Q    Did you form any impressions about the nature of the relationship between Mr. Carlton and Mr. Ingram?

A    Yes.

Q    What impression did you form?

A    They had a professional relationship.

Q    Did you form any impression about whether or not they had communicated around the 2024 Rainbow Gathering?

A    Yes.

Q    What was your impression?

A    That they had communicated about the gathering.

Q    Did you form any impression about whether or not Jason Ingram holds a position of influence over Mr. Carlton?

A    None that -- no, I did not get that impression.

Q    Okay.  When you reviewed Mr. Ingram's Facebook page, were there references that you can recall -- just yes or no -- to Mr. Carlton?

A    Yes.

Q    Did Mr. Ingram, as best you can recall, provide any information on his Facebook page to contact Mr. Carlton?

A    Yes.

Q    What information, if you can recall, did he provide?

A    His phone number -- or a phone number.  I never checked to see if it was actually Mr. Carlton's phone number.

Q    In providing Mr. Carlton's phone number, was Jason Ingram referring to anything related to the 2024 Rainbow Gathering?

A    Yes.

Q    In providing Mr. Carlton's phone number, was it your impression --

THE COURT:  Was it your impression that -- go ahead.

BY MS. MURPHY:

Q    -- was it your impression that Mr. Ingram was inviting people to contact Mr. Carlton regarding the gathering?

A    Yes.

Q    Did you have an opportunity to ask Mr. Carlton if he'd seen those Facebook posts by Mr. Ingram?

A    I don't recall.

Q    Would reviewing the report of that interview help refresh

your recollection?

A    Yes.

Q    Do you have a copy of that report with you --

A    Not in front of me, no.

Q    -- up at the stand?  If not, I'll --

THE COURT:  Mr. Campbell, do you have that report?

MR. CAMPBELL:  I do.  Yes, Your Honor.

THE COURT:  All right.  Does the Court?

THE WITNESS:  No.

MS. MURPHY:  I have it here, Your Honor.  I'll just approach for the purposes of recollection.  I'm not seeking to admit the reports.

THE COURT:  Okay.

BY MS. MURPHY:

Q    Just let me know if your recollection is refreshed either way.

A    Okay.

Q    In your interview of Mr. Carlton, did you ask him if he'd seen the posts?

A    No.  We didn't ask him about the posts.

Q    Based on your recollection of your investigation as To Mr. Ingram's two Facebook posts, was it your impression that the -- what was your impression of the purpose of Mr. Ingram's posts?

A    To make the community aware of what was going on at

the -- about the Rainbow Gathering.

Q   Did you form any impression as to whether or not the posts were designed to put pressure on the United States Forest Service?

A   Yes.

Q   What was that impression?

A   That there should be some pressure from the community for Mr. Carlton to do something.

Q   In the course of your investigation, did you review any other recordings of communications regarding the Rainbow Gathering?

A   Yes.

Q   What other recordings did you review --

A   There was --

Q   -- in the course of your investigation?

A   -- a city council meeting.  I don't recall which city council, but they were concerned about the Rainbow Gathering as well, and Mr. Carlton was present for that one.

Q   Do you recall if Mr. Ingram was present for that?

A   He was not.

THE COURT:  I'm sorry.  Are you characterizing this as a city council meeting?

THE WITNESS:  Mm-hmm.

THE COURT:  Okay.

THE WITNESS:  Or a Board of Supervisors meeting --

I'm sorry -- from a different county, not Lassen County.

THE COURT:  Okay.

BY MS. MURPHY:

Q    And in reviewing that recording which you say Mr. Carlton was present at, were there public comments about the Rainbow Gathering --

A    There were.

Q    -- 2024?

A    Yes.

Q    Were those comments disparaging in nature?

A    Yes.

Q    The Facebook page that you obtained the posts that are now admitted on a limited basis as Defense Exhibits C and E -- where did you obtain those from?

A    From Mr. Ingram's Facebook post.

Q    Were you able to form an impression as to whether or not that was his personal or professional page?

A    I believe it's his professional page.  There's a link on the Facebook post that goes directly to the Board of Supervisors government website.

MS. MURPHY:  Okay.

(Counsel confer)

BY MS. MURPHY:

Q    In the course of your investigation, did you learn that Mr. Carlton attended any other public meetings or town halls in

addition to that Board of Supervisors meeting you had just referenced?

A    I don't recall.

Q    Okay.  Would you recognize -- would you be able to recognize the likeness of Jason Ingram --

A    Yes.

Q    -- if you saw it?

A    Yes.

MS. MURPHY:  I would ask to pull up just a still -- we don't need to play it -- Defense Exhibit -- it was previously admitted as G-1 at 3:25.

THE COURT:  I'm not sure G-1's in evidence, Counsel. G-2 is.

MS. MURPHY:  Well, my apologies.

THE COURT:  Hang on just a moment.

MS. MURPHY:  That's what I get for wearing so many hats.  I can walk that back.  I'd still ask to pull this up.

THE CLERK:  A little tech trouble here.

THE COURT:  Yeah.  I know -- I see that it was referenced, but I don't have it in evidence.

MS. MURPHY:  All right, Your Honor.  I will get that admitted, then.  I have pulled up on the screen a portion of what's previously been admitted as Defense Exhibit G at approximately -- I'm sorry.  Can I have the timestamp that I've pulled up?

THE CLERK:  3:23.

BY MS. MURPHY:

Q    Do you recognize the person in -- on screen?

A    Yes.

MR. CAMPBELL:  Objection, Your Honor, as to foundation.  This witness has testified that he would recognize Mr. Ingram but has provided no basis as to how he would recognize Mr. Ingram, as to whether he's met him, or what would enable him to accurately identify the individual.

MS. MURPHY:  I am getting there, Your Honor.  I intend to lay that foundation now.

THE COURT:  Yes.  All of that foundation is going to be necessary -- and including some authentication of this video before this is going to get played, but --

MS. MURPHY:  I don't intend to play it, Your Honor.

THE COURT:  Oh, all right.  Very good.  Continue with your foundation, then.  Objection is overruled for the moment.

MS. MURPHY:  Yes.  First of all, let me -- since -- if there's any concern about the video, this is Defense Exhibit G's video.  The foundation was laid for the video authentication was laid through Val DeMars, but I can lay additional foundation if the Court needs me to here with this witness as to the authentication of this video.  Otherwise, I'll just focus on how he identifies on the individual on screen.

THE COURT: Yeah. I'm not sure that we got very far down the road of authentication with Mr. DeMars --

MS. MURPHY: Okay.

THE COURT: -- before we got off on to CAL FIRE personnel and other issues that took us out of this on --

MS. MURPHY: Not a problem. I can do that here.

BY MS. MURPHY:

Q    Mr. Doig, do you recognize where this -- what video this image is a part of?

A    Yes.

Q    Where -- what video is this?

A    It's a video that was provided to me by Val DeMars.

Q    Okay. And how do you recognize it?

A    I reviewed it.

Q    Okay. Did you review it in the course of your investigation for this case?

A    Yes.

Q    Okay. Did you provide this video to the defense?

A    Yes.

Q    Did you alter the video in any way before providing it to the defense?

A    No.

Q    Okay. In receiving the video from Mr. DeMars, did you have an opportunity to discuss with him how he came to be in possession of the video?

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

A    Yes.

Q    Did he -- what impression did you form as to how he came to be in the possession of the video?

A    That he videotaped it.

Q    Is that because of what he advised you?

A    Yes.

Q    Okay.  Do you recognize the individual on screen?

A    Not right now.

Q    Okay.

A    That's why --

THE CLERK:  Got to reopen it.  It shut down.  So my apologies to the Court.

MS. MURPHY:  3:23?

THE CLERK:  It's at seven minutes.

MS. MURPHY:  Sure.

THE CLERK:  Sorry.  I can get it to 3:24.  Not very (indiscernible).

MS. MURPHY:  I think -- I mean --

THE CLERK:  3:24 okay?

MS. MURPHY:  That's fine with me.

BY MS. MURPHY:

Q    Do you recognize -- and just for the record, we are now at 3:24 in Defense Exhibit G.  Do you recognize the individual on screen?

A    Yes.

Q    How are you able to recognize this individual?

A    Upon reviewing the video, there's several mentions that -- to his name, Jason Ingram.  And then I spoke to Mr. DeMars, and he verified that was Jason Ingram down at the site.

Q    Okay.  Did you also review any independent photographs or likenesses of Mr. Ingram?

A    Yes.  There was several photographs of him all over the internet, especially on the Lassen County district supervisor's website, on his Facebook posts, and they matched similarly to this body, build, and glasses and --

Q    What is Mr. Ingram carrying in this image?

A    A machete.

Q    Did you review this video in its entirety?

A    Yes.

Q    In this video, are there any images of Mr. Ingram using the machete on the water lines?

A    You really can't tell.  They're kind of at a distance because they're grainy.  So I took Mr. DeMars' observations.  I couldn't really tell because of the graininess of the video.

Q    Okay.  Is there narration in the video that Mr. Ingram --

A    Yes.

Q    -- is attacking the water lines with the machete?

A    Yes.

Q    Does Mr. Ingram at any point in the video use any other tools or demonstrate any other tools in his possession?

THE COURT:  All right, Counsel.  We're not going to go through item-by-item in the video and -- when it is not admissible at this point.  Mr. DeMars has not testified that this was his video, and just the fact that this witness has watched it doesn't authenticate it.  And --

MS. MURPHY:  Well, Your Honor, Mr. DeMars did testify that this was his video and laid the authentication for this video.  I've -- I am -- I mean, perhaps the Government -- if the Government disagrees, but I believe that Mr. DeMars testified that he recorded this video, that he recognized it.

THE COURT:  It -- I've got G-2.  Hang on just a sec. Let me check my notes.

MS. MURPHY:  Yes.  That's -- that is all the same video.  It's one continuous 11-minute video.

THE COURT:  Oh, this is just -- oh, okay.  All right. And all right.  Then at this point, I'll hear from Mr. Campbell.

MR. CAMPBELL:  Well, Your Honor, the -- Mr. Val DeMars was played a short section of the video and said that he recognized that as his.  There are other portions of the video which he did not testify to, but the Government acknowledges that he did recognize those portions of the video as being his.

THE COURT:  All right.  Counsel, where are you going with this?  I don't want you to sit and ask him -- ask your investigator about each frame that he saw on this.

MS. MURPHY:  No.  I just want to confirm the sort of two aspects of the video that we would have questioned Mr. Ingram about, which is that he possessed a machete and a chainsaw and that in the video was using them to take down the water lines.

THE COURT:  All right.  Mr. Campbell?

MR. CAMPBELL:  Your Honor, when the witness was asked whether the video depicted Mr. Ingram attacking the water lines, he said that it did not or at least he couldn't determine that it did --

THE COURT:  Correct.

MR. CAMPBELL:  -- because the video was grainy.  So the fact that Mr. -- the video depicts Mr. Ingram carrying a chainsaw -- I don't believe there's any reason to believe that's relevant.

THE COURT:  Well --

MS. MURPHY:  Your Honor, I think it's relevant because it goes to one, that this was a very aggressive encounter.  A chainsaw is a pretty over-the-top tool for a small, two-inch, soft pipeline.  But also, I think it speaks to why ordinarily US Forest Service would have investigated this incident, and it didn't.  I'm happy to move on if that's what the Court would prefer, but I do certainly think it's relevant, and I think the questions have been very limited.  And I've been dancing on a very thin wire.

THE COURT: You have.

And at this point, Mr. Campbell, rather than have conflicting characterizations and leave this particular piece of evidence without completeness, I'm going to direct that it be shown and only in the event that a specific foundation as to what this witness saw am I going to permit questions about what's on here. But I am going to direct that -- how long is this?

MS. MURPHY: I have one --

THE COURT: On --

MS. MURPHY: -- one more question, Your Honor, and that's all. The video in its entirety is 11 minutes. We have been --

THE COURT: But how long a portion of G-1 did you -- were you making reference to with machetes and chainsaws?

MS. MURPHY: I believe it's about 30 seconds, Your Honor.

THE COURT: All right.

MS. MURPHY: 25 seconds, it appears to be.

MR. CAMPBELL: Your Honor, I would renew my objection to hearsay to the extent that this video contains statements by out-of-court witnesses.

THE COURT: All right. At this point, I'm admitting it for limited purposes without regard to the truth of the matter asserted, merely for purposes of clarifying what now

seems to be conflicting representations from the two sides. We'll see the 30 seconds.

(Video played at 3:29 p.m.)

MS. MURPHY:  We can pause it there.

(Video paused at 3:29 p.m.)

(Counsel confer)

MS. MURPHY:  I'm sorry.  Keep going.

(Video played at 3:29 p.m. to 3:30 p.m.)

MS. MURPHY:  We can stop there.

THE COURT:  All right.  Anything further for this witness, Counsel?

MS. MURPHY:  No, Your Honor.  I'd just seek to admit what was just played as Defense Exhibit G-1.

THE COURT:  1.

MS. MURPHY:  G-1.  And nothing --

THE COURT:  All right.

MR. CAMPBELL:  For the limited purposes that the Court has indicated, no objection.

THE COURT:  All right.

MS. MURPHY:  Nothing further for this witness.

THE COURT:  All right.

Cross-examination, Mr. Campbell?

MR. CAMPBELL:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q    Good afternoon, Mr. Doig.

A    Good afternoon, Mr. Campbell.

Q    You were not present in Plumas County on June 20th for the altercation involving the water pipes, correct?

A    No.

Q    You were not present in the closure area on July 5th for any events that transpired there.

A    Nope.

Q    You did not witness the arrest of Ms. Robichaud.

A    Video, but --

Q    You did not personally --

A    Yeah.  No, I did not.

Q    Let me be more general.  You are -- you did not personally witness any event related to this case.

A    No.  Correct.

Q    And with regards to the Facebook posts that you attribute to Mr. Ingram, you've not spoken with Mr. Ingram to verify whether he in fact created those posts, correct?

A    That's correct.

Q    You do not know whether Mr. Ingram was the one who typed out those posts.  Is that correct?

A    That's correct.

Q    And also, you don't know whether those posts have been edited in the time since they were made, correct?

A    I don't understand the question.

Q    You're familiar with Facebook.

A    Yes.

Q    It's possible to edit a post after it's been made.

A    Yes, I --

Q    It's possible that these -- you cannot verify that the posts that you introduced today were not edited in the time since they were made.

A    Yeah.  I would agree with that, yes.

Q    The Facebook profile you viewed, that is a professional profile, correct?

A    I don't know if it's professional because it doesn't specifically say it's an official website.  The only reason I came to the conclusion that it was an official website is there's a link from the Facebook post to the government website, but not --

Q    So --

A    -- not reversed, if that makes sense.

Q    Other than the name, you have no indication that Mr. Ingram actually owns or manages that Facebook page.

A    I would assume no.  I -- I can't answer that.  I don't know.  I mean --

Q    So you have no indication that he is actually responsible for the content of that Facebook page.

A    I would assume it is his.  I'm not sure.

Q    I'm not asking for your assumption, sir.  I'm asking if

you have evidence which shows that he is responsible for managing or editing that page.

A    I would say yes, that there's enough evidence that it is his Facebook page.

THE COURT:  And what is the basis for that?

THE WITNESS:  Just if you look at the overall Facebook page, it consistently gets posted, and there's posts to community events.  So I would assume -- I know I'm not supposed to assume, but I would assume that Mr. Ingram is making those posts because he refers to himself a lot and people refer to, thank you, Mr. Ingram, for all your help.

THE COURT:  But you had no communications with him in that regard.

THE WITNESS:  No.  I will -- okay.

THE COURT:  All right.  Go ahead, Counsel.

BY MR. CAMPBELL:

Q    Do you know how old this Facebook account is?

A    It's a year old.

Q    Do you know when it was initiated, when it was created?

A    The Facebook stamp says around the timeframe of the Rainbow Gathering.  So around June.

Q    And you don't have any evidence as to whether -- as to -- you've already answered that.  Do you have any indication as to whether the name of this Facebook page has been changed since it was created?

A    No.

Q    So it's possible that the Facebook account was created under one name and then the name was later changed to something else.

A    Anything is possible.

MR. CAMPBELL:  Thank you, Your Honor.  No further questions.

MS. MURPHY:  Very brief redirect.

REDIRECT EXAMINATION

BY MS. MURPHY:

Q    So you testified on cross-examination that you are familiar with Facebook.

A    Briefly, yes.

Q    When a Facebook post is edited, is there an indication on the post that it's been modified or edited?

A    I'm not sure.

MS. MURPHY:  Nothing further.

THE COURT:  All right.  Any reason to retain Mr. Doig?

MR. CAMPBELL:  Not from the Government, Your Honor.

THE COURT:  All right.  Counsel for the defense, can this witness be released?

(Counsel confer)

MS. MURPHY:  Yes, Your Honor.  This witness can be released.

THE COURT:  All right.  Thank you.  You're welcome to stay and watch the balance of the trial, or you may be excused.

MS. MURPHY:  Can I excuse one more case agent? (Indiscernible).

THE WITNESS:  Who's next?

(Witness excused)

MS. MURPHY:  May we call our next witness, Your Honor?

THE COURT:  You may.

MS. MURPHY:  The defense calls Chris Carlton to the stand.

THE CLERK:  (Indiscernible).

MS. MURPHY:  Oh, excuse me.

CHRISTOPHER CARLTON, DEFENDANT'S WITNESS, SWORN

THE CLERK:  Would you state your name and spell your last name?

THE WITNESS:  My first name is Christopher.  Last name is Carlton.  C-A-R-L-T-O-N.

THE COURT:  Okay.  Welcome, Officer --

THE WITNESS:  Thank you, Your Honor.

THE COURT:  -- Carlton.  Does either Counsel wish to have Mr. Carlton advised of Fifth Amendment rights?

MR. CAMPBELL:  No, Your Honor.

MS. MURPHY:  No, Your Honor.

THE COURT:  All right.  With that, welcome.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Please have a seat.

THE WITNESS:  May I take my notes?

THE COURT:  You may.

THE WITNESS:  Okay.  Thank you.

DIRECT EXAMINATION

BY MS. MURPHY:

Q    Good afternoon, Mr. Carlton.  Thank you for being here.
What's your current occupation?

A    I am a deputy regional forester with the United States
Forest Service in Ogden, Utah.

Q    Where were you working in June 2024?

A    I was the forest supervisor on the Plumas National Forest
in -- based out of Quincy, California.

Q    How long were you the forest supervisor in Plumas National
Forest?

A    For approximately six years.  From late 2019 through
December 2024.

Q    When did you -- when -- so you transferred in December,
then.

A    That's correct.

Q    Why did you transfer to Ogden?

A    I wanted to take a different opportunity and a chance to
go do something -- broaden my experience.

Q    So you testified that at Plumas National Forest, you were

a forest supervisor.  What did that position entail?

A    So as the forest supervisor, I am the primary line officer responsible for the overall administration of that forest. That includes the three ranger districts within the forest and the approximately 280 employees and then our -- all -- all of our resource programs.

Q    Would that include briefing officers on how to enact closure orders, whether that have to do with fire, law enforcement?

A    It would typically involve conveying intent and expectations, usually to senior leadership within those programs.  It would not typically involve me directly briefing individual officers or individual, you know, in the case of fire, firefighters.

Q    Okay.  Is that a yes that you would brief in a more general sense, just not individuals?

A    Yes.  That is correct.

Q    When did you first hear about the Rainbow Gathering planned to take place in Plumas National Forest in 2024?

A    Approximately June.  I think it was the 17th.  I was advised, and I don't recall specifically by whom, that the Rainbow Family Gathering was going to be going to the -- was starting to move to the Plumas National Forest.

Q    Were you advised by people within the United States Forest Service?

A    Correct, yes.

Q    Who were you advised by?

A    I -- I do not recall.

Q    Not specifics, was there a -- in -- a team that did that?

A    Yeah.  I probably received a notification from my public affairs officer or someone else in -- on the -- on the staff -- on my staff.

Q    Sir, going back just briefly to the briefing question, when you brief in a general fashion -- or when you did as forest supervisor --

A    Sure.

Q    -- of Plumas National Forest, did you expect that to trickle down to officers enforcing the order?

A    Yes.

Q    Okay.  So your testimony is that you heard about the Rainbow Gathering from inside the US Forest Service.

A    That is correct.

Q    Okay.  Were you involved with the issuance of Forest Closure Order Number 0511022405 in June 2024?

A    Would you mind reading the name of that closure order, please?

Q    Yes.  I believe it's been --

THE COURT:  Actually, Counsel, why don't we show him a copy of that?  So I'm not sure anyone could remember that many digits.

THE WITNESS:  I --

MS. MURPHY:  Absolutely.

THE CLERK:  (Indiscernible) several exhibits.

MS. MURPHY:  I believe that was admitted in (indiscernible) the Government's exhibit.

Which number was that, Government?

BY MS. MURPHY:

Q    Under Government Exhibit 3.  That would be in the binder in front of you, the white binder.

A    Yes, I am familiar with that closure.

Q    And you were involved with the issuance of the closure order.

A    I -- I was.

Q    Prior to the closure order, were campers associated with the Rainbow Family following fire safety protocol?

THE COURT:  All right.  Ask that question again, please.

BY MS. MURPHY:

Q    Prior to the closure order, was it your impression that campers associated with the Rainbow Family were file -- following fire safety protocol in your capacity as the forest supervisor of Plumas National Forest?

MR. CAMPBELL:  Objection, Your Honor.  Lack of foundation and calls for speculation.

THE COURT:  Overruled.

Do you understand the question, Mr. Carlton?

THE WITNESS:  So it would help if you could clarify what you mean by "fire safety protocol."

THE COURT:  Break that out into pieces.

MS. MURPHY:  Absolutely.

BY MS. MURPHY:

Q   I guess I -- by "fire safety protocol," I mean -- were you involved in officers checking on disperse campers in the area of the closure order that we've already talked about and checking on their fires and making sure that they were following fire safety protocol?

THE COURT:  All right.  Let's --

THE WITNESS:  Yeah, but --

THE COURT:  I'm going to stop you there.  Let's break that into pieces.

MS. MURPHY:  Yes, Your Honor.

THE COURT:  Why don't we first ask this witness is he familiar with fire safety protocol and then have him describe what that is so that we're talking about the same thing.

MS. MURPHY:  Yes, Your Honor.

THE COURT:  And then we'll ease into the application to this specific event.

MS. MURPHY:  Yes, Your Honor.  I got excited.

THE COURT:  Yeah.

BY MS. MURPHY:

Q    Mr. Carlton, are you familiar with fire safety protocol in Plumas National Forest?

A    Yes, I am.

Q    How are you familiar with the fire safety protocol?

A    So I will -- I will provide a response related to the dates in -- in the incident that you're talking about.

Q    Absolutely.

A    So on the Plumas National Forest, as on most forests, but on the Plumas National Forest, as the -- as the season, the summer goes on, we enter periods where we implement varying and increasingly stringent restrictions around what is allowable for campfires and fire use.  On June 25th, I believe -- it was the 24th or the 25th, I'm reasonably sure -- I signed Stage I Fire Restrictions.  Prior to that, there were no fire restrictions, and in California, fire is also administered through -- you have to have a state burn permit, and we do not administer that piece of it.

Q    Okay.  So your testimony is that around the 24th or 25th is when there was fire safety precautions that were implemented --

A    The --

Q    -- or Stage 1 fire safety.

A    Stage 1 Fire Restrictions, which was also an order that was -- that I -- that I signed.

Q    Were you briefed on whether campers were following this --

the fire safety protocol?

A    I probably was.  I -- I don't recall specifics.

Q    Do you recall the result of that briefing?

A    I -- I -- I do not.  So I would receive regular updates from, in this case, the incident management team who were patrolling or our -- or our fire personnel, depending on who it was or what was going on -- about a wide range of things.  If there were infractions, they would probably have been mentioned offhand, but I don't specifically recall receiving briefings on numbers or instances of violations.

Q    For the record, can you explain what that incident management team is that you just mentioned?

A    Yeah, absolutely.  So within our forest resources, we have, you know, finite staff.  Typically, an incident management team is assigned when there is a large incident beyond the capacity of the forest.  In -- in my experience in that capacity as forest supervisor, that is typically a fire.  Over my tenure there, we had multiple incident management teams for fire.  It can also other all-hazard needs such as flooding.  It's -- you know, flooding, hurricane response.  In this case, our law enforcement need.  So in this case, there was an incident management team established that has been, over the years, established to respond to the unauthorized Rainbow Family Gathering incidents across the country.  That team was under my command as of -- I -- I can't remember the date of the

delegation, but several days prior to the 24th.

Q    Okay.  So your testimony just was that -- to clarify, your testimony was just that you have more experience with fire safety incident management teams than law enforcement incident management teams?

A    Most of my experience has been working with fire -- with incident management teams related to fire.  That is correct, yes.

Q    Was this your first experience with a law enforcement incident management team?

A    It was.

Q    Did you call in additional safety crews before -- I'm sorry -- fire safety crews in according with that fire safety precaution?

A    So we would not necessarily call additional crews in based on fire safety precaution.  And -- and -- and by "precaution," I'm going to assume you mean fire restrictions.

Q    Restriction.  Yes, sir.

A    Okay.

Q    Sorry.

A    Yeah.  And -- and just to clarify, fire restrictions are basically established at a threshold of -- there's a bunch of indices, you know, that -- that our fire staff use.  So it's not a -- just an arbitrary thing.  When we reach those critical indices, we go into fire restrictions.  In this case, when we

went into fire restrictions, however, simultaneously, we brought in additional fire resources on this fire, not necessarily just because of the -- the Rainbow unauthorized incident, also because the High Sierra Music Festival was occurring in Plumas County at that time as well as just our general conditions.  We'll bring in additional resources to facilitate aggressive initial attack to wildfires.

Q    Absolutely.  Is that type of fire response typical for this time of year, then?

A    Based on the indices at that -- at that time, it was.

Q    Okay.  Before the closure was order -- before the closure order was issued, did your subordinates reissue any citations for human waste issues?

A    I do not recall.

Q    Is June always a busy time for disperse camping in Plumas National Forest?

A    It is, especially mid-to-late June heading into July.

Q    Do you close the National Forest to campers every year?

A    We do not.

Q    As a part of your process of issuing the forest closure order, did you write a memorandum about the closure order?

A    Yes.

Q    Would you be able to recognize a copy of that memo?

A    I would.

Q    At this time, please go ahead and open up the binder --

the black binder in front of you to what has been pre-marked as Defense Exhibit A.  Let me when -- know when you're there, please.

A    Okay.

Q    Do you recognize this document?

A    I do.

Q    What do you recognize it as?

A    It appears to be the letter to file that -- that I signed and wrote regarding the justification for -- an explanation for the closure order.

Q    How do you recognize it as your letter that you wrote?

A    Because I've read it several times and wrote it.

Q    Is it a true and accurate copy of that letter?

A    It appears to be, without going word-for-word through it.

        MS. MURPHY:  Absolutely.  Your Honor, the defense moves to admit this document as Defense Exhibit A.

        MR. CAMPBELL:  No objections, Your Honor.

        THE COURT:  Admitted.

    (Defendant's Exhibit A admitted into evidence)

BY MS. MURPHY:

Q    Okay, Mr. Carlton.  We're going to go through some very specific paragraphs.  So let me know if you need time to flip. In the second paragraph of this exhibit, you write about an estimated number of campers.  How did you come up with that estimate?

A    That is the number that was relayed to me by law enforcement.

Q    Law enforcement on the incident management team.

A    That's correct.

Q    Okay.  How did they come up with that estimate?

A    You would have to ask their operations.  I do not know.

Q    Okay.  Did you ever talk with Rainbow participants -- did you ever go down to the area that Rainbow Gathering was held to get a headcount of how many folks were camping down there yourself?

A    I did not personally, no.

Q    Did the incident management team go down?

A    I believe that they counted daily during patrols, but I don't know details about that.

Q    So that estimate, to clarify, is -- was you relying on the incident management number that they came up with.

A    That is correct.

Q    Okay.  Perfect.  Okay.  On Page 2, Paragraph 3 of Exhibit A, there is an estimate of the anticipated number of campers.  How did you come up with this estimate?

A    That estimate was provided by -- provided to me by the incident management team and others based on past experience.

Q    How did the incident management team come up with that estimate?

A    That I do not know.

Q    Did you ever talk with Rainbow participants about the expected number of participants?

A    I did not.

Q    Did the incident management team ever talk with Rainbow participants about the expected number of participants?

A    That I don't know.

Q    Was that number correct?

THE COURT:  I'm sorry.  Which number are we talking about?

MS. MURPHY:  The --

THE COURT:  The 10,000?

MS. MURPHY:  Yes.  Yes, Your Honor, the 10,000.  Yes, the number that we are currently talking about.

BY MS. MURPHY:

Q    Was that number correct for the number of participants?

MR. CAMPBELL:  Objection, Your Honor.  Vague.  It's an anticipated number.  It can't be verified as correct or false.

MS. MURPHY:  I can rephrase.

THE COURT:  Go ahead and rephrase.  Sustained.

BY MS. MURPHY:

Q    Did 10,000 people show up at the Rainbow Gathering?

A    10,000 people did not.  However -- am I permitted to --

THE COURT:  Yeah.  Go ahead.

THE WITNESS:  Okay.  So that was the initial

estimate, but that did not account for anything like a closure order or other actions taken.  So I was -- I was advised to expect up to 10,000 people based on previous Rainbow Family Gatherings, and that was what I -- I relied to weigh the potential resource impacts and considerations.

BY MS. MURPHY:

Q    Referring back to the first number, the number of people that were there when you issued the closure order was 400 and something.  Is that correct?

A    That's correct.

THE COURT:  When you say "first number" --

MS. MURPHY:  Yes.  The first number --

THE COURT:  -- what are you referring --

MS. MURPHY:  -- that we referenced, Your Honor.

THE COURT:  The 1,000 to 2,000 vehicles and up to 10,000 individuals in Paragraph 2 on Page 1.

MS. MURPHY:  No, Your Honor.  460.  460-plus individuals.  The first sentence of the second paragraph of the exhibit.

THE COURT:  All right.  Very good.  You see where there's also references to --

MS. MURPHY:  Yes.

THE COURT:  -- 10,000 and 1,000 and 2,000.

MS. MURPHY:  Lots of numbers.

THE COURT:  So --

MS. MURPHY:  Absolutely.  I'll be more precise.

THE COURT:  And what was your question relative to the 460-plus individuals already disperse camping within the concentrated area?

MS. MURPHY:  One moment, please, Your Honor.

THE COURT:  Sure.  Take your time.

(Counsel confer)

BY MS. MURPHY:

Q    You indicated that part of the reason that you don't think the anticipated number, the 10,000 number of people showed up was because of the closure order.  However, at the time, and per your own memo, there were only 460 confirmed individuals.  Is that correct?

A    That is correct.  That was the information that I relied on in issuing that closure.  Would you like me to connect --

MS. MURPHY:  I am okay.  Thank you.

(Counsel confer)

BY MS. MURPHY:

Q    We're moving on to another number.  In the next paragraph of Exhibit A --

THE COURT:  Are we still on Page 1?

MS. MURPHY:  -- which I will look at and get a specific number for in just one moment, please.

BY MS. MURPHY:

Q    We are on Page 2, Paragraph 4.  You state that

there -- the presence of Rainbow may result in close to $100,000 of lost revenue. How did you come up with that estimate?

A   That estimate was provided to me by my recreation specialist. That -- and to clarify, so typically when I issue a closure order, as the forest supervisor, I am not necessarily an expert in a wide range of topics. I have working knowledge of a lot of program areas. We have staff officers whose primary responsibility is those program areas. So in this case, I would consult with our -- our fire management officer, our recreation specialist, et cetera, who would advise me on -- based on their analyses what those appropriate metrics would be.

Q   Okay. So it's your testimony that you did not have complete knowledge as to the estimated revenue that would be lost.

A   That is correct. I don't know that there would complete knowledge. It was -- it was an estimate based on potential impacts to the concessionaire who operated a number of those sites as well as the direct impacts for those sites that we operate -- operated as the forest directly.

Q   Okay. In that same paragraph, you note that the closure area is a -- in a location that is extremely popular for disperse camping, especially in the summer. What is the maximum capacity of campers Plumas National Forest can

accommodate in disperse camping areas, if you know?

A    Yeah.  I don't know that.

Q    Did you ever personally speak with any of the Rainbow Family before issuing the closure order?

A    I do not believe I did.

Q    Did members of the incident management team personally speak with any of the Rainbow Family before issuing the closure order?

A    That I do not know.

Q    Okay.  Moving on.  Do you remember attending a Plumas County Board of Supervisors meeting on June 25th, 2024?

A    June 25th.  Not specifically, but I expect I probably did. There were a number of meetings during that time.

Q    Absolutely.  If I were to show you a clip of that video, would you be able to recognize -- a clip of that board meeting, would you be able to recognize the board meeting?

A    Yes, I expect so.

        MS. MURPHY:  I'll now play a portion of what has been pre-marked for you as Defense -- has been pre-marked as Defense Exhibit H, specifically H-2.

        THE CLERK:  You want to play H-2?

        MS. MURPHY:  Mm-hmm.

    (Video played at 3:57 p.m.)

BY MS. MURPHY:

Q    Do you recognize this board meeting that you were present

at?

A    Correct, I do.  That is me.  Yeah.

Q    Were you present at the beginning of this meeting on June 25th?

A    That I do not recall.

Q    Did you remain present until after the public comments that related to what you were presenting on at this board meeting?

A    I don't remember.

Q    Do you recognize your voice in this video?

A    I do.

Q    And your likeness?

A    Yes.

Q    How do you recognize your voice and your likeness in this video?

A    It appears to be me.

Q    And is this a fair and accurate of the board meeting you were present at at June -- on June 25th?

A    As far as I know.  I -- I don't know why it wouldn't be, but I don't know where it came from.

Q    Were you aware that these were Zoom-recorded board meetings?

A    Yeah.  Absolutely.

        MS. MURPHY:  Your Honor, the defense moves to admit this video as Defense Exhibit H.

MR. CAMPBELL:  Your Honor, two objections.  First, as to hearsay:  this is a two-hour-long video which contains hundreds of statements made by identified and unidentified individuals.  Second, some of the comments made at this -- in this exhibit contain discussion of criminal activity which took at prior Rainbow Gatherings, which defense has specifically moved to exclude.

THE COURT:  My understanding is that all that's being offered is the 30 seconds that we've seen.  Is that not the case?

MS. MURPHY:  (Indiscernible) --

MS. MURPHY:  Your Honor, we're --

THE COURT:  So far, that's all that subject to being admitted.

MS. MURPHY:  Your Honor, we would only move to admit individual clips.  It won't be the full two hours.  So this would be specifically the clip that is marked in H-2 for now. We can move to admit other clips as we go along.

THE COURT:  Yes.  I'm -- I am not going to admit the entire video.

Mr. Campbell, do you have an objection as to that portion that we've watched, which I characterized as 30 seconds but is probably less than that?

MR. CAMPBELL:  Not to that portion, Your Honor.  No.

THE COURT:  All right.  Then H-2, which we all just

watched, will be before the Court.  Does Counsel have a timestamp that we can apply to that?

MS. MURPHY:  It's been provided individually, Your Honor, as clips, and it's --

THE COURT:  Oh, all right.  So --

MS. MURPHY:  That is not the entirety of the clip.  That was -- we only played what was necessary for authentication, which we will play the entire clip now to discuss it.

THE COURT:  All right.  You may ask additional questions.

MS. MURPHY:  But yes, Your Honor.  To answer your question, this clip is -- begins at 12:30 -- 12 minutes and 30 seconds.

THE COURT:  All right.

MS. MURPHY:  This has been previously marked as Defense Exhibit H-2.  It is a minute and 34 seconds from minute 12:30 to 14:03.

THE COURT:  All right.  You may proceed and -- subject to further objections, Counsel.  If what has been authenticated proves to have inadmissible hearsay or other issues, I'll hear your objections.  Do you wish to play the whole thing now?  The whole of H-2, not the whole of the video.

MS. MURPHY:  Your Honor, may I have a second with cocounsel?

THE COURT:  Sure.

(Counsel confer)

MS. MURPHY:  At this time, Your Honor, we don't have to play the entirety of H-2.  We would just like that it be reflected that it was --

MS. MURPHY:  The first 30 seconds were admitted.

MS. MURPHY:  -- that the first 30 seconds were admitted.

THE COURT:  All right.

BY MS. MURPHY:

Q    At this board meeting on June 25th, 2024, did you hear any public comments from folks outside of the US Forest Service about the Rainbow Gathering?

A    I don't recall specifically, but I'm sure there were some.

MS. MURPHY:  At this time, I would like to play you a clip from Defense Exhibit H, marked for the record as H-1.  That is a part of the same board meeting.

(Video played at 4:03 p.m.)

THE COURT:  All right.  What are -- what's your proffer as to what's going to be seen here?

MS. MURPHY:  My proffer this is that this is a board meeting that the witness has testified that he was present at, and we are going to hear two public comments from this board meeting that he was in the room for that he did hear.  And I would like to ask him that he did hear them.  Those public

comments are not being offered for the truth of the matter asserted.  They are going to be offered for the effect of the listener as this was prior to the closure order that Mr. Carlton issued.

THE COURT:  All right.  You may proceed.

MS. MURPHY:  Thank you.

MR. CAMPBELL:  Your Honor, if I may, two objections.  First of all, the -- as I recall, the witness testified that he did not recall whether he was present from the beginning of the meeting.  This clip took place in the meeting before the clip we just saw of the witness introducing himself.  So I don't believe there is foundation been laid that the witness heard this statement.  Moreover, I've reviewed this clip.  It contains a description of criminal activity which took place at a prior Rainbow Gathering.  Defense counsel has moved to exclude that.  If they wish to drop their motion in limine, they're welcome to do so, but there's some door opening happening here.

THE COURT:  Thank you for that clarification.

(Counsel confer)

MS. MURPHY:  Your Honor, may I attempt to refresh the witness's recollection as to whether he heard these public comments?

THE COURT:  That's fine.  You can show it to him to refresh his recollection, and if he still doesn't remember,

then it's not coming into evidence. But on the separate issue of the defense prior motion as relating to criminal activity at other Rainbow events, are you now waiving that objection if that is in fact included in this video clip?

MS. MURPHY: No, Your Honor. The assertions occluded in -- included in this video clip are simply disparaging remarks. They include reference to who the -- what the speaker might consider to have been previous crimes, but they are not substantiated in any way. Therefore, we will not be entered any evidence of previous crimes committed by anyone at any Rainbow Gathering.

THE COURT: Okay. With that, you may proceed.

MS. MURPHY: Thank you.

(Video played at 4:05 p.m. to 4:06 p.m.)

BY MS. MURPHY:

Q    Does that refresh your recollection? Have you -- do you remember hearing that public comment?

A    I am absolutely willing to accept that I was there and I heard that. I don't recall -- I mean that doesn't --

THE COURT: If you have no --

THE WITNESS: -- you know, spark a memory, but I -- I find it plausible, yeah.

MS. MURPHY: Your Honor, at this time, the defense would move to admit that as H-1.

THE COURT: All right. I'm not satisfied that this

witness recalls this other than being there. I'm not hearing there's a specific recollection. If you want to attempt to lay some additional foundation that connects him with this comment, but otherwise, you can bring in the person who we just heard or it's established that he in fact remembers it, but just the default of it must have happened in front of me because I was there is insufficient foundation to get this admitted.

MS. MURPHY: Understood, Your Honor.

(Counsel confer)

MS. MURPHY: Your Honor, we have another brief clip that we could use to attempt to refresh recollection.

THE COURT: Certainly.

MS. MURPHY: If that does not work, we can move on. At this time, I would like to play a clip from Defense Exhibit H, marked for the record as H-6.

(Video played at 4:08 p.m. to 4:09 p.m.)

BY MS. MURPHY:

Q    Mr. Carlton, do you remember that public comment from the board meeting on June 25th, 2024?

A    I don't remember it specifically. I do want to clarify. There were a wide range of public comments over that period of those couple of days. And so I -- and it was over a year ago. So I -- I'm -- I don't recall specific comments very easily.

Q    Absolutely. You were there for this board meeting, correct?

A    I was there for a portion of that board meeting.

Q    And you listened to relevant public comments at this board meeting and others, right?

MR. CAMPBELL:  Objection, Your Honor.  Leading.

BY MS. MURPHY:

Q    Did you listen to public comments at this board meeting and others regarding the Rainbow Gathering prior to your issuance of the closure order?

A    Occasionally.  Typically, when I was at a public -- a board meeting like this, I would be there with our public information officer and potentially a couple other folks. Usually, we would show up to make sure we were there on time. Public comment would be ongoing.  However, I would often be consulting or chatting with other folks about what we were going to say.  So I did also listen to hear some of the comments, but not deliberately all of them.

MS. MURPHY:  Understood.

THE COURT:  Counsel, do you have the names of either of these individuals who spoke or any additional specificity about what we just listened to?

MS. MURPHY:  No, Your Honor.  We can move on from this line of questioning for now.

THE COURT:  All right.  H-1 and H-6 will not be admitted.  Next question.

BY MS. MURPHY:

Q    Mr. Carlton, did public comments influence your decision to issue the closure order?

A    No.

Q    Did you hear public comments at this board meeting and from other concerned individuals prior to your issuance of the closure order?

A    Absolutely, yes.

Q    Would you consider serving the public a part of your job as the forest supervisor of Plumas National Forest?

A    I would.

Q    Would you say that you are concerned with public comments?

A    I am interested in public comments.  My level of concern depends on the topic and the situation.

THE COURT:  And again, Counsel, I'd remind you this is direct exam.

MS. MURPHY:  Understood, Your Honor.

THE COURT:  Please ask narrative questions and don't lead the witness.

MS. MURPHY:  Understood, Your Honor.

BY MS. MURPHY:

Q    Was this board meeting on June 25th, 2024 held prior to the closure order that you issued going into effect?

A    I believe the date of the closure order was the 26th.  And so yes.

Q    Do you remember attending a different Plumas County Board

of Supervisors meeting on July 2nd, 2024?

A    I do.   Sorry.   Can I amend my answer to the last question?

THE COURT:  The question regarding --

MS. MURPHY:  No.

THE COURT:  -- whether it was --

THE WITNESS:  Prior to the -- the -- yeah.  And I want to clarify because in preparation for the closure, multiple resource specialists were engaged in assessing and identifying potential impacts.  And so while this was prior to me actually signing and issuing the closure order, that -- that effort was already ongoing by a bunch of other folks simultaneously.

BY MS. MURPHY:

Q    Understood.  Thank you, Mr. Carlton.  Do you remember -- I'm going to repeat my last question so that we can get back on track.  Do you remember attending a Plumas County Board of Supervisors meeting on July 2nd, 2024?

A    Probably, yes.

Q    Were you present at the beginning of this meeting or before your portion of this meeting?

A    That I do not recall.

Q    Did you remain present through your presentation at this meeting?

A    Yes.  I was present the time I was present.

Q    Would you recognize a video of this meeting if I were to

show it to you?

A    Probably.

            MS. MURPHY:  One moment, please, Your Honor.

            Thank you, Your Honor.  I'm going to now play a portion of what has been pre-marked as Defense Exhibit I for you, specifically, Defense Exhibit I-3.

            THE COURT:  Well, before we play any further exhibits, at this point, I've heard a question of whether this witness attended another Board of Supervisors meeting, but I don't know the date.  I don't know --

            MS. MURPHY:  Your Honor, I'm sorry.  Let me clarify. I thought I clarified that it was July 2nd, 2024.

            THE COURT:  All right.  And what portion of that --

            MS. MURPHY:  We're playing --

            THE COURT:  -- July 2nd -- what portion of that July 2nd Board of Supervisors meeting are you proffering right now?

            MS. MURPHY:  Right now, we're proffering for authentication I-3, which is a statement by the witness at this board meeting.

            THE COURT:  All right.  What portion of the July 2nd, 2024 meeting are you playing for authentication?

       (Video played at 4:15 p.m.)

            MS. MURPHY:  It has been pre-marked as I-3 on our exhibit list, but I can find the timestamps for you if that's

what you're asking, Your Honor.

THE COURT:  Yeah.  I'm asking where this comes in the meeting.

MS. MURPHY:  At 59 minutes and 20 seconds.

MS. MURPHY:  Yes, Your Honor.

THE COURT:  All right.  That's 59 seconds -- or minutes into a video, but I want to know where this is in the meeting.  Right now, we're just dealing with an abstract.  Can you clarify what it is that you're asking this witness to confirm?

MS. MURPHY:  If I may proffer, I am -- would like this witness to confirm that he was at the board meeting.  He has -- I want to -- him to offer -- or authenticate this video of him at the board meeting.  Further, the public comments that we intend to bring up after that in other clips have him in the video listening and responding to them.

THE COURT:  All right.  And --

MS. MURPHY:  So it --

THE COURT:  -- what exhibit is this?

MS. MURPHY:  It's pre-marked as Exhibit I-3.

MS. MURPHY:  Your Honor, that is from 59:26 to 1:13:05.  We do not have to watch the entirety.  I just am using it for authentication purposes.

THE COURT:  All right.  You may proceed.

MS. MURPHY:  Thank you.

(Video played at 4:16 p.m.)

BY MS. MURPHY:

Q    And Mr. Carlton, do you recognize yourself in that video?

A    I do.

Q    How do you recognize yourself in that video?

THE COURT:  You don't need to ask him that.  I'm sure he recognizes himself --

THE WITNESS:  Yeah.

THE COURT:  -- once he says that that's him.

MS. MURPHY:  Okay.

THE COURT:  He doesn't need to confirm years of seeing pictures of himself.  So go ahead.

BY MS. MURPHY:

Q    Is this a fair and accurate recording of the board meeting you were present at at on July 2nd?

A    It appears to be.

Q    In this board meeting, did you hear any public comments from folks outside of the US Forest Service about the Rainbow Gathering?

A    I probably did.

THE COURT:  But you have no specific recollection of that as you sit here.

THE WITNESS:  No.  That's correct, Your Honor.

BY MS. MURPHY:

Q    Were you present for some of these public comments?

A    I -- I believe I was.

Q    Would you like your recollection refreshed on that?

A    Sure.

MS. MURPHY:  Okay.

THE COURT:  You can show him the video and ask him if that refreshes his recollection as to a specific comment.  And if it does, then we'll address admissibility and whether additional questions can be answered.  And if it does not, we're going to move on.

MS. MURPHY:  Yes, Your Honor.  I'm now going to play a portion of what has been pre-marked as Defense Exhibit I-4, which is, for the record, 1:13:18 to 1:13:43 of Defense Exhibit I.

(Video played 4:19 p.m.)

BY MS. MURPHY:

Q    Mr. Carlton, do you recognize yourself in that video?

A    I do.

Q    Have -- do you remember this public comment?

A    I honestly don't recall the public comment, but I do recognize myself there.

MS. MURPHY:  Your Honor, may we go forward with authenticating this video as an exhibit?

THE COURT:  He doesn't recall it.  Do you have additional foundation to offer?  Because if you don't, then we're -- no.  There's nothing further to see in that video.

ACCESS TRANSCRIPTS, LLC                    1-855-USE-ACCESS (873-2223)

BY MS. MURPHY:

Q    Mr. Carlton, in your role as forest supervisor, do you take public comments into account?

A    That depends on the decision or what I'm doing, but I do take interest in public comments, yes.

THE COURT:  And Counsel, we've already heard testimony that public comments did not influence the issue of the closure order.  So at this late hour, circling around the issue of influence of public comment is not taking anywhere.

MS. MURPHY:  I will move on, Your Honor.

THE COURT:  Yes, please.

BY MS. MURPHY:

Q    Mr. Carlton, do you know a Mr. Joe Egan?

A    I do.

Q    How do you know Mr. Joe Egan?

A    Mr. Egan is a livestock raising permittee on Plumas National Forest, and I have met with him a couple of times.

Q    Did you meet with him in regards to the Rainbow Gathering in 2024?

A    I believe he was on a conference call that I was on, and I -- I probably had a phone conversation with either him or his brother, Richard, but I don't specifically recall which of them it was.

Q    What was that conversation about?

A    It would have been regarding their livestock raising

allotment.

Q    Where was that livestock raising allotment?

A    It's the antelope allotment, and it is located at the site of the -- the first site of the Rainbow Family Gathering.

Q    What did Mr. Egan have to say about his allotment there?

A    Mr. Egan and I -- I'm not sure which Mr. Egan it was. I -- I actually think it may have been Richard with whom I spoke, but they are both permittees on that allotment. Expressed concern about a large number of individuals in -- in the area as well as concerns regarding potential impacts to the water that their livestock were using.

Q    What were they concerned about as far as the water goes?

A    Quality and quantity.  Availability.

Q    Why were they concerned about that?

A    Because of a large number of individuals showing up in the area and setting up camp.  I -- and I believe they had been putting a water pipe or diversion in the -- in the water.

Q    When did this call take place?

A    It -- I expect there were probably a -- a couple that came in.  I don't remember when I specifically spoke with Richard individually.  There was a group call with several of us regarding impacts on that allotment that took place I believe around the 24th or -- it might have been the 20th.  Sorry.  It might have been earlier than that.  I don't -- I don't recall.

Q    Is that --

A    It -- it was --

Q    -- before the closure order?  Is that what you're trying to say?

A    That is correct, yes.

Q    Understood.  How did Mr. Egan characterize the Rainbow Family when he approached you with these complaints?

THE COURT:  That would call for hearsay, Counsel, unless you have an exemption.

BY MS. MURPHY:

Q    What was your impression of how Mr. Egan characterized the Rainbow Family when he lodged these complaints with you?

A    It did not seem favorable to me, but I don't recall the specific words used.

Q    Do you know a Jason Ingram?

A    I do.

Q    How do you know Jason Ingram?

A    Jason Ingram is a county supervisor for Lassen County. Part of the Plumas National Forest is within Lassen County and so I -- I periodically have interactions with all of our counties.

Q    Did you have any conversations with Mr. Ingram regarding the Rainbow Gathering?

A    I did.

Q    What were those like?

A    Let's see.  We spoke a -- a couple of times I believe

after the closure order was issued.  I don't -- I don't recall speaking with him directly prior to that, although he may have been on that initial meeting.

Q    Okay.  Do you know Mr. Val DeMars?

A    I know the name.

Q    How do you know the name?

A    I believe he was one of the individuals who I issued an exception to to allow to retrieve material from inside the closure order.

Q    Was he related at all to the water incident that you just spoke about?

A    I -- I believe he was, but I don't know specifically.  My understanding is he is the individual who was involved in -- in the water or the pipe or something like that somehow.

Q    Did he ever complain to you about any issues with the water line?

A    Mr. DeMars?

Q    Yes.

A    I do not recall.

Q    Did you ever -- or did you or any of your subordinates issue Mr. Egan any citations for the dismantling of Mr. DeMars' water line?

A    I did not, and I don't recall whether law enforcement did issue any citations.  And if it was a nonfederal issue, that would be the sheriff, and I wouldn't know.

Q    Where is this allotment that you're talking about, to clarify?

A    Yeah.

Q    Is it on Plumas National Forest territory?

A    Correct.  It is on the Plumas National Forest.

Q    Thank you.  Did you or any of your subordinates issue Mr. Ingram any citations for dismantling Mr. DeMars' water line?

A    Again, that's not something -- A, I'm not law enforcement. I wouldn't issue citations.  B, I was not present; and C, I don't recall specifically whether any citations were issued.

Q    Okay.  Moving on from those.  Did you instruct officers as to the enforcement of the closure order?

A    I did.

Q    How did you direct officers to enforce the closure order?

A    I signed the order and provided it to the incident management team for implementation.  I had conversations with the incident commander and deputy incident commander -- Coda Witt, and I can't recall the deputy incident commander's name -- about how we would -- how we wanted to move that forward.

Q    Was it your understanding that they would disperse the information on how you wanted to move forward to other officers?

A    Yes.

Q    How did you want to move forward?  What was the result of your deciding how to enforce the order?

A    So the closure order was -- I signed the order on the 25th.  It went into effect on the 26th when it was released publicly into the media.  At that time, the expectation that I gave was we would provide people up to 48 -- almost 48 hours until noon on Friday to vacate the area and remove their belongings.  At that point -- not even on Friday the 28th, then we would begin enforcing the closure.  And we wanted to make sure that folks had time to learn about it, make arrangements to get out of there.  It's a pretty rough and inaccessible area, and we wanted to make sure that we afforded people opportunity.

Q    On the 28th, were you aware of any extensions granted for folks to stay in the closure area?

A    I did not grant any extensions.  What I did grant was on a -- on a form, I allowed folks to come back into the closure area if they'd been caught outside when that closure went into effect or for a couple -- my understanding is there was some infrastructure that had been installed without authorization, and we wanted to make sure folks could get stuff out that they had put in there.

Q    Were any other orders given to officers regarding the Rainbow Gathering?

A    Yes.  There were multiple.  So when you -- you refer to

the Indian Headwater closure, that was not the first closure order issued for this incident. We initially issued -- I -- I issued either two or three aggressive orders to regulate parking and traffic flow to protect natural resources.

Q   After the closure order, were campers associated with the Rainbow Gathering following fire safety protocol?

A   Are you referring to campers within the closure area?

Q   Yes, sir.

A   So campers within the closure order would have been in violation of the closure. I -- I don't know whether they were firing -- following fire safety protocol or not.

Q   Would it refresh your memory to see a clip of you answering that question from the board meeting on July 2nd, 2024?

A   It would.

        MS. MURPHY:  Your Honor, at this moment, we are playing a portion of Defense Exhibit I, marked I-5.

        (Video played at 4:29 p.m. to 4:30 p.m.)

BY MS. MURPHY:

Q   Did that refresh your recollection, Mr. Carlton?

A   It -- it -- it does. So that is an accurate statement relative to site two, which is the site to which the Rainbow Family Gathering relocated. It does not -- that -- that statement does not refer to the area within the closure.

Q   Understood. How would you characterize the law

enforcement posture that the United States Forest Service took against the Rainbow Gathering?

A    I have had the opportunity over the years to work with a wide range of folks.  I found law enforcement to be extremely competent, professional, thoughtful, respectful, and absolutely dedicated to the job they were doing.

Q    At that July 2nd, 2024 board meeting, would you have said that we're taking an aggressive law enforcement posture to respond?

        MR. CAMPBELL:  Objection, Your Honor.  Leading.

        THE COURT:  Yes.  Sustained.

        Rephrase, Counsel.

BY MS. MURPHY:

Q    Is that how you would have recalled it on July 2nd, 2024?

        THE COURT:  Again, Counsel, now it's an incomplete question.  Is -- what is the "that" we're referring to?

        MS. MURPHY:  Understood, Your Honor.

BY MS. MURPHY:

Q    Have you ever described it any -- I'm sorry.  Have you ever described the law enforcement posture that the United States Forest Service took in enforcing this forest closure order any other way than competent?

A    Probably, yes.

Q    And how would that have been?

A    I think it would depend on the situation.  I've probably

characterized it multiple ways in multiple situations.

Q   On July 2nd, 2024, at that board meeting, would you have characterized it as aggressive?

A   That's likely, yes.

MS. MURPHY:  No further questions at this moment, Your Honor.

(Counsel confer)

MS. MURPHY:  I take that back.

(Counsel confer)

MS. MURPHY:  Just a couple more questions, Your Honor.

THE COURT:  Please.

BY MS. MURPHY:

Q   Ordinarily, upon report of someone using a machete in the National Forest to destroy someone's personal property, would that have been grounds for a citation?

A   I am not law enforcement.  I am not familiar with the specific grounds for citation.  That would be a question for a sworn law enforcement officer.

Q   Would that have been grounds for an investigation?

A   Again, I'm not a law enforcement officer.

Q   Ordinarily, would you --

(Counsel confer)

MS. MURPHY:  No further questions at the moment, Your Honor.

THE COURT:  All right.  Very good.

Cross-examination, Mr. Campbell?

MR. CAMPBELL:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q    Good afternoon, Mr. Carlton.

A    Good afternoon.

Q    I'll direct your attention to Defense Exhibit A, the memo you issued to -- the memo you issued.  Have you reviewed that memo?

A    I have.

Q    Does it accurately capture the reasons why you issued the forest closure at issue in this case?

A    It does.

Q    Briefly, why did you issue the forest closure order here?

A    There are three primary factors that I was concerned about.  The first is fire and public safety.  And -- so I can follow the -- the order, basically.  Natural, tribal, cultural resources; public safety; and valid existing rights or authorized uses.  I'm going to go through each of those, and I'm going to start fire because that was pretty high on everybody's minds.  The -- sorry.  Go ahead.

Q    I don't need you to go through the entire list.

A    Sure.

Q    But the memo accurately captures your rationale.

A    Absolutely, yes.

Q    It sounds like you may have received some comments from the public about the Rainbow Gathering.  Do you often -- is part of your job as supervisor hearing comments from the public?

A    Yes.

Q    Is part of your job as supervisor hearing comments from permittees and users of the forest?

A    Yes.

Q    Do those people often ask you to do something?

A    Yes.

Q    Do you do everything public commenters tell you to do?

A    No.  If I -- if I did that -- no, I do not.

Q    Did the public comments you heard about the Rainbow Gathering -- specifically regarding any derogatory comments as to the nature or practices of the people there in any way influence your decision to issue the forest closure order?

A    No, not at all.

Q    Was your intent in issuing the forest closure order to prevent members of the Rainbow Gathering from exercising their religious or political beliefs?

A    No.

Q    Did you at any point instruct officers in the Plumas Forest that that was the reason you had issued the order?

A    No.  On the contrary, there was clear acknowledgment

that -- particularly on July 4th.  That was a day that we were going to not interrupt unless absolutely necessary anything that was going on because I was informed that that was a particularly important holiday.

Q     For members of the Rainbow Gathering.

A     That's correct, yes, and we wanted to make sure we were respectful of that in our enforcement actions.

Q     So just to be clear, there were enforcements actions taken on -- that you directed to be taken on July 4th specifically to allow members of the Rainbow Gathering to exercise their religious or political beliefs.

A     That was the agreement of myself and the incident commander, correct.

Q     Were you present in the closure area on July 5th?

A     I was.

Q     Did you witness Ms. Robichaud being arrested or cited?

A     I don't specifically recall.  I saw somebody being detained from a pretty far distance away, but I don't -- I couldn't tell you who, what, anything like that.

Q     Do you recognize the defendant?

A     I -- I do not specifically, no.

Q     So you have no memory of seeing her on the 5th specifically?

A     I -- they may well have happened, but I don't recall it. Sorry.

MR. CAMPBELL:  No further questions at this time, Your Honor.

THE COURT:  Thank you.

MS. MURPHY:  A very brief redirect in just one moment, Your Honor.

(Counsel confer)

REDIRECT EXAMINATION

BY MS. MURPHY:

Q    Mr. Carlton, is it your testimony that you were able to direct enforcement actions in regards to the closure order but not when it came to the violent destruction of water lines?

A    So direction of enforcement actions was primarily from our incident commander, who was a law enforcement officer.  And he and I agreed -- or we discussed strategically how we would proceed but not necessarily operationally or what specific instructions were given to law enforcement.

MS. MURPHY:  No further redirect, Your Honor.

THE COURT:  All right.  Can Mr. Carlton be excused as a witness?

MR. CAMPBELL:  Nothing from the Government, Your Honor.

MS. MURPHY:  Yes, Your Honor.

THE COURT:  All right.  Thank you, Mr. Carlton.  Safe travels back to Ogden.

THE WITNESS:  That's correct, Your Honor.  Thank you.

MS. MURPHY:  Your Honor --

THE COURT:  But you are welcome to stay if you wish to watch the balance of the proceedings, but --

THE WITNESS:  Absolutely.

THE COURT:  -- I don't want you to feel like we're throwing you out.

THE WITNESS:  (Indiscernible).

(Witness excused)

THE COURT:  All right.  Next witness.

MS. MURPHY:  Your Honor, the defense would like to call Paul Kingston to the stand.

THE COURT:  All right.  After Mr. Kingston, how many more witnesses do we have?

MS. MURPHY:  One, Your Honor.  Just the defendant.

THE COURT:  All right.  We are approaching the end of the business day, and I've got staff that has not had a break other our brief recesses.  Do you have an estimate of how long it will take to get through Mr. Kingston and the defendant?

MS. MURPHY:  Mr. Kingston is our briefest, Your Honor.  It will be about 15 minutes tops.  Ms. Robichaud will be about half an hour.

THE COURT:  All right.  With cross, that takes us past six o'clock.  With closings, I'm going to -- before we put Mr. Kingston, we're going to take a brief recess.  I'd like to meet with staff to see, and we will reconvene at five minutes

to the hour.

MR. CAMPBELL:  Your Honor, one brief matter before we go.  My case agent has indicated that he has some matters and would like to be excused.  The Government has no objection.  I believe he was dismissed and not subject to recall.  I just wanted to make sure the defense doesn't have an objection.

THE COURT:  Any issues from the defense?

MR. KEVANE:  No objections from the defense.

THE COURT:  All right.  Officer, thank you.  My -- you got security staff will see you out.  Is -- I think it's locked up outside.

THE BAILIFF:  Yeah.

THE COURT:  All right.  If you could make sure that the officer gets safely out.

And Madam Clerk?

THE CLERK:  The court is in recess.

THE COURT:  All right.  If I could see court staff in my chambers.

(Recess taken at 4:42 p.m.)

(Proceedings resumed at 4:55 p.m.)

THE CLERK: Court is back in session.

THE COURT:  Very good, you may be seated.

All right.  Welcome.

PAUL KINGSTON, DEFENDANT'S WITNESS, SWORN

THE CLERK: Please say your name and spell your last

name for the record.

THE WITNESS:  Paul Kingston, K-I-N-G-S-T-O-N.

THE CLERK:  Okay.

THE COURT:  All right.  Admonitions for this witness?

MS. MURPHY:  No, Your Honor.

MR. CAMPBELL:  Nothing that I'm aware of, Your Honor.

THE COURT:  All right.  Very good.

All right.  Mr. Kingston, if you would come forward, please.  Have a seat.  We don't have a court reporter.  This is being electronically recorded.  So I'd ask you to speak boldly into the microphone.

Thank you.

And please don't talk over the counsel as she asks you questions.  Following her questions, Mr. Campbell may have some cross-exam for you, and we'll proceed.

MS. MURPHY:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. MURPHY:

Q    Mr. Kingston, do you know Mia Robichaud?

A    Yes.

Q    How do you know Mia Robichaud?

A    I met her at the 2023 annual Rainbow Gathering in New Hampshire.

Q    What is the Rainbow Gathering?

A    It's a tradition that started in the '70s when the -- my

understanding is, veterans and hippies kind of got together to have a prayer for peace, and it just kind of kept happening each year after that. But yeah, it's a prayer for peace and gathering of people.

Q    Have you attended gatherings in the past?

A    Yes.

Q    How --

A    2007 in Arkansas was my first gathering.

Q    How -- so you've been attending since 2007. Is that how long?

A    Yes.

Q    Why do you attend the Rainbow Gatherings?

A    For, like -- so many reasons, I could double the length of this trial, but I'll try and summarize as -- like, one of the biggest ones is that, to me, it's people trying to do things another way because we all kind of look at the world, and we're doing it the wrong way. But we just -- we can't do it another way. But the Rainbow Gathering is, people say, no, no, we really -- we can just get along because people like to just get along, and we prove it year after year. And that's kind of powerful.

Q    Where were you on July 5th, 2024?

A    I was at the annual Rainbow Gathering in the Plumas National Forest.

Q    When did you arrive in the Plumas National Forest for the

Rainbow Gathering?

A    Around June 16th or 17th, immediately after the Spring Council reached its consensus to pick that site.

Q    Were you ever approached by law enforcement about a closure order?

A    On July 4th, yes.

Q    What was your understanding of how the closure order would affect you?

A    It varied a lot throughout the course of the gathering. Early on, we thought that we were going to be physically dragged out.  When that turned out to not be the case, there were rumors that, since there wasn't a lot of us left, and we were cleaning up, that they were just going to leave alone. And so that was kind of the impression based on the fact that nobody was coming in to say anything to us until the 4th, when they came in and said that, quote/unquote, "law enforcement action" would begin.  And then it was, well, maybe we'll get arrested the next day, maybe we'll get citations, but something probably actually was going to happen.

Q    When did officers say that they would be back on the next day?

A    Yeah.  I heard -- there was two things I heard.  One was at noon, and another one was in 24 hours and --

            MR. CAMPBELL:  Objection, Your Honor.  Hearsay as to the officers' statements.

MS. MURPHY:  Your --

THE COURT:  Arguably, it's the statement of a party opponent, but I have not heard testimony that a specific officer offered that.  I heard rumors were, which would suggest that it could've been an officer or someone else conveying that.

So, Counsel, why don't you clarify that?  I'm going to sustain the objection, and see if you can narrow down the source of this information and specifically what information was being conveyed.  And we'll take up hearsay issues to the extent that you're offering it for the truth of the matter asserted, depending on who was saying this to this witness.

MS. MURPHY:  Your Honor, firstly, we were not offering it for the truth of the matter asserted.  We're offering it for effect on the listener.  However --

THE COURT:  But then, I would ask you what the relevance is because --

MS. MURPHY:  Absolutely, we can cross that bridge and --

THE COURT:  All right.  All right.  You may proceed.

MS. MURPHY:  Okay.

THE WITNESS:  So --

BY MS. MURPHY:

Q    Prior to -- it's okay.

A    It was -- the second answer was just that it was noon the

next day, and then in 24 hours, and I just wanted to be clear that the 24 hours was definitely afternoon because the 4th was when we have our prayer for peace.  And that ends at noon, and it was at least an hour or so after that when they showed up.

Q    Okay.  So who told you that you had 24 hours after they showed -- after -- who showed -- who told you you had 24 hours to clean up on the 4th of July?

A    I couldn't say specifically, somebody, but the 24 hours and noon were both different things that I heard different individuals amongst the group of officers say when they came in.

Q    So to clarify, did you hear both of those answers from separate officers, specifically?

A    I think so.  I'm pretty sure, but I'm not positive.

Q    Okay.  Did you get the impression that officers were communicating with one another to provide uniform instructions on when to be out of the closure area?

A    No.

Q    When did you first see U.S. Forest Service begin citing Rainbow Gathering participants for violating the closure order?

A    That would be on the 5th.

Q    Around what time on the 5th?

A    I would say probably a little bit after 9.  Because I photographed a lot of the citations, I can say definitively that they were generally all between 9 and 11.

Q    When were you cited for being in the closure area?

A    I don't --

Q    You were cited.

A    -- know exactly, but I would say kind of in the earlier period of after 9, like, maybe 9:30 to 9:45-ish or something. I guess, sorry, that's a little bit contradictory, 9:30 to 9:45-ish.

Q    Did you see Ms. Robichaud on July 5th?

A    Yes.

Q    When did you see her?

A    Originally, before the citations, when we were kind of making breakfast and starting to get ready to get the last camp in the woods broken down, and then after the officers arrived and started issuing citations, I saw her when she was being led out of the woods by an officer with, I think, two other officers accompanying them.

Q    Did you see that interaction with the forest officers?

A    The being led out of the woods, yes.

Q    What did you see specifically?

A    So I kind of heard the commotion and was going over, and I saw the officers marching Robi out of the woods.  There was a crowd of people telling them to stop, asking them why they're doing it.  Robi herself was asking them why they're doing it. I asked -- they had said something about her not giving her name.  One of the other individuals said, just tell them your

name, and the officer who was escorting her replied, it's too late now.

MR. CAMPBELL: Objection, Your Honor. Hearsay as to the statement by the officer.

THE COURT: Overruled.

BY MS. MURPHY:

Q    For the record, can you clarify who Robi is that you're talking about?

A    Yes. Sorry, Robi is the name that I know Mia Robichaud by.

Q    When you saw officers walking Ms. Robichaud out of the forest, did she need to be carried?

A    No.

Q    Was Ms. Robichaud walking with the officers?

A    Yes.

THE COURT: And again, Counsel, I'd remind you that this is direct exam. Please ask what this witness recalls, as opposed to suggesting answers to him.

MS. MURPHY: One moment, Your Honor.

BY MS. MURPHY:

Q    Do you recall how Ms. Robichaud was walking with officers?

A    Yes.

Q    How do you recall she was walking with officers?

A    Like, kind of shuffling as they were taking her along, you know, but consistently moving forward.

Q    Where were the officers during this that we're talking about, for the record?

A    I -- I believe one behind, kind of two in front.  I think the one behind was probably holding, like, one of her arms or something like that.  But yeah, basically, you know, a pretty stable -- like, kind of triangular formation with her in the middle.

MS. MURPHY:  Okay.  May I have one moment to confer with my co-counsel?

THE COURT:  You may.

BY MS. MURPHY:

Q    At any time, did you see the officers lift her up and carry her?

A    No.

MS. MURPHY:  No further questions at the moment, Your Honor.

THE COURT:  All right.  Cross-examination?

MR. CAMPBELL:  Yes, Your Honor.  Thank you.

                    CROSS-EXAMINATION

BY MR. CAMPBELL:

Q    Good afternoon, Mr. Kingston.

A    Good afternoon.

Q    You mentioned that the group called the Spring Council picked the site for this.  When did that occur?

A    It started on June 13th.  It was at a different location,

but it lasted about three to four days.

Q    And the Spring Council, this is a leadership group for Rainbow Gathering.

MS. MURPHY:  Objection.  Relevance.

THE COURT:  You've opened the door, Counsel.  We're going to give him some latitude here.

Go ahead, Mr. Kingston.

THE WITNESS:  No.  It's a consensus process where, you know, we -- like, there's no leader.  It's when everybody agrees, which means nobody says no, that's when we can go do the thing.

BY MR. CAMPBELL:

Q    On July 5th, you were in the closure area.  Is that correct?

A    That is correct.

Q    You received a citation for being in the closure area.

A    Yes.

Q    When the officers approached you, they asked you for your name.

A    Yes.

Q    You provided your name.

A    Yes.

Q    Were you cited for interference?

A    No.

Q    I can be more clear.  Did you receive a citation for

interfering with or resisting an officer?

A    No.

Q    Were you detained and transported to the Lassen County Sheriff's Office for identification?

A    No.

MR. CAMPBELL:  No further questions, Your Honor.

THE COURT:  Thank you, Counsel.

Redirect?

MS. MURPHY:  Just one question for redirect.

REDIRECT EXAMINATION

BY MS. MURPHY:

Q    Mr. Kingston, can we walk back very briefly for the record the times of everything?  So what time you heard on July 4th that the closure order --

MR. CAMPBELL:  Objection, Your Honor.  Outside the scope of cross.

THE COURT:  Counsel, we have heard this.  Is there a specific direction that you're going?

MS. MURPHY:  Yeah.  Your Honor, there was question as to whether it was clarified that the officers were -- came in in the morning or the evening.  Mr. Kingston mentioned nine o'clock.  I just wanted to clarify for the record that he meant 9 a.m.

THE COURT:  Ask him that.

BY MS. MURPHY:

Q    Did you mean 9 a.m. when you said nine o'clock?

A    That is correct.  Yes.

MS. MURPHY:  Great.  No further redirect, Your Honor.

THE COURT:  All right.  Anything further for this witness?

MR. CAMPBELL:  No, Your Honor.  Thank you.

THE COURT:  Can Mr. Kingston be excused at this time?

MS. MURPHY:  Yes, Your Honor.

THE COURT:  Mr. Kingston, thank you for making the journey.

THE WITNESS:  No problem.

(Witness excused)

MS. MURPHY:  May we call our final witness?

THE COURT:  You may.

MS. MURPHY:  The defense calls Mia Robichaud to the stand.

THE COURT:  Ms. Robichaud, if you'd come forward and be sworn, please.

MIA ROBICHAUD, DEFENDANT, SWORN

THE CLERK:  State your name and spell your last name for the record.

THE WITNESS:  My name is Mia Robichaud, and Robichaud is spelled R-O-B-I-C-H-A-U-D.

THE CLERK:  (Indiscernible).  Thank you.

THE WITNESS:  Thank you.

THE COURT:  And I trust neither side is looking for a Fifth Amendment admonition here.

MR. CAMPBELL:  Correct, Your Honor.

MS. MURPHY:  Correct.

THE COURT:  All right.  Having so noted, please, Ms. Robichaud, if you'd come forward and have a seat.

Begin when you're ready, Counsel.

DIRECT EXAMINATION

BY MS. MURPHY:

Q    Good evening, Ms. Robichaud.

A    Good evening.

Q    What is your occupation?

A    I'm a student.

Q    Where do you go to school?

A    I go to school at Naropa University in Boulder, Colorado.

Q    What are you studying there?

A    I'm studying yoga, music, and teaching.

Q    When do you graduate?

A    This spring.

Q    Were you in Plumas National Forest on June -- in June 2024?

A    I was.

Q    Why were you in Plumas National Forest at that time?

A    I went there to attend the Rainbow Gathering.

Q    When did you first arrive to the forest?

A    I arrived on the morning of the 22nd of June.

Q    Did you have any contact with law enforcement at that time?

A    Not when I entered the forest.

Q    Did you have any contact with law enforcement in the couple days following the 22nd?

A    I did.

Q    How did that interaction go?

A    As I was setting up my camp, there was approximately two times where officers and mostly resource people came by, and they were checking in on my propane stove setup for cooking on in the kitchen.  And I showed them my CAL FIRE campfire permit that, under the current fire regulations, was what was needed to have a propane-burning stove.  I even had it laminated. That's how stoked I was about making sure that I was not only being fire safe but following the -- the authority as best as I could.  And yeah, we had some -- some interactions, and I really liked the resource guys.  They -- they do a lot of great things out there for us.

Q    Did law enforcement find your setup to be fire safe?

A    They sure did.

        MR. CAMPBELL:  Objection, Your Honor, as to speculation.

        THE COURT:  I believe the question was directed at the witness's understanding of what was found as opposed to

projecting anything into the minds of the officers.  I'm going to overrule.

BY MS. MURPHY:

Q    After you got to the forest on the 22nd, did you leave at any point?

A    I did.

Q    When was that?

A    I left on the morning of the 26th.

Q    Why did you leave on the 26th?

A    I went to San Francisco to get my passport renewed.

Q    How did you travel back to the forest?

A    The whole time, I was in my mom's car.  I was borrowing it.

Q    Were you by yourself in your mom's car?

A    I was.

Q    Okay.  Why were you going back to the forest after getting your passport renewed?

A    Well, I was going back to -- to -- to just go back, I guess, for the -- for the gathering.  Yeah.

Q    When you arrived again on the 26th, was anything different?

A    Yes.  When I arrived at a concern point along the road, there was a blockade of a couple -- maybe, a total of three police cars, law enforcement vehicles, I guess of the Forest Service, so maybe not police vehicles, but law enforcement

vehicles of the Forest Service.  And they stopped me on my way to the woods.

Q    Did you speak with the officers then?

A    Briefly, yeah.

Q    Did they let you back in?

A    They did let me back into the woods.

Q    Were you asked to identify yourself?

A    Yeah --

          MR. CAMPBELL:  Objection, Your Honor.  Leading.

          THE COURT:  I'll permit it as foundation, but, Counsel, narrative answers -- narrative questions so that she can give narrative answers.

BY MS. MURPHY:

Q    Did the officers that let you back in ask you to identify yourself?

A    Yes.  They --

Q    And did you?

A    Yes.  And they took a photo of my ID.

Q    Had you left anything in the forest?

A    Yes.  All of my belongings other than the couple of things I took with me on a day trip, were in the woods, and, yeah, so my whole kitchen setup, I mean, I bring a free-food kitchen to the woods every summer, at least for the past few years.  And it's a big passion of mine to feed the people for free.  So I -- my whole kitchen setup, as well as my personal camping

gear, was -- was in the woods.

Q    Were you given instructions at the blockade about how long you could be in the closure area?

THE COURT:  Okay.  And there's an example of leading. "What instructions, if any, were you given?" would allow her to provide a narrative answer, but --

MS. MURPHY:  Yes, Your Honor.

THE COURT:  -- please direct exam questions for direct exam of this witness.

MS. MURPHY:  Yes, Your Honor.

BY MS. MURPHY:

Q    What instructions, if any, were you given about how long you could be in the closure area at the blockade?

A    Yeah.  They told me that I had 48 hours --

MR. CAMPBELL:  Objection, Your Honor.  Hearsay.

THE COURT:  Clarify, please, Counsel, who told her, and then we'll take up the hearsay.

BY MS. MURPHY:

Q    Who told you that you had 48 hours?

A    The woman who was speaking to me, she appeared to be a Forest Service Officer, and she was blonde.  I don't know her name, but she told me that I had 48 hours --

MR. CAMPBELL:  Renew the objection, Your Honor.

THE COURT:  Objection is overruled.  Admission of a party opponent, statement of a party opponent.  If the

Government representative is providing this information, then it's not hearsay.

MR. CAMPBELL:  Your Honor, if I may, I don't believe that an individual Forest Service Officer represents the United States of America, which is the party.

THE COURT:  However, Counsel, these are the Government representatives, and I'm overruling your objection.

You may proceed.

BY MS. MURPHY:

Q    Was that blonde woman forest officer that you talked to, was she the same officer who later arrested you?

A    No.

Q    How long have you been attending the Rainbow Gathering?

A    The first one I ever went to, I was five years old, and it was in 2006.

Q    Have you been attending ever since?

A    I have, not every year, but I've been to a bunch of them. Yeah.

Q    Why do you attend them?

A    I just love the Rainbow Gathering.  It's a super special place for community, for coming together, and it's -- it's all about an economy of giving.  It's all about giving, which is not the way that the world around me the rest of the year is, and that's a really special thing to experience.

As well as -- as an American, I think it's incredibly

important and special that -- that we get to celebrate the right to peaceably -- peaceably assembling on a public land, which is why we do it in the -- in the Forest Service -- excuse me, in the forest -- national forest every year, and -- and yeah, use that public forum for freely expressing. I think that upholds democracy. And -- and even further than that, it's a really -- it's a really beautiful place for individual spiritual practice, however -- however any person might hold that. For me, personally, it's a really sacred time to pray for peace and -- and come together both with -- with nature that I'm so deeply a part of as well as connect with all my fellow humans on this Earth. I'm really grateful for it.

Q   Thank you for that. After you got let back into the forest, when did you next have contact with law enforcement?

A   The next time that I saw law enforcement was on July 4th, in the afternoon.

Q   What happened on July 4th, in the afternoon?

A   They entered the woods, maybe -- I don't know how many officers, but a large group of officers, probably around 3 p.m., but I didn't have a clock on me. And they entered the woods, and they told us at that time that we had 24 hours to leave the woods.

Q   So what was your impression of how long you had to pack up your camp?

A   At that time, it was 24 hours, but previous to that, I was

under the impression that the few people that remained to clean the woods could continue to do so until the woods were clean because there was just a few of us left and many abandoned camps.

Q    Were you in the forest the next day on July 5th?

A    I was.

Q    What happened that day?

A    I woke up to the sounds of people shouting and saying that the Forest Service was coming into the -- or the law enforcement officers were -- were coming into the forest to give people citations or -- I don't really know exactly what, but just -- just people shouting about them being there.  So I got dressed, and I started making breakfast at my friend's kitchen, and -- or, like, it's a collectively-held space, and -- yeah.  Then -- then as they started getting closer, I pulled out my phone.  I started recording, and soon, there was a ton of officers in the woods.

Q    Around what time was that?

A    Well, I would say it was around 10 in the morning, but -- but from -- I just told you things that happened over a small period of time, so probably starting around 9:30 and -- and until where I just left off in the story.  That was probably around 10 or 10:30.

Q    When you first saw law enforcement -- one moment.  When you first saw law enforcement, what did you do?

A    When I first saw law enforcement -- well, like I said, I was filming on my phone, and I said that I was peacefully assembling on public land.

Q    Why didn't you leave with everyone else before the 5th or on the 5th in the morning?

A    Well, we were cleaning up the woods, and I was going to keep doing that until it was clean and -- and ready to -- ready to leave.  Yeah.

Q    Why were you so concerned with cleaning the woods?

A    Well, I mean, for one thing, for me, personally, I love and respect forests, and I know the Forest Service does, too. And I just -- yeah.  I -- it's really important to me to leave any space better than I found it, but particularly these natural spaces that we share and we hold so dear.

And -- and more than that, it's a -- it's quite a pillar of Rainbow itself to make sure that the forest is always left with such care, and so, people stay for, oftentimes, weeks afterwards.  Sometimes, I've heard, it's months, but as long as is needed to really make sure that all the micro trash is picked up and all -- just yeah, everything is just as -- as clean and spic and span as -- as you could possibly do it and re-naturalizing.  Yeah.

Q    So after you made that first constitutional remonstrance that you mentioned, did you try to communicate with officers again?

A    So -- yeah, yeah.  So -- okay.  So bringing us to the 5th, yes, I -- I expressed that I was peacefully assembling on the land.  I expressed that -- when they were -- mentioned the order, the closure order, I expressed that it was my understanding that the closure order was only put in place because we were gathering there on the land, and that it -- we -- we didn't enter a closed forest, that they instead, rather, closed the forest around us where we were gathered and that -- and -- and my understanding of the closure order was that it was highly illegal.  And -- and on top of that, again, I was under the impression that once the vast majority of the people had left -- and also, in their very speedy, fearful leaving, had left a lot more abandoned things, abandoned camps than are ever usually left at Rainbow.  So then it was just a few of us left to clean up the abandoned stuff of many people, and I was under the impression, via word of mouth, that -- that the few people left to remain in the woods, that we could do that, and -- until it was done.

    And so -- and to the officers at that time, I expressed that I was peacefully assembling, that I was cleaning the woods, and that I wished to continue cleaning the woods.

Q    At this time, I'm going to play a portion of what has been admitted as Joint Exhibit 1, specifically what has already been marked as F1, for the record.

    (Video played from 5:26 p.m. to 5:26 p.m.)

BY MS. MURPHY:

Q   Was that one of the constitutional remonstrances you remember making?

THE COURT:  Why don't you clarify what that term means since I -- this witness may or may not have the legal understanding --

THE WITNESS:  Yes.

THE COURT:  -- of constitutional terms?

MS. MURPHY:  Absolutely.

THE WITNESS:  Remonstrances is quite a big word.

THE COURT:  Yeah.

BY MS. MURPHY:

Q   Constitutional assertions, do you understand what assertions mean?

A   A statement of -- of -- yeah, a statement, yeah.

Q   Was that one of the constitutional assertions you remember making?

A   Yes, one of many.

Q   At this time, I'd like to play one more portion of that same exhibit that has already been marked F2.

(Video played from 5:27 p.m. to 5:27 p.m.)

BY MS. MURPHY:

Q   Is that another constitutional assertion you remember making?

A   That's another one.

Q    Before being in Plumas National Forest, had you ever had an interaction with law enforcement?

A    I had been in a couple traffic stops before, but I had never had a interaction with law enforcement beyond that.

Q    How did you feel about the officers coming into your camp?

A    I was pretty terrified.  Yeah.  I -- I highly respect the Forest Service, and -- and like I said, especially the -- the resource people that really are looking out for us out there. But every video that I've ever seen of interactions with law enforcement gave me the reason to be very terrified in that moment.  And yeah, I was -- I was in shock, I think, more than anything.

Q    How did you act while interacting with law enforcement?

A    Well, I -- to everybody, I do my very best to use kind and polite words, and -- and particularly to law enforcement, and in this moment, I maintained my composure as best as I could. I used kind words, and I kept my voice at a speaking level. And I -- I just tried to speak up for myself.  I -- I didn't call out anybody or -- or say anything mean.  I just -- I just spoke up for why I was there, to clean the woods, and that I felt that it was within my -- my right to peaceably assemble and -- and practice religion and -- and freely express myself in the public forum.  I -- I just tried to express that, but in a really calm and kind manner as best I could.

Q    Okay.  Once you had been arrested, why didn't you

immediately start walking with the officers?

A    Like I said, I was in a -- I was in quite a bit of -- of shock and fear at that moment, and it -- it took me a while to compose myself.  And yeah, but I was -- but -- but then I was ready to -- to walk with them, and -- and I did.

Q    Did you ever threaten any officer before your arrest?

A    No.

Q    Did you ever threaten any officer during your arrest?

A    No.

Q    Did you ever threaten any officer after your arrest?

A    No.

Q    Did you ever use force against any officer before your arrest?

A    No.

Q    Did you ever use force against any officer during your arrest?

A    No.

Q    Did you ever use force against any officer after your arrest?

A    No.

Q    Once you were handcuffed, did you follow directions from officers?

A    I did.

Q    About how long do you recall walking to the car with the officers -- or to the law enforcement vehicle with the

officers?

A    I would estimate about 15 minutes, but it's hard to say exactly.

Q    What was the terrain like on that walk?

A    We were walking up a mountain.  It -- there was a trail for the most -- actually, we started off of a trail, and then we walked to a trail and continued the rest of it up the mountain.

Q    What footwear were you wearing?

A    Sandals.

Q    How was the experience of being in handcuffs on that walk?

A    Being in handcuffs is super painful.  I think, maybe, in the video, you could see saying ouch and please stop.  And I was, yeah, definitely in a lot of pain, in a lot of shock, and particularly with their arms under my arms and with the handcuffs behind my back.  And they kind of, like, leaned me forward as we were walking, and yeah, it was -- it was quite a bit of a painful experience.  Yeah.

Q    Did you remain in handcuffs in law enforcement's vehicle?

A    I was in handcuffs the whole time.

Q    How long were you in the vehicle for?

A    There was probably about 20 minutes of sitting in the vehicle, and that's when I just started crying and was just -- yeah, sitting there and just -- like, yeah, still just in handcuffs.  And -- and then, yeah.  And then we started

driving.

Q    You keep motioning like this.  Were your handcuffs behind your back?

A    They were.  Yeah.

Q    When you got to the station, did you make any other constitutional assertions?

A    Yes.  In the station, I made the similar assertions multiple times.  Yeah.

MS. MURPHY:  One moment, please, Your Honor.  No further questions at this time, Your Honor.

Please answer any questions from the Government.

THE COURT:  Cross-examination?

MR. CAMPBELL:  Yes, Your Honor.  Thank you.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q    Good afternoon, Ms. Robichaud.

A    Good afternoon.

Q    I'd like to start by talking about the time that you were in the forest closure area after the closure order was issued. Now, you testified on direct that you learned about the forest closure order when you were returning to the forest on June 26th.  Is that correct?

A    I didn't know the details, but they did tell me.

Q    And you remained in the forest until July 5th.  Is that correct?

A    That is correct.  But can I explain why?

Q    You can do it on redirect, if you'd like.  While you were in the forest, the whole time you were there, you were cleaning.  Is that correct?

A    I would say that's a pretty accurate statement of facts.  Though, of course, throughout a day, one is also sleeping and eating.  So there's probably other times of my day that I wasn't cleaning, too.  Sure.

Q    But aside from the time you were sleeping and eating, you were working to clean the forest.

A    That's true.

Q    Is that correct?

A    Yeah.

Q    And you were there with 20 to 30, perhaps, other people who were doing the exact same thing.

A    It's really hard to say that -- the number in -- in the big, old woods with a bunch of spread-out camps, but yes.  That is -- that is accurate.

Q    And on the 5th, you were still not done cleaning.  Is that correct?

A    That is correct.

Q    So just to be clear, the members of the Rainbow Gathering left so much trash behind that it took 20 to 30 people approximately a week and a half of cleaning, and they were still not done.

A    To clarify, Rainbow Gathering participants are ecstatic about leaving the woods very clean, and in this particular instance, the fear caused by the closure order and the rumor spreading that went on about what the heck was going to happen and -- it drove everybody from the woods at a pace that is not usually taken.  And so it left just a few people to clean up the mess of many more, and that's not usually the way that it happens at all.

Q    Ms. Robichaud, I'm not asking about what usually happens. I'm asking what happened in this instance.  And in this instance, it took 20 to 30 people, working full-time for a week and a half, and they were still not done cleaning up the garbage and mess that had been left behind by the other members of the Rainbow Gathering.  Yes or no?

A    Garbage is not accurate, not how I would put it, but re-naturalization of the area, yes.

Q    Let's talk about July 5th.  You acknowledge that you were approached by officers on that day, correct?

A    On July 5th, yes.

Q    Those officers asked you to identify yourself, correct?

A    That's true.

Q    They told you that if you did -- and when they did so, you refused to identify yourself, correct?

A    I expressed why I was there.

Q    I understand that, but you did not identify yourself,

correct?

A    That is true.

Q    The officers explained to you that if you did not identify yourself, then they would detain you and transport you to a sheriff's office.  Is that correct?

A    That is true.

Q    You still refused to identify yourself.

A    I still told them that I was expressing my right to peaceably assemble and that I was cleaning the woods.

Q    But you did not identify yourself.

A    That is true.

Q    The officers then placed you in handcuffs.  Is that correct?

A    That is true.

Q    The officers then asked you to identify yourself again. Is that correct?

A    I believe so, but I would have to watch the video to refresh my memory.

Q    Nonetheless, you did not identify yourself at that time, correct?

A    I did not.

Q    The officers then detained you and brought you to the Lassen County Sheriff's Office.  Is that correct?

A    That's correct.

Q    Once you were there, you were fingerprinted and

identified. Is that correct?

A    That's correct.

Q    Once they identified you, they issued you a citation for remaining in the closure area. Is that correct?

A    That's correct, and I also would like to expand on my previous answer, if that's okay.

Q    You can do so on redirect.

A    Okay.

Q    After they issued you the citation for remaining in the closure area, they also issued you a citation for interfering or resisting with a forest officer. Is that correct?

A    That is correct.

Q    I'll direct your attention to the white binder in front of you, if you would, go in there and look at Exhibit 2, which has previously been admitted.

A    Yes.

Q    That is the citation you received for resisting or interfering with a forest officer. Is that correct?

A    I believe so.

Q    And after they had identified you and cited you, you were released. Is that correct?

A    That -- that is fairly accurate. Yes.

          MR. CAMPBELL: No further questions, Your Honor.

          THE COURT: All right. Redirect?

          MS. MURPHY: Yes, Your Honor.

                        REDIRECT EXAMINATION

BY MS. MURPHY:

Q    Ms. Robichaud, why did you remain in the forest until July 5th?

A    Over the course of the days after the 26th, I received several pieces of information via word of mouth that the closure order had been extended by 48 hours and then another 48 hours.  And I just continuously heard word of mouth that -- so perhaps, not truly verified, but word of mouth was the best that I had at that moment.  And I was operating on that most-recent information that it had continued to be extended and extended.  So I believed that I was within the -- the letter of what they were offering to us.  And further than that, I also believed that because so many people, the vast majority of the people had left, it seemed to me like they completely got whatever they wanted out of this closure order and that the few people that remained to clean up, another word-of-mouth thing that I had heard, that some people were allowed to stay to clean up.  And I didn't have the details on, oh, exactly who was allowed to stay to clean up.  But I was cleaning up and one of the few who was doing it, and so I under the impression that -- between the extensions and the allowance of people to clean up the woods, I was completely under the impression that I was okay to be there.

Q    Did forest officers ever ask you if you had an extension

before issuing your citation?

A    During that interaction on the 5th, I don't recall that they did.

Q    Do you remember what options forest officers provided you with how to respond to their requests for identification?

A    To the best of my memory, it was, give us your name, your date of birth, all your information, or we will detain you and identify you.

Q    Did you understand that not identifying yourself was interfering?

A    I did not know that that was interfering.  My impression was that I was just communicating to them why I felt that I was following the law, again, both because it was my First Amendment right to be there, and it felt as though this closure order -- or my -- okay.  The words that I -- that -- word-of-mouth communications that I had heard was that this closure order -- order was illegal because it was targeted.  So it was a combination of that and the cleaning up, and yeah, I just -- I was trying to explain to them why I believed it was okay for me to be there.  They didn't want to hear it.

Q    Was it your impression that not identifying yourself was one of two options, either identify or go in for a Live Scan?

A    That -- yes, that was the options as they presented.

        MS. MURPHY:  No further redirect.

        THE COURT:  Anything further for this witness?

MR. CAMPBELL:  No, Your Honor.

THE COURT:  May this witness be excused?

MS. MURPHY:  Yes, Your Honor.

THE COURT:  Thank you, Ms. Robichaud.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Any further witnesses from the defense?

MS. MURPHY:  No, Your Honor.  The defense rests its case.

THE COURT:  All right.  With that, any rebuttal witnesses, Counsel?

MR. CAMPBELL:  No, Your Honor.  The Government's ready to proceed with closing statements.

THE COURT:  All right.  Is the defense also ready to proceed with closing statements?

MS. MURPHY:  Yes, Your Honor.

THE COURT:  All right.  Mr. Campbell, when you're ready, approach the lectern, please.

MR. CAMPBELL:  Thank you, Your Honor.

THE COURT:  Ms. Talty.

You may proceed.

MR. CAMPBELL:  Thank you, Your Honor.  This is a tale of two cases.  One case, the Government's case, relates to the elements of the offense.  That is a simple case.  There are two elements, first, that on or about July 5th, 2024, the

defendant, Mia Robichaud, threatened, resisted, intimidated, or interfered with any forest officer; second, on account that such interference happened on account of or while said forest officer was engaged in the performance of the forest officer's official duties.

Officer Caudle's testimonies, supplement by the testimony of Supervisor Carlton, proves both these elements beyond a reasonable doubt; established that -- the defendant acknowledged herself that she was in the forest on July 5th; and indeed, there is no material dispute as to the nature of her interaction between -- of the interaction between herself and the officers.

Officer Caudle testified that in order to -- that his duty that day and the duty of the other officers when they approached Ms. Robichaud was to issue her a citation for remaining in the closure area, that he had received that direction from one of his superiors at briefing that morning. It was his duty to issue a citation. The officers approached Ms. Robichaud and attempted to issue a citation. In order to do so, they needed the defendant to identify herself. Officer Caudle testified that that is a necessary part of the citation process. Ms. Robichaud refused to identify herself.

Because of that, the officers were unable to issue her a citation and were, thus, unable to carry out their duties. They explained multiple times why Ms. Robichaud's

actions were preventing them from carrying out their duties and that they also explained the procedure that they would follow if she refused to -- if she continued to refuse to identify herself.  In spite of that, Ms. Robichaud continued to refuse to identify herself, and indeed, the officers followed the procedure that they said they would follow.  They took her to the sheriff's office.  They fingerprinted her to determine her identity, and then once they had done so, they issued her two citations, one, the citation for being in a closure area, which everyone there received that day, and second, a citation for interference, which she received only because she refused to identify herself, and thus, prevented the officers from carrying out their duty that day.  This satisfies the two elements of the offense and concludes the Government's case.

But as I said, this is a tale of two cases.  The second case is the one put on by the defense, which attempts to suggest that the forest order was so facially invalid that the officers could not have been acting in good faith when they relied upon it.  Defense counsel asked many questions regarding that case and regarding that line of questioning, and there is no substantive evidence on the record which supports that theory.

Simply put, the -- as Officer -- as Supervisor Carlton testified, the closure order was put in place for specified reasons laid out in the closure memo, which had

nothing to do with the belief or practices of the Rainbow Gathering and everything to do with protecting the natural, economic, and tribal archeological resources of the forest. That is a valid reason for instituting a closure order, and as both Mr. Carlton and Mr. Caudle testified, there was nothing that occurred there which would've given either of them any reason to believe that the order was not valid or that, in enforcing it, they were doing anything other than enforcing the law and carrying out their duties as members of the Forest Service.

This is a valid citation.  It was issued based on good facts, and at this trial, the Government has proven it beyond a reasonable doubt.  For that reason, the Government asks you to find the defendant guilty.  Thank you.

THE COURT:  Thank you.

Who will be giving closing for defense?

MR. KEVANE:  I will be, Your Honor.

THE COURT:  You may proceed.

MR. KEVANE:  Thank you.

Your Honor, the defense agrees with the Government that this is a simple case.  The evidence presented today showed that Ms. Robichaud's conduct and refusal to give her name just did not rise to interference with a Forest Service Officer performing their official duty.

And Ms. Robichaud is not guilty of the present charge

for three reasons.  First, this closure order was facially invalid.  It was not content-neutral and targeted the Rainbow Gathering specifically.  Ms. Robichaud raised an affirmative First Amendment defense, and we have met the burden of showing her First Amendment rights were being violated.  Second, officers were aware of the facially invalidity of the order and were not enforcing it in good faith.  And lastly, Your Honor, even if the order was facially neutral and officers enforced it in good faith, District of Columbia v. Little finds that constitutional remonstrances, when combined with peaceable conduct, just do not rise to interference.

But first, the order was not content-neutral.  The Court heard a lot today from local leaders, like Joe Egan.  His testimony showed the attitudes that many locals had towards the Rainbow Gathering, that they had preconceived notions about who these people were, hippies, drug addicts, and other names that I will not repeat before the Court.

So they took it upon themselves to try and shut this gathering down.  They shared their concerns over Facebook, at town hall meetings, and tried to -- tried to shut down the Rainbow Gathering by destroying their water access.  And these effects had an effect -- these efforts had an effect on Forest Service.

Jason Ingram, Joe Egan, and numerous members of the community were pressuring Forest Service into issuing this

closure order, and they have the power to pressure Mr. Carlton into issuing the closure order.  Jason Ingram is an elected leader in Lassen County.  Joe Egan has a lease -- or has grazing rights with Forest Service.  Forest Service was receiving money from him.  These were individuals with the power to pressure Forest Service, and they used that power to pressure Forest Supervisor Chris Carlton.  And Chris Carlton listened to those concerns.  Forest Service tacitly approved attempts to try and shut down the gathering when they failed to respond to that incident, destroying the water lines on July 20th.

And after this incident on July 20th, when extensive amounts of pipeline belonging to Mr. DeMars were destroyed, what did Forest Service do?  Nothing.  They never opened an investigation.  They never cited a group for vandalism or assault.  Why not?

Testimony showed that Mr. Carlton had a law enforcement incident team at his disposal and that he used that incident team and their law enforcement capabilities to enforce the closure order, yet he never used that law enforcement team to investigate this incident.

Testimony from Mr. DeMars showed that Chris Carlton was aware of this incident, that he spoke to Mr. DeMars about the event.  Nothing was done about this incident because Forest Service was, at best, happy to be complacent as locals took

matters into their own hands, and, at worst, complicit in these attempts to shut down the Rainbow Gathering.

Either way, the order was not content-neutral. It specifically targeted the area where the Rainbow family had set up their camp and was not in response to any specific conduct by people camping with the Rainbow Gathering.

The content-based nature renders this order patently invalid, and Ms. Robichaud was -- was in the -- correct not to succumb to this order and claim her First Amendment rights.

Second, Your Honor, officers were aware of the content-based nature of the order. The public outcry was so prevalent that it should be presumed that it impacted the decision of Forest Service to issue this closure order. And the lack of content neutrality is inextricably tied to the order's enforcement. The dance cannot be separated from the dancer.

The First Amendment deficiencies in the order were clear. They were clear enough that Ms. Robichaud identified them as she was being approached and handcuffed by officer -- officers, and they would have been clear to the officers enforcing the order.

As Officer Caudle's testimony showed, the enforcement was not uniform. Officers were not in communication with each other in how to enforce this order, and most importantly, Officer Caudle testified that he was here to -- for the Rainbow

closure, specifically targeting the closure order for Rainbows.

And so, when officers showed up on July 5th to issue citations, they were not interested in a dialogue with the few campers who remained only to clean up the remaining campsites. They were not interested that other officers gave a 24-hour extension and that Ms. Robichaud had been granted permission to remain in the forest to clean up.

They were interested in a show of force. They were interested in clearing out these hippies from the forest. They were not enforcing the order in good faith. But lastly, Your Honor, Ms. Robichaud's conduct simply does not rise to interference.

Ms. Robichaud's First Amendment remonstrances and refusal to give her identification, which are the actions characterized as interference, were constitutionally protected. There's no daylight here between the facts presented in Little and the facts presented here. Like Little, Ms. Robichaud made numerous constitutional remonstrances.

Like Little, Ms. Robichaud acted peaceably towards officers. She was polite to officers when she asserted her rights. She did not swear, make threats, or otherwise act violently. Ms. Robichaud did not know her refusal to give her ID was interference. She thought she was being given a choice to identify herself or to be taken to the sheriff's office for a Live Scan, and she chose to be taken to the sheriff's office.

She allowed officers to place handcuffs on her despite them being painful and uncomfortable.  She walked with officers as they held her by both arms as she was being walked -- as she walked up this steep incline in sandals while in pain from the handcuffs.  Her directions did not interfere with an officer's official duty to enforce the closure order.

And so, Your Honor, the Government has failed to meet their burden to show that Ms. Robichaud interfered with Forest Service Officers and their official duty.

The defense however, has met the burden to show the order was facially invalid.  We have met the burden to show that officers were not enforcing this order in good faith, and we have met the burden to show that Ms. Robichaud was making constitutional remonstrances and acting peacefully.  And for those reasons, Ms. Robichaud should be found not guilty.  Thank you.

THE COURT:  All right.  Rebuttal?

MR. CAMPBELL:  Briefly, Your Honor, thank you.  I know that the day is getting long, so I will be brief.  The specific allegations that the defendant's -- the defense counsel raises in their closing statement about the officers being informed -- I'll be more brief.

The defense has not introduced evidence to support their contention that the officers were not acting in good faith.  Moreover, the argument that the defense advanced

regarding Little is foreclosed by the fact that Little and Wilfong are disanalogous.

The Government has submitted briefing on this previously and introduced arguments at the last hearing, so I will not belabor the point. I will also -- I will however, point out that in both Buehler and Zizlevich (phonetic), the Ninth Court -- in the Ninth Circuit and the Ninth Circuit itself respectively, have held that the refusal to identify is a criminal act in these circumstances and that it is punishable, regardless of whether there is a First Amendment argument raised.

So in short, the defendant's -- the arguments the defense counsel presents in their closing statement, the ones which are factual are unsupported by the facts, and the ones which are legal are unsupported by the law. The Government asks you to find the defendant guilty.

THE COURT: All right. The Court has considered the extensive testimony and arguments that have been presented today. The charge before the Court of interference does, indeed, consist of two elements, whether the forest officers were performing an official duty and whether there was interference with that duty.

And the Court finds that, here, the forest officers were, in fact, performing an official duty, acting in response to the closure order, which was issued. And we heard the

testimony from the supervising officer that this was not issued in response to public protest or pressure, but was issued based on legitimate concerns, including the enumerated grounds and fire safety issues.

The Court does not find that this was issued to punish or in any way retaliate against the Rainbow Gathering or the defendant in this case.  The Court finds that the officers were acting in good faith in enforcing the closure order and repeatedly advised the defendant of the enforcement process that was being undertaken.

Defendant testified that various word-of-mouth indications may have prompted her to believe that the order was being extended or that the need to leave the forest had somehow been changed.  But there was no ambiguity in the instructions provided by the officers at the time that the officers approached and asked the defendant to identify herself, and explained in detail the consequences of failing to identify herself.

And it is that failure that, here, gives rise to the resistance that is the other element of this charge, the interference with duty.

The Court notes that, during the process by which the officers explained those consequences and repeatedly requested identification, that the defendant did, indeed, remain calm and did, indeed, politely assert a constitutional right as the

defendant understood it, that she was desiring to peaceably assemble.

But her refusal to obey an order that was being appropriately enforced in good faith by these officers, nonetheless, created a violation in the form of the resistance, and the Court does not find that refusal to give her name was a constitutional right in these circumstances where the officers were proceeding with a good faith enforcement.

The Court does not find that there is a link between this refusal to identify herself, particularly given the explanations that the officers provided, and any Fourth Amendment protections here.  And as such, the defense theory fails, and the Court finds the defendant guilty of the violation as charged.

The violation notice included a fine of $250 plus a $30 processing fee for a total of $280 in fines associated with this, and while the statute affords the ability to impose a considerably greater fine, I am going to impose only the fine as indicated here, a total of $280, which includes the $30 processing fee.  That is --

MS. MURPHY:  Your Honor, may the defense be heard as to sentencing?  I believe that Ms. Robichaud has a right to allocate, and the defense does have an argument as to why no fine should be imposed.

THE COURT:  I'll allow you to be heard, Counsel.

MS. MURPHY:  Allocute, I apologize.  Your Honor, as the Court indicated, although Ms. Robichaud has been found guilty of the offense, she was calm, remained calm during the interaction.  She was asserting a First Amendment claim of rights that she believed in her own good faith to apply in her situation.

She had reason to believe that she was permitted to be in the forest at the time she was contacted by law enforcement.  She is of very limited means.  She has been found indigent by this Court, which is why our office was appointed to represent her.  She has now traveled from Colorado to Sacramento on two occasions, first for her initial and now for trial, at her own expense, which was considerable.

She has also spent one day in custody, and as was borne out of the course of trial, was placed in handcuffs behind her back for the entire walk to the vehicle, while she sat in the vehicle, and for a 45-minute drive to the ranger station, which was very punitive in nature.

The officer -- Officer Caudle, testified he had the discretion to release her from those handcuffs, that she had not given him any reason to believe she was violent or dangerous.  She hadn't been threatening or disrespectful.

And so, that was, in fact, punishment and a significant punishment, and was very significant for Ms. Robichaud.  I think that, in light of the fact that she

spent that time in custody, that she suffered those particular and painful experience, the fact that she has expended her own resources to come to Court, not to -- you know, to address this citation and to participate in these proceedings, the Court should take those things into account.

I think the -- no fine would be appropriate here, and I think, perhaps, the Court could impose a term of community service consistent with a $100 fine, which, at least, typically, in cases like this, perhaps not in this Court, but in my experience, would be ten hours of community service.

If the Court wishes to impose something equivalent to a $250 fine, we would ask the Court consider 25 hours of community service, but not to impose a monetary fine given Ms. Robichaud's indigence.

And we would also ask the Court to take into account those measures that have already been taken, and if Ms. Robichaud wishes to allocute, we would just ask the Court to briefly allow her that opportunity.

THE COURT:  All right.  From the Government?

MR. CAMPBELL:  Yes, Your Honor, briefly.  The $250 amount contained in the violation notice assumes that the defendant, by paying a violation notice, assumes responsibility for her actions.  That is not the case.

So while the Government does not object to the imposition of a $250 fine, the Government also believes that a

higher fine would be reasonable and that a lower fine is not.

In addition, in response to the comments about the defendant's indigence, defendant testified that she was attending a private university in Boulder, Colorado, and was renewing her passport at the time -- shortly before this was issued.  That is not behavior consistent with someone who has the inability to pay a $250 fine.  Thank you.

THE COURT:  The Court is certainly aware of the burdens of travel to attend the several proceedings associated with this, and those burdens were borne by both defense and Government in bringing this matter.

But the Court does find compelling the contention that this has involved a considerable burden, and for that reason, did not increase the amount as would have been otherwise considered and elected to stay with the fine as set forth in the citation.

On the representation that this is a financial burden that gave rise to the appointment of the public defender in the first instance, I am prepared to consider a reduction and a community service alternative.  The Court strongly believes in the benefit of community service throughout situations like this.

Does the defense have a proffer with regard to where such service would be performed?

MS. MURPHY:  Your Honor, Ms. Robichaud would perform

community service in Boulder, Colorado.  She would need to speak with a non-profit there and get their approval to perform the hours, and we would ask that we could submit that the Government for the Government's approval, that it's an appropriate non-profit organization, and then provide the Government with proof that those hours have been performed.

So we would ask that the Court order a term of supervision, Court probation, and a time period by which the community service hours should be performed.  And we will coordinate with the Government to ensure that she is performing those hours at an organization they don't object to and that they can verify that the hours have been completed.

THE COURT:  All right.  I will so direct.  I am going to order 20 hours of community service, and to the extent that that can be performed at an animal shelter or similar non-profit organization, I'm going to direct that defense provide that information to the -- to Mr. Campbell.

And I direct further that that confirmation of that completion, within 120 days, be provided to the Court and to the prosecution.

MS. MURPHY:  Yes, Your Honor.

THE COURT:  Anything further?

MR. CAMPBELL:  Not from the Government, Your Honor, thank you.

THE COURT:  All right.  Anything further from the

defense?

MR. KEVANE:  Nothing further, Your Honor.

THE COURT:  All right.  That will be the order of the Court.  Thank you.

Madam Clerk?

THE CLERK:  Court is adjourned.

(Proceedings concluded at 6:10 p.m.)

* * * * *

C E R T I F I C A T I O N

I, Heidi Jolliff, court-approved transcriber, hereby certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

_____

HEIDI JOLLIFF, AAERT NO. 2850    DATE: September 22, 2025

ACCESS TRANSCRIPTS, LLC

ACCESS TRANSCRIPTS, LLC          1-855-USE-ACCESS (873-2223)